## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: TAXOTERE (DOCETAXEL) EYE INJURY PRODUCTS LIABILITY LITIGATION | MDL NO. 3023 |
| | SECTION "H" (5) |
| This Document Relates to: | HON. JANE T. MILAZZO |
| Juanita Anderson, Case No. 2:22-cv-04751 | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS SANOFI US SERVICES, INC. AND SANOFI-AVENTIS U.S. LLC'S <u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendants Sanofi US Services, Inc. and Sanofi-Aventis U.S. LLC ("Sanofi") have designated Dr. Bita Esmaeli as an expert witness. She states in her expert report: "it is my opinion that stenosis/obstruction is not likely to occur with the standard docetaxel-containing regimens given every three weeks in the adjuvant setting." SOF ¶ 1. Indeed, she states that excessive tearing can be caused by a myriad of issues, including menopause, hay fever, allergies, sinus infections, tear film deficiency, corneal irritation, conjunctivitis, trichiasis, and eyelid malposition, among others. SOF ¶ 1. Despite the numerous potential causes and the supposed unlikelihood of this particular cause, Sanofi nevertheless asks this Court to find, as a matter of law, that Plaintiff Juanita Anderson's claims are barred by prescription because she acted unreasonably in failing to discover that the tearing she experienced after chemotherapy was in fact a symptom of this "unlikely" injury. At worst, this is a fact question and not an issue that can be decided as a matter of law.

The evidence in this case firmly supports Ms. Anderson's claims that Taxotere caused her punctal stenosis and years of suffering before she was able to discover Taxotere caused permanent damage to her nasolacrimal drainage system. Sanofi contends Ms. Anderson failed to establish the requisite showing under the learned intermediary doctrine, but Sanofi's argument misrepresents Ms. Anderson's injury as "epiphora" – which is not the injury alleged, but rather a symptom of the

underlying damage to her nasolacrimal drainage system. Sanofi claims on the one hand that Ms. Anderson should have known she had an injury caused by Taxotere while on the other hand saying that Taxotere likely did not cause her injury. Likewise, Sanofi argues that Ms. Anderson cannot establish causation under the learned intermediary doctrine. Yet, again, Sanofi argues that Ms. Anderson's oncologist appreciated the risk of her Taxotere regimen while at the same time disputing that the risk is even likely.

Sanofi cannot demonstrate that there are no issues of material fact, and Ms. Anderson's claims warrant submission to the trier of fact.

## I.    Legal Standard

Summary judgment requires Defendants to show "that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The movant bears the burden to show that summary judgment is appropriate. *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 397 (5th Cir. 2010). Only when the movant has carried its burden under FRCP 56(a) must the nonmovant then demonstrate a genuine material fact dispute. *Tolan v. Cotton*, 572 U.S.650, 656-67 (2014). The court must view all the facts and draw all reasonable inferences in the light most favorable to the nonmovant. *Id.* at 660; *Penton v. Crown Zellerbach Corp.,* 699 F.2d 737, 741 (5th Cir. 1983). A genuine dispute exists when a reasonable jury could resolve the disputed fact in favor of the nonmovant. *T-Mobile S., LLC v. City of Roswell,* 574 U.S. 293 (2015).

## II.    Sanofi Cannot Show Ms. Anderson's Claims are Prescribed as a Matter of Law

This Court is well versed in the applicable legal principles regarding prescription:

> Under Louisiana Civil Code article 3492, the prescriptive period for products liability claims is one year. Generally, the period begins to run from the day the injury or damage is sustained. If the face of the petition shows that the prescriptive period has already elapsed, the plaintiff has the burden of establishing that suspension, interruption or renunciation of prescription has occurred.

*In re Taxotere Docetaxel Prods. Liab. Litig.,* 2020 WL 1815854 (E.D. La Apr. 7) (citations omitted). Here, Ms. Anderson's claims are timely because she filed her lawsuit on December 2, 2022, which was within one year after being diagnosed with "epiphora due to insufficient drainage" on December 6, 2021 and punctal stenosis on January 6, 2022. SOF ¶¶ 9-10.

A.      **Sanofi Failed to Show That Plaintiff's Complaint is Facially Prescribed**

Ms. Anderson filed her Short Form Complaint on December 2, 2022 adopting the allegations set forth in the Master Complaint. Rec. Doc. 25. Her Short Form Complaint alleges: "Plaintiff suffers from chronic and debilitating epiphora due to permanent damage to her lacrimal drainage system." SOF ¶11. As alleged, the injury is permanent damage to her lacrimal drainage system and the symptom is chronic and debilitating epiphora.

Sanofi seeks to start the prescription clock based on knowledge of her symptom rather than on knowledge of her injury. Specifically, Sanofi argues that Ms. Anderson sustained her **injury** "in September 2013 when Ms. Anderson alleges she experienced her injury of epiphora." Rec. Doc. 546-1, p.2.

Ms. Anderson's allegations adopt those in the Master Long Form Complaint that allege "serious – but preventable – damage to patients' lacrimal systems, resulting in physical scarring and disfigurement" (Rec. Doc. 26, p.2); "life altering damage to the lacrimal system, including punctal, canalicular, and/or nasolacrimal duct stenosis" (*Id.* at p.3); and "life altering injuries to their lacrimal systems, including…canalicular stenosis" (*Id.* at p.4).

Plaintiff's expert, Dr. Vikram Durairaj, an oculoplastic surgeon who has treated dozens of patients with damage to their nasolacrimal drainage systems due to Taxotere, testified that he often sees patients with severe stenosis:

> A:    But understand, there are some times patients will walk in the door, and they've completed their – their treatment in 2010 or 2011, and they've been

> walking around for 10 or 12 years with profound tearing. They just didn't
> know you could really do anything about it.

SOF ¶ 13. Dr. Durairaj further testified that some cancer patients may have symptomatic tearing as a result of transient stenosis, which gets better and goes away, but that stenosis can become permanent, depending on the patient and the length of therapy. SOF ¶ 14. Irreversible stenosis is a condition that develops over time, not on a discrete date. As a result, the date on which Ms. Anderson's cause of action accrued cannot be ascertained from the face of her Complaint, which merely states that her chemotherapy ended on December 27, 2013. SOF ¶ 15.

Sanofi's argument that her prescription began to run when she began chemotherapy does not comport with the science behind this progressive injury. *See* Rec. Doc. 546-1. The proposition that her prescription expired on October 1, 2014 is completely arbitrary and Sanofi cites no medical basis for its self-serving determination that Ms. Anderson had a permanent injury to her nasolacrimal drainage system at the first sign of tearing. Sanofi cannot identify when Ms. Anderson's injury "manifested itself with sufficient certainty to support accrual of a cause of action." *See Cole v. Celotex Corp.*, 620 So.2d 1154 (La. 1993) ( reversing trial court's ruling on prescription as "manifest error,", and holding plaintiff's claim had not prescribed because his delay in filing until he had a diagnosis of asbestosis was reasonable, despite being told years earlier something in his lungs had shown up on an x-ray).

### B. *Contra Non Valentem* Tolled Prescription of Ms. Anderson's Claims

Because Sanofi cannot prove that Ms. Anderson's claims are facially prescribed, the burden does not shift to Ms. Anderson to show prescription was interrupted. However, even if the Court believes that the face of Ms. Anderson's complaint shows that the prescriptive period lapsed before she filed suit, she can establish that suspension, interruption or renunciation of prescription has occurred. *See In re Taxotere Docetaxel Prods. Liab. Litig. (Kahn),* 2020 WL 1815854 (E.D. La

Apr. 7). And whether *contra non valentem* applies is a question best left to the jury. *See Bruno v. Biomet*, 74 F.4th 620 623-24 (5th Cir. La. 2023).

This Court has explained:

> The doctrine of *contra non valentem* provides some grace for those plaintiffs who are unaware that their injury was caused by a tort. The doctrine states that prescription begins to run when a plaintiff has actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. This occurs when the plaintiff has actual or constructive knowledge of a causal relationship between the object or product and the injury. There is no requirement that a patient be informed by an attorney or physician of a possible [claim] before prescription begins to run. Rather, prescription begins to run when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim. Accordingly, to toll prescription, a plaintiff who suspects that something is wrong must act reasonably to discover the cause of the problem; otherwise, *contra non valentem* will not apply. The ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct.

*In re Taxotere Docetaxel Prods. Liab. Litig.,* (Kahn), 2020 U.S. Dist. LEXIS 64648, 2020 WL 1815854 *7 (E.D. La Apr. 7) (citations omitted). "In the face of a plaintiff who is unaware that the damage suffered is the fault of the defendant, *contra non valentem* suspends 'the running of prescription until such time as the plaintiff knew or reasonably should have known that his or her damages were the fault of the defendant's negligent act.'" *Crochet v. Bristol-Myers Squibb Co.,* 804 Fed. Appx. 249, 2020 U.S. App. LEXIS 8235, *7 (5th Cir. La. Mar. 13) (citing *Carter v. Haygood,* 04-0646 (La. 01/19/05), 892 So. 2d 1261, 1268.)

*Contra non valentem* is particularly appropriate for medical causation cases. *See, e.g.*, *Sharkey v. Sterling Drug, Inc.,* 600 So.2d 701, 713 (La. App. 1 Cir.), writs denied, 605 So. 2d 1099, 1100 (La.1992) (no error finding suit timely filed within one year of actual knowledge of any link between aspirin and Reye's syndrome because "even if a plaintiff is aware that an undesirable condition developed at some point in time after medical treatment, prescription does not run until

the plaintiff has actual or constructive notice of the causal connection between the medical treatment and the subsequent condition").

The Court has noted that there is no "requirement" that a patient be informed by an attorney or physician of a possible [claim] before prescription begins to run. *In re Taxotere (Kahn)*, 2020 WL 1815854 at *7. This does not mean, however, that diagnosis will never trigger the running of prescription, and Louisiana jurisprudence demonstrates that in certain circumstances, it **is** the actual diagnosis of an injury that starts the clock running. Indeed, a sister court has noted, "[t]he Court is mindful that medical problems are unique in that it is often difficult to trace them to a single cause and that patients must often receive treatment without knowing how or why the problem developed." *Averette v. Bayer Healthcare Pharms., Inc.*, No. 13-05968, 2014 U.S. Dist. LEXIS 39347 * 9 (E.D. La. Mar. 25). Diagnosis of the injury is essential in a case such as this, where although tearing was apparent, Ms. Anderson did not know that her nasolacrimal drainage system had sustained permanent damage and that the tearing would not go away on its own as opposed to her tearing being caused by a myriad of other reasons like hay fever or allergies, especially in light of her immunocompromised state. *See* SOF ¶¶ 1, 25.

Louisiana's Fourth Circuit found that the doctrine of *contra non valentem* suspended prescription of a plaintiff's medical malpractice claim, holding that until she received the results of conclusive testing, she did not reasonably know she had a claim. *Carter v. Grant*, 97-2106 (La. App. 4 Cir. 10/25/00), 772 So. 2d 835 (noting that the plaintiff "did not have any reason to doubt her treating physician's diagnosis based on the fact that her doctors had the expertise to decipher medical testing results."); *Bruno* 74 F.4th 620 n.38 ("We reject the implicit assertion that, as a matter of law, an individual is not allowed to rely on the advice and counsel of a treating physician on complex matters of medicine."); *Harrison v. United States*, 708 F.2d 1023, 1028 (5th Cir. 1983)

(stating it is unreasonable to hold [a plaintiff] to a "higher degree of medical competence and understanding" than her doctors); *Perrin v. Rodriguez*, La. App. 153 So. 555 (4th Cir. 1934) (holding prescription tolled while plaintiff did not know he had an actionable injury where the patient relied on the dentist's professional advice, despite complaining of pain for 14 months after a negligent dental procedure); *R.J. Reynolds Tobacco Co. v. Hudson*, 314 F.2d 776 (5th Cir. 1963) (affirming denial of defendant's motion for summary judgment, finding that the cause of action had not accrued until plaintiff knew or should have known of the causal link between his cancer and tobacco products, which was a question for the jury).

Here, Ms. Anderson repeatedly testified that she reported her watery eyes to her oncologist, "I didn't specifically say tearing. I just told her that my eyes run because I didn't know there was a legal name for it. I just said it was my eyes were running." SOF ¶ 16.

> Q:     And you accepted these serious side effects associated with Taxotere, correct?
> A:     Yes, because when I spoke with Andrea and you, you know, we talked about it, the skin rash, I had problems with, like I said, the lesions and stuff that came in my head, and she immediately sent me to the ER to have it removed. We talked about—we talked about taking—taking the medication, and I told her brought my hair out, and it—and it still, it comes back, but it leaves again. Then it goes away, and it comes back again, so that's whatever I said continual, and talking to her about the—the tearing and stuff, I didn't specifically say tearing. I just told her that my eyes run because I didn't know there was a legal name for it. I just said it was my eyes were running just talking to Andrea, but whenever I talked to her, she would go and tell Dr. Burton what I said, and that's why they went on and did the lesions, took care of the lesions.

*Id.* In response to her complaint, Plaintiff testified that she was told it was just a side effect that would be all right:

> Q:     And you remember telling Andrea that you were having this side effect?
> A:     Yes, I remember telling Andrea because I—like with my—like I said, whenever I was having a problem, I would tell Andrea.
> Q:     When did you tell Andrea that you were having runny eyes?
> A:     It was during one of my visits.

Q:     How many infusions—
A:     It's not like I—it's not like I called her. It's like one of my visits.
       ***
Q:     So Andrea told you that the—the runny eyes was one of the side effects
       from your chemotherapy?
A:     When I told her about it, she said, oh, that's just one of the side effects. It's going
       to be all right.

SOF ¶ 17.

Ms. Anderson's testimony is clear that she advised her oncologists that her eyes were

"running:"

Q:     So, under the active problem list, there is no report of the runny eyes or
       tearing after your second infusion of chemotherapy on October 31, 2013,
       correct?
A:     Correct, but at this time here now, this is when I was dealing with Andrea
       and I told Andrea about it. I mean, sometimes she would be like, oh, that's
       just one of the side effects that's going to go away, so that's probably why
       I thought it was going to go away, because that's what she said.
Q:     Do you think that Andrea did not--
A:     She probably didn't put it in.
Q:     So that's my question. Do you think that Andrea did not report that side
       effect that you were having in your medical records?
A:     Evidently, she didn't…but I did tell her because we discussed it.
Q:     But you don't remember when you discussed it?
A:     It was while I was going through this. While I was going through the—I had
       the lesions and—and all of that different stuff, and at one point, we did talk
       about me with my runny eyes and she said, oh, its going to clear up. That's
       just another side effect.

SOF ¶ 18.

Q:     …You mentioned…that you reported you were having the runny eyes or
       tearing to Andrea around October or November of 2013? Do I have that
       correct?
A:     It was in that time frame, it was during that time frame, exactly when it was,
       I don't know, but I do know that we talked about it, and she told me it was
       –it was a side effect and it would be all right.
Q:     Okay. Do you remember after that point, complaining about it to either her
       or any of your cancer care team again?
A:     I probably mentioned it to her again, but I mean, when somebody tell you
       all this, that's going to be all right, you don't really just keep bringing it up
       like beating a dead horse, you know?

SOF ¶ 19.

Plaintiff reiterated that she took her medical providers' word that it was "going to be all right:"

> Q:    Okay so about six months after you—you were out of chemotherapy and you were still having this—this runny eyes or watery eyes every day, were you concerned about it six months out?
> A:    It was a concern, but it was more like I've had the chemo; how long do residuals from chemo last? You know, because you have—I do have some stuff that's from the chemo and it—and it still lasts. Your—you-your body is really never the same after you've had chemo.
> Q:    Okay. And at kind of six months out, did you ask your doctor why you were still having this ongoing watery eyes?
> A:    No.
> Q:    Did you think it was just going to be a permanent issue?
> A:    It was going to be all right.

SOF ¶ 20.

Plaintiff repeatedly emphasized her trust in her doctors supported her belief that her eyes would get better, and meanwhile, "it's just something I deal with:"

> Q:    So, around December of 2014, after a year of having constant tearing all day, every day, did you think that this is now a permanent side effect that I'm having that hasn't resolved in a year?
> A:    No, I didn't think like that.
> Q:    Did you ask your doctor about it?
> A:    No.
> Q:    Why not?
> A:    Because Andrea said it was going to be okay.
> Q:    And what did you take that to mean?
> A:    That it was just a side effect. It'll eventually go away.
> Q:    Do you still think it'll eventually go away?
> A:    At this point, it can be corrected with surgery—with surgery, and I'm leaning toward that, but I'm afraid of that because its dealing with my eyes, and I don't want anything to mess up, you know, any other than what is already going on, but it can--it can be corrected with—with surgery, but the way he was describing it, it looked like it was going to hurt, so I'm still thinking on it.

SOF ¶ 21.

Ms. Anderson testified that though her runny eyes persisted, she "just didn't dwell on it" and trusted her doctor "that one day it will stop." *Id.* It was not until Dr. Vekovius advised her that surgery could alleviate her symptoms did she realize she sustained a permanent injury. SOF ¶ 22.

> **1.    It is Unreasonable to Conclude that Ms. Anderson Could Have Discovered Her Injury by Searching the Internet**

Sanofi claims that had Ms. Anderson "acted with reasonable diligence," she would have discovered that Taxotere was a potential cause of her injury, and that she would have discovered the medical literature cited in her Master Complaint. *See* Rec. Doc. 546-1. The inquiry as to whether a plaintiff acted reasonably in investigating an injury takes into account her education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct." *In re Taxotere (Kahn)*, 2020 WL 1815854 at * 7. Yet Ms. Anderson testified she did not know the terms "lacrimal duct obstruction," "canalicular stenosis," or even "epiphora." SOF ¶ 23. She testified that she had heard of the term "punctal stenosis" but didn't know what it meant. *Id.*

Ms. Anderson's reasonableness is an issue for the trier of fact. Sanofi faults Ms. Anderson for not investigating her injury, yet cites no support for its conclusion that, had she conducted an internet search, she would have located (without a subscription) specialty medical journals and understood the complexity of the issues she was having. Indeed, Sanofi does not even establish which articles would have been available electronically versus requiring a subscription to obtain a written copy. Further, the opaque nature of search engine algorithms invalidates Sanofi's argument, since reconstructing what Ms. Anderson's browser would have shown years ago is impractical and entirely unfeasible. Search rankings, which are influenced by personalization, shape user exposure in unpredictable ways, and the use of algorithms can obscure authoritative

sources.[1] Without evidence of the Ms. Anderson's specific search behavior, Sanofi cannot prove

she was on notice, as the "filter bubble" effect—where algorithms reinforce existing knowledge—

could have excluded medical journals from her results. The burden of proof lies with Sanofi, and

the documented variability of search outcomes renders their argument speculative and insufficient

to establish notice as a matter of law.

Further, had Ms. Anderson searched "watery eyes" or "tearing" or "runny eyes" along with the

list of all the drugs she had taken during chemotherapy and thereafter, the trier of fact could

conclude that the barrage of information about ocular complications would still not have allowed

her to appropriately triangulate the cause of her injury to scarring of her nasolacrimal drainage

system due to Taxotere exposure. A jury could conclude that Plaintiff acted reasonably in believing

her oncologist to be wholly unconcerned about her "runny eyes," and, in her second battle with

breast cancer, remaining optimistic that it would be "all right."

## 2.      Plaintiff's Contact with a Law Firm Presents a Question of Fact

Ms. Anderson's contact with a law firm creates another fact issue for the jury to consider. This

is because Ms. Anderson testified:

> Q:      Okay, so when you signed this authorization and hired the Hotze Runkle
>         Law Firm in the fall of 2020, you had an appointment with Dr. Burton that
>         same fall, in August of 2020.
>         ***
>         Do you—do you think that you told Andrea, hey, I'm going to file a lawsuit
>         from one of the drugs that you guys gave me, what do you think about that?
> A;      No, I didn't say that.
> Q:      Why didn't you ask her about it?
> A:      I don't know.
> Q:      Had you already made your decision at that point you were going to file a
>         lawsuit?
> A:      No….

---

[1] R. Epstein, & R.E. Robertson, The search engine manipulation effect (SEME) and its possible
impact on the outcomes of elections, Proc. Natl. Acad. Sci. U.S.A. 112 (33) E4512-E4521,
https://www.pnas.org/doi/10.1073/pnas.1419828112.

Q:      You didn't want her opinion on it?
A:      No.
Q:      Why not?
A;      She was—I don't know. Let me just was it like that, I don't know. I wasn't already going to—when I read and tell what it was about, I just called.
Q:      You just called the lawyers?
A:      Yes.
Q:      Okay.
A:      To speak with someone.

SOF ¶ 24. Further, it should be noted that Ms. Anderson retained Hotze Runkle in the summer of 2020, in the midst of the global COVID-19 pandemic, and at that time, Ms. Anderson reported in multiple psychiatric therapy sessions throughout 2020 and 2021 that she was traumatized by the deaths of her family and friends, including the deaths of her sister and cousin from contracting COVID while in the hospital. SOF ¶ 25. She quit her job and reported that she was afraid to leave the house, "feeling overwhelmed due to anxiety over Covid-19." *Id.* Given that *contra non valentem* is an equitable doctrine, the extraordinary global circumstances during 2020 and 2021 should also be considered in determining whether Ms. Anderson, a two-time cancer survivor, should have subjected herself to a medical environment to obtain a diagnosis earlier. [2]

III.    **Sanofi Has Failed to Establish Learned Intermediary**

Louisiana applies the learned-intermediary doctrine, which permits a drug manufacturer to discharge its duty to warn consumers by adequately warning physicians. *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 265 (5th Cir. 2002). "The premise underlying a failure-to-warn claim in the learned intermediary context is that the patient is claiming that the manufacturer failed to adequately warn the *treating physician.*" *Id.* at 268 (original emphasis). Thus, "[t]he obligation to the consumer is fulfilled when the prescribing or treating physician is informed of any potential

---

[2] While Plaintiff did attend her scheduled appointments with her oncologist, the jury should be allowed to consider these facts in light of the fact that Plaintiff already suffered a recurrence of her cancer.

side effects or risks from the drug's use so that they may intelligently decide on its use and advise

the patient." *Id.* at 267 (quoting *McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 413 (E.D. La.

1999)).

The Fifth Circuit has held that there is a two-prong test governing inadequate warnings claims

under the Louisiana Products Liability Act (LPLA) when applying the learned intermediary

doctrine:

> First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician.
>
> Second, the plaintiff must show this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury.

*Id.* at 265-266.

Sanofi claims Ms. Anderson cannot make either showing. However, the evidence is squarely

to the contrary. At a minimum, the evidence is such that the learned-intermediary doctrine cannot

be resolved on summary judgment in this case.

**A.      The Evidence Shows Sanofi Failed to Warn Dr. Burton of the Risk of Stenosis of the Nasolacrimal Drainage System Associated with Taxotere and Dr. Burton was not Otherwise Aware of the Risk.**

"[A] mere reference to the adverse effect is not necessarily an 'adequate warning' under the

LPLA. The warning must contain language that is adequate to reasonably inform the recipient (i.e.

the doctor in a learned intermediary case) about the nature of the danger involved." *Stahl*, 283 F.3d

at 267. A inadequate warning claim "can appropriately be based on alleged inadequacies in a

recommended medical monitoring or testing regime." *Id.* at 270.

The LPLA provision defining an "adequate warning" encompasses "instructions" as well as

"warnings." *See* La. Rev. Stat. Ann. §9:2800.53(9) (defining an "adequate warning" as a "warning

or instruction that would lead an ordinary reasonable user or handler of a product to contemplate

the danger in using or handling the product and either to decline to use or handle the product or, if

possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made.") "Indeed, it is an accepted tenet of Louisiana products liability law that a manufacturer's duty to warn includes a duty to provide adequate instructions for safe use of a product." *Stahl*, 283 F.3d at 269-270 (citing *Hines v. Remington Arms Co., Inc.*, 648 So. 2d 331, 337 (La. 1994)).

Regarding the adequacy of the label, from the time the FDA approved Taxotere in 1996 through the conclusion of Ms. Anderson's chemotherapy treatment in December 2013, Taxotere's label failed to warn doctors of the risk of progressive/potentially permanent damage to the nasolacrimal drainage system or that permanent damage can be prevented and/or mitigated with monitoring and prompt intervention. SOF, ¶¶ 26-27. Instead, in 2013, Sanofi's Taxotere label only included the language that "lacrimal duct obstruction has been reported," which was "reversible upon discontinuation of the infusion." SOF, ¶¶ 28, 29. Simply put, Sanofi's label did not (and still does not) disclose the true risk of permanent stenosis or identify the preventative measures needed to treat it. Nor did it convey the potentially rapid onset of stenosis or the need to monitor patients accordingly.

Because of these omissions, physicians failed to appreciate the risk of permanent damage and to inadequately advise their patients. For example, Plaintiff's oncology expert Dr. Kevin Knopf offers the following opinion:

> To this day, nowhere in the label does Sanofi warn of the risk that excessive tearing may be a symptom of progressive stenosis, which, if managed early, can be prevented. Prior to May 15, 2020, a reasonable oncologist would conclude that lacrimation or excessive tearing was a temporary side effect that would cease on termination of treatment.[3]
>
> . . . .
>
> To the extent the label intended to warn oncologists of stenosis, it fails to convey to a reasonable oncologist that immediate intervention is needed to prevent injury.

---

[3] In 2020 the label placement of "reversible upon discontinuation of the infusion" was changed in the Taxotere label. (SOF ¶ 31).

> The label does not convey the immediate need for a patient to be referred to a lacrimal specialist upon early signs of tearing.

SOF ¶30. Similarly, numerous articles in the medical literature show that oncologists did not appreciate the risk of permanent stenosis. Even Sanofi's own expert, Bita Esmaeli, acknowledged in her 2003 article that "ophthalmologists and oncologists must be aware that docetaxel can induce obstruction of the lacrimal outflow, especially if this drug is used weekly or for prolonged periods." SOF ¶ 32. The 2006 article "Docetaxel-Associated Epiphora" likewise highlighted that epiphora may be underrecognized as an adverse effect because excess tearing after chemotherapy administration is not as "stringently monitored as life-threatening toxicities such as neutropenia and major organ dysfunction .... Moreover, effective management of docetaxel treatment-related epiphora hinges on early detection." SOF ¶ 33. Finally, Kang, *et al*.'s 2017 article in the British Journal of Ophthalmology states that "oncologists should be aware that LDO is treatable and that overlooking a treatable symptom for a long period makes it more difficult to treat ... early intervention ... may, thus, achieve a good treatment outcome for cancer-associated epiphora and may prevent permanent scarring and closure of the lacrimal drainage apparatus that might necessitate complicated surgical procedures." SOF ¶ 34.

If the Taxotere label provided an adequate warning, there would presumably not be multiple publications over the course of more than a decade stating that oncologists do not appreciate the risk of permanent stenosis or the need to monitor patients for its development. *See Baudin v. AstraZeneca Pharms. LP*, 413 F. Supp. 3d 498, 501 (M.D. La. 2019) (finding label inadequate under Louisiana law because it did not warn of the importance of properly monitoring patients).

Even though Sanofi's Taxotere label fails to warn that stenosis is progressive and may become permanent or of the importance of monitoring patients so that early medical intervention can occur, Sanofi claims that Ms. Anderson's prescribing physician Dr. Burton was aware of the risk prior to

Ms. Anderson's chemotherapy treatment. *See* Rec. Doc. 546-1 at 10. Thus, according to Sanofi, "Dr. Burton's awareness of the risk before 2013 makes it impossible, as a matter of law, for Ms. Anderson to establish that Sanofi's alleged failure to warn Dr. Burton caused her harm." *Id.* This argument should be rejected. While Dr. Burton may have been aware of the potential for progressive stenosis requiring intervention from Taxotere in the weekly setting prior to prescribing Ms. Anderson's chemotherapy, he did not testify that he was aware of its potential for occurrence in the every-three-week dosing regimen that Ms. Anderson received.

Indeed, Dr. Burton stated during his deposition that he had never had a patient experience excessive tearing while taking Taxotere on an every-three-week schedule. SOF ¶ 35. Similarly, Dr. Burton testified that the only patients that he had referred to ophthalmology for surgical intervention on the nasolacrimal drainage system had been in the "weekly setting." SOF ¶ 36. In fact, Dr. Burton testified that he probably never asked Ms. Anderson if she was experiencing tearing because "we just didn't see it" in the every-three-week setting. SOF ¶¶ 37-38. Finally, the only pre-2013 study that Dr. Burton could recall where patients experienced grade 3 or grade 4 excess tearing necessitating referral and possible surgical invention was in the weekly Taxotere arm of the study. SOF ¶ 39.

Dr. Burton testified that the side effect profile is different when Taxotere is administered weekly versus every three week. SOF ¶ 40. Notably, the Taxotere label from its approval in 1996 through the end of Ms. Anderson's chemotherapy in 2013 has only included an administration schedule of every-three-weeks. SOF ¶¶ 41-42. Thus, a stronger warning in the Taxotere label would have made Dr. Burton aware that progressive/potentially permanent damage to the nasolacrimal drainage system is not limited to weekly patients as he had encountered in his medical practice and in the literature, but can also occur in the every-three-week dosing schedule that Ms.

Anderson received. Moreover, it would have also made him aware that permanent damage can be prevented and/or mitigated with monitoring and prompt intervention in the every-three-week dosing schedule that Ms. Anderson received.

**B.    The Evidence Shows Sanofi's Failure to Warn Was Both the Cause in Fact and Proximate Cause of Ms. Anderson's Injury**

As mentioned above, a plaintiff must also show that a drug company's failure to warn was the cause in fact and proximate cause of the plaintiff's injury. *Stahl*, 283 F.3d at 266. Sanofi incorrectly suggests that the only way to establish causation is through evidence that Ms. Anderson's prescribing physician would not have used or prescribed the drug had he received a stronger warning. *See* Rec. Doc. 546-1 at 10. This is one method to establish causation on a failure-to-warn claim; it is not, however, the exclusive means to do so.

Causation can also be established by showing that, if properly warned, a plaintiff's treating physician would have acted differently such that the injury alleged by the plaintiff could be avoided. *In Re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 58056, at *8 (E.D. La. Apr. 17) (denying summary judgment based on the learned intermediary doctrine because "this Court finds that Plaintiffs do not contend that prescribing physicians never should have prescribed Xarelto. Instead, they argue their claim survives merely by showing the doctor would have acted differently had they been adequately instructed, and that Plaintiffs' injuries could have been avoided."); *see also Mingo v. Janssen (In re Xarelto (Rivaroxaban) Prods. Liab. Litig.)*, 2017 U.S. Dist LEXIS 115461, at *13 (E.D. La. July 24, 2017) ("The question in the instant case, and Plaintiffs argument here, is not whether Dr. Jordon would still have prescribed Xarelto, but rather whether he would have prescribed it differently if those instructions were given.").[4] Here,

---

[4] Other courts have similarly found that although choosing not to prescribe a particular medication or device is one way to establish causation, it is not the only adequate means of demonstrating causation on a failure-to-warn claim. *See, e.g., Georges v. Novartis Pharms. Corp.*, 2012 U.S. Dist.

Ms. Anderson does not allege that with an adequate warning she would not have been prescribed Taxotere. Instead, she argues that had Sanofi provided a stronger warning, Dr. Burton would have monitored her for tearing and promptly referred her to a specialist to prevent potentially permanent stenosis of her nasolacrimal drainage system. *See* Master Long Form Complaint, Rec. Doc. 25 at ¶¶ 1, 5, 23, 28, 58.

To assist in easing the cause-in-fact burden on a plaintiff, Louisiana recognizes the "heeding presumption." This presumption assumes that if an adequate warning had been provided, that warning would have been followed and the plaintiff would not have been injured. *See Bloxom v. Bloxom*, 512 So.2d 839, 850 (La. 1987); *Wagoner v. Exxon Mobil Corp.*, 813 F.Supp.2d 771, 797 (E.D. La. Aug. 24, 2011); *In re: Xarelto*, 2017 U.S. Dist LEXIS 115461, at *8. This presumption may be rebutted with evidence showing that an adequate warning would have been futile under the circumstances. *Bloxom*, 512 So.2d at 850. Here, there is a presumption that if a stronger warning had been provided Dr. Burton would have monitored Ms. Anderson for excess tearing and promptly referred her to an ocular specialist for intervention to prevent the permanent tearing that she now experiences.

---

LEXIS 189174, 2012 WL 9083365, at *6 (C.D. Cal. Nov. 2) (noting multiple courts have "held that even where physicians admitted that they still recommended the Treatment Drugs knowing of their ... risks [of causing deterioration of bones in the jaw], the changes to their prescription and treatment procedure nonetheless created triable questions of fact on specific causation"); *Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809, 830 (N.D. Cal.) ("Gilead asserts that Plaintiffs must allege that their physicians would not have prescribed the TFF drugs had Gilead given different warnings, but that position is not supported by the case law."); *In re Aredia & Zometa Products Liab. Litig. (White)*, 2009 U.S. LEXIS 72098, 2009 WL 2497692, at *3 (M.D. Tenn. Aug. 13, 2009) ("It is sufficient for Plaintiff to survive summary judgment to show that one of [plaintiff's] treating physicians ... would have behaved differently.") (applying California law); *Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 645 n.4 (4th Cir. 1981) ("In certain failure to warn cases (notably ones involving oral contraceptives), it is possible to establish evidence of causation not only by showing that a physician would not have given the patient a certain medicine but also by showing that a properly warned physician could have detected early signs of an adverse reaction to a drug and reduced the injury.").

Dr. Burton's testimony creates genuine issues of fact as to whether a different instruction or warning would have changed his actions and avoided or lessened Ms. Anderson's injuries. As noted above, Dr. Burton testified that he could "recall two patients that I sent to ophthalmology to have canaliculi opened up." SOF ¶ 36. These referrals occurred "in the 90s" and involved patients receiving Taxotere in the "weekly setting." *Id.* Had Dr. Burton received an adequate warning of the risk for progressive stenosis in every-three-week Taxotere patients he would have similarly referred Ms. Anderson to an ophthalmologist for potential intervention that could have prevented her injury.[5] Unfortunately, Dr. Burton was unaware of the risk of potentially permanent stenosis in every-three-week patients "because we just didn't see it." SOF ¶ 38.

Sanofi argues that Dr. Burton never read the Taxotere label and, therefore, a stronger warning would not have changed his prescribing decision. Rec. Doc. 546-1 at 11. While it is true that Dr. Burton testified that he had never read the Taxotere label, he also testified that the contents of the Taxotere label are "adequately summarized and easier to put together from other sources" such as UpToDate and pharmacologic textbooks that he did review. SOF ¶ 43. Therefore, had Sanofi provided a stronger warning Dr. Burton would have learned of it through his review of UpToDate and those same pharmacologic textbooks and altered his treating decision as it relates to Ms. Anderson's tearing. *See Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010) (the court analyzed alternative ways the prescribing physician might have become aware of an update to the drug's label in order to demonstrate a genuine issue of material fact regarding causation).

Objective evidence also supports the conclusion that Ms. Anderson has satisfied the causation element of the learned-intermediary doctrine. Under Louisiana law, subjective testimony from the

---

[5] As detailed above Ms. Anderson made Dr. Burton's office aware of her excessive tearing during her Taxotere infusions and continued reporting the excessive tearing at subsequent appointments. (SOF ¶¶ 4, 7, 8, 16, 17, 18, 19).

treating physician on causation may be "supplement[ed] ... with objective evidence of how a reasonable physician would have responded to an adequate warning." *Allgood v. GlaxoSmithKline PLC*, 2008 WL 483574, at n.6 (E.D. La. Feb. 20, 2008) (internal quotations and citations omitted). Ms. Anderson has supplemented Dr. Burton's testimony with the expert opinions of her oncology expert Dr. Knopf. Dr. Knopf states in his report that a reasonable oncologist "may consider dose adjustments, cessation of a particular agent due to toxicity, delay of treatment, changes in anti-emetics or growth factors, *or management of toxicities including referrals to other specialists.*" (SOF ¶ 44). In other words, Dr. Knopf opines that had a stronger warning been provided a reasonable oncologist would have concluded that excessive tearing might be a symptom of progressive stenosis, which, if managed early through prompt referral could be prevented. (SOF ¶ 30). Accordingly, the existence of both objective and subjective evidence of causation precludes the entry of summary judgment under the learned-intermediary doctrine.

CONCLUSION

Sanofi has failed to meet its burden to show that summary judgment is warranted as a matter of law and its motion for summary judgment should be denied.

Dated: July 9, 2025                    Respectfully submitted,

**PAUL LLP**                           **HOTZE RUNKLE**

Richard M. Paul III (*pro hac vice*)   */s/  Patrick Hotze*
Laura C. Fellows (*pro hac vice*)      Patrick O. Hotze (*pro hac vice*)
601 Walnut Street, Suite 300           Karen Cannon Shanks, LA Bar 33049
Kansas City, Missouri 64106            Justin E. Dunlap (*pro hac vice*)
Tel: 816-984-8100                      1101 S. Capital of Texas Highway
rick@PaulLLP.com                       Building C, Suite 100
laura@PaulLLP.com                      West Lake Hills, Texas 78746
                                       Tel: 512-476-7771
                                       photze@hotzerunkle.com
                                       karen@hotzerunkle.com
                                       justin@hotzerunkle.com

**COUNSEL FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 9, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

*/s/ Patrick Hotze*