**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: TAXOTERE (DOCETAXEL) EYE INJURY PRODUCTS LIABILITY LITIGATION | MDL NO. 3023 |
| | SECTION "H" (5) |
| **This Document Relates to:** | **HON. JANE T. MILAZZO** |
| ***Wooten v. Accord Healthcare, Inc.* Case No. 2:22-cv-01636** | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT ACCORD
HEALTHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT**

The evidence in this case firmly supports Plaintiff Kimelia Wooten's claims that docetaxel caused her canalicular stenosis and years of suffering before she was able to discover docetaxel caused permanent damage to her nasolacrimal drainage system. Accord seeks summary judgment on its prescription affirmative defense and on the basis of the learned intermediary doctrine. On the former, Accord totally ignores the fact that it expressly agreed to toll Ms. Wooten's claims for an entire year, which makes her claim timely. Moreover, Ms. Wooten did not fail to investigate the cause of her watering eyes because she sought medical advice about the cause of her tearing from at least **six different doctors**. Ms. Wooten acted reasonably and diligently to discover the nature of her injuries and had no reason to know she had an actionable claim until she was diagnosed by an oculoplastic surgeon with canalicular stenosis, a relatively rare and unique injury.

As to the learned intermediary doctrine, none of the material facts that Accord would need to prove to be entitled to summary judgment are undisputed. The testimony of Plaintiff's oncologist demonstrates that she did not appreciate the need to monitor Plaintiff's condition or the actual severity and irreversibility of canalicular stenosis. At a minimum, fact issues are present which warrant consideration by a jury.

For these reasons, Accord's motion for summary judgment should be denied.

## INTRODUCTION AND FACTUAL SUMMARY

Plaintiff Kimelia Wooten was diagnosed with breast cancer on March 25, 2015. SOF ¶ 1. Her treating oncologist, Dr. Laura Chauvin, prescribed a chemotherapy regimen consisting of Taxotere and Cytoxan SOF ¶ 2. Plaintiff commenced chemotherapy on April 14, 2015, with 12 weekly infusions ending on June 30, 2015. SOF ¶ 3. On May 26, 2015 , she complained of "watery eyes that started about 1 week ago." SOF ¶ 4. She again complained of "watery eyes" with "mild epiphora" noted on June 9, and June 16, 2015. *See* SOF ¶¶ 5-6. After her final Taxotere infusion on June 30, 2015, Ms. Wooten's tearing persisted and she continued to complain of watery eyes. SOF ¶¶ 7-10. Ms. Wooten was prescribed letrozole in April 2016 as continuing treatment for her cancer. SOF ¶ 34. Plaintiff's oncologist testified that she was aware that aromatase inhibitors such as letrozole can cause watery eyes. SOF ¶ 35.

On November 11, 2015, less than five months after completing chemotherapy, Ms. Wooten saw an ophthalmologist, Dr. Gerard Guidry. SOF ¶ 13. Ms. Wooten told Dr. Guidry she recently completed chemotherapy for breast cancer and that she was experiencing "excessive watering of the eyes." SOF ¶ 13. Dr. Guidry diagnosed Ms. Wooten with Meibomian Gland Dysfunction (MGD) and Dry Eye Syndrome of Bilateral Lacrimal Glands (DES). SOF ¶¶ 13-14. Both MGD and DES are common eye disorders that can occur naturally or as a result of exposure to certain medications and cause watery eyes.[1] SOF ¶¶ 20, 36. Plaintiff followed up with Dr. Guidry again as instructed on December 30, 2015 but no additional diagnoses were made. SOF ¶¶ 13-14.

---

[1] Whether Ms. Wooten acted reasonably after a physician diagnosed her with a disease involving the deficit of tear production, as opposed to an issue involving scarring in the nasolacrimal duct is directly at issue. Dry eye involves excess tear production, abnormal tear drainage. MGD similarly involves a tear production deficit. A genuine dispute of material fact precludes summary judgment because whether Ms. Wooten had notice of damage to her nasolacrimal drainage system hinges on what was ultimately a misdiagnosis.

On April 19, 2016, Plaintiff sought a second opinion from Dr. Keith Kellum at Southern Eye Institute. SOF ¶¶ 15, 63. She likewise informed Dr. Kellum of her previous breast cancer. SOF ¶ 15. Upon examination, Dr. Kellum diagnosed her with dry eye syndrome (DES). SOF ¶¶ 15, 64. Plaintiff followed up with Dr. Kellum per his instruction two months later on June 20, 2016 and he reaffirmed his dry eye diagnosis. SOF ¶¶ 16, 67.

Plaintiff consulted a third eye doctor, Dr. Nano K. Zeringue, also with the Southern Eye Institute, on August 1, 2017, who concurred with the DES diagnosis, also noting edema/swelling and trichiasis without entropion left upper eyelid. SOF ¶ 17. On October 18, 2017, Plaintiff consulted a fourth eye specialist, Dr. Jessica Liu with NOMC Optometry Wellness Center. SOF ¶ 18. Upon examination, Dr. Liu also diagnosed Ms. Wooten with MGD, noting it was the "cause of watery eyes." SOF ¶ 18. On June 22, 2020, Ms. Wooten sought treatment with a fifth eye specialist, Dr. Michael Worley, an oculoplastic surgeon in New Orleans. SOF ¶ 23. Dr. Worley conducted a probing and irrigation exam, at which point he was able to determine that instead of dry eye syndrome, Ms. Wooten actually suffered from complete blockages in her lacrimal drainage system. SOF ¶ 23. On that date, he diagnosed Ms. Wooten with canalicular stenosis. SOF ¶ 23. Upon discovering that she suffered this unique injury known to be caused by docetaxel in June 2020, Ms. Wooten realized that she may have a cause of action for her injuries. SOF ¶¶ 37, 55-57.

On March 9, 2021, Accord entered into a tolling agreement that tolled Ms. Wooten's statute of limitations. SOF ¶ 38-40. The agreement terminated one year later, on March 9, 2022. SOF ¶¶ 38-40. Plaintiff timely filed suit shortly thereafter on June 6, 2022, before her prescriptive period expired. SOF ¶ 91.

## I.      Legal Standard

Summary judgment requires Defendant to show "that there is no genuine dispute to any material fact." Fed. R. Civ. P. 56(a). The movant bears the burden to show that summary judgment is appropriate. *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 397 (5th Cir. 2010). Only when the movant has carried its burden under FRCP 56(a) must the nonmovant then demonstrate a genuine material fact dispute. *Tolan v. Cotton*, 572 U.S.650, 656-67 (2014). The court must view all the facts and draw all reasonable inferences in the light most favorable to the nonmovant. *Id.* at 660; *see also Penton v. Crown Zellerbach Corp.,* 699 F.2d 737, 741 (5th Cir. 1983). A genuine dispute exists when a reasonable jury could resolve the disputed fact in favor of the nonmovant. *T-Mobile S., LLC v. City of Roswell,* 574 U.S. 293 (2015).

## II.     Accord Has Failed to Prove that Plaintiff's Claims are Prescribed

Ms. Wooten's claims are timely because she filed her lawsuit on June 6, 2022, which was within one year after she was diagnosed with canalicular stenosis after considering the parties' tolling agreement.

As a preliminary matter, Accord failed to disclose Ms. Wooten's claims were tolled from April 6, 2021 to March 9, 2022. SOF ¶¶ 38-40. Less than two months after the tolling agreement expired, on June 6, 2022, Ms. Wooten filed suit. SOF ¶ 91. Therefore, even without considering *contra non valentem*, Ms. Wooten's one-year prescriptive period was extended an entire year by agreement of the parties. SOF ¶¶ 38-40. Further, Accord's prescription defense is undermined by its defenses that Plaintiff's eye conditions and symptoms were caused by medicines other than docetaxel. *See Sharkey v. Sterling Drug, Inc.,* 600 So.2d 701, 714 (La. App. 1 Cir.), writs denied, 605 So. 2d 1099, 1100 (La.1992).

4

This Court has extensively considered prescription in the context of injuries caused by docetaxel and has set forth the applicable legal principles as follows:

> Under Louisiana Civil Code article 3492, the prescriptive period for products liability claims is one year. Generally, the period begins to run from the day the injury or damage is sustained. If the face of the petition shows that the prescriptive period has already elapsed, the plaintiff has the burden of establishing that suspension, interruption or renunciation of prescription has occurred.

*In re Taxotere Docetaxel Prods. Liab. Litig.,* 2020 WL 1815854 (E.D. La Apr. 7) (citations and quotations omitted).

### A.    Accord Failed to Demonstrate Ms. Wooten's Complaint is Facially Prescribed

Accord's argument that Ms. Wooten's claim is facially prescribed rests on a fatal error – that the at-issue injury is Ms. Wooten's tearing. Yet, Ms. Wooten "… was diagnosed with Stenosis of Bilateral Lacrimal Canaliculi. Docetaxel Injection Concentrate caused the injury, *which resulted* in chronic and debilitating epiphora. Ms. Wooten underwent painful and invasive surgery in an effort to treat the significant damage to her nasolacrimal system. SOF ¶¶ 24-26, 29, 32, 91. Ms. Wooten alleges damage to her canaliculi, not the epiphora that manifested as a result. Moreover, Ms. Wooten's allegations adopt those in the Master Long Form Complaint that allege "serious – but preventable – damage to patients' lacrimal systems, resulting in physical scarring and disfigurement" (Rec.Doc. 26, p. 2); " … punctal, canalicular, and/or nasolacrimal duct stenosis" (*Id.* at p. 3) and "life altering injuries to their lacrimal systems, including…canalicular stenosis" (*Id.* at p. 4).

Ms. Wooten acted diligently by attempting to understand the cause of her tearing and was misdiagnosed with a number of maladies that manifest symptoms of watery eyes. SOF ¶¶ 13-22, 33, 47, 53. It was not until June 22, 2020, when she received a canalicular stenosis diagnosis, that Ms. Wooten was able to ascertain the cause of her tearing because canalicular stenosis is an injury

that, due to its unique and relatively rare nature, allowed her to identify docetaxel as the cause of her injuries.

Plaintiff's expert, Dr. Vikram Durairaj, is an oculoplastic surgeon who has treated dozens of patients with damage to their nasolacrimal drainage systems due to docetaxel. SOF ¶ 20. He testified that he often sees patients with severe stenosis:

> A:    But understand, there are some times patients will walk in the door, and they've completed their – their treatment in 2010 or 2011, and they've been walking around for 10 or 12 years with profound tearing. They just didn't know you could really do anything about it.

SOF ¶ 21.

Dr. Durairaj further testified that some cancer patients may have symptomatic tearing as a result of transient stenosis, which gets better and goes away, but that stenosis can become permanent, depending on the patient and the length of therapy. SOF ¶ 22. Therefore, the date on which Plaintiff's cause of action accrued cannot be ascertained from the face of her Complaint, which merely states that her chemotherapy ended on June 30, 2015. SOF ¶ 91.

Accord claims the latest deadline to file the complaint was April 7, 2017, one year after an April 7, 2016 appointment Plaintiff had with her oncologist in which it was noted that her tearing had not resolved. Rec. Doc. 544-1, p. 6. Yet, this date precedes the diagnosis of her injury—and precedes the misdiagnosis of her injury by several doctors. Accord cites no legal or medical basis for its self-serving determination that Ms. Wooten had reason to know of her injury before her doctors did. And, although the complaint indicates that Ms. Wooten completed chemotherapy with Taxotere in 2015, the complaint does not indicate when her injury "manifested itself with sufficient certainty to support accrual of a cause of action." *See Cole v. Celotex Corp.*, 620 So.2d 1154 (La. 1993) (reversing trial court's ruling on prescription as "manifest error,", and holding

plaintiff's claim had not prescribed because his delay in filing until he had a diagnosis of asbestosis was reasonable, despite being told years earlier something in his lungs had shown up on an x-ray).

**B.    A Tolling Agreement and *Contra Non Valentum* Tolled Ms. Wooten's Claims**

Because Accord has not demonstrated Ms. Wooten's claims are facially prescribed, the burden does not shift to her to show prescription was interrupted. Ms. Wooten's claims are timely because she filed her complaint on June 6, 2022, which was within the prescription period from the date of Ms. Wooten's diagnosis, taking into account the parties' one-year tolling agreement. Accord has failed to show the absence of any material fact in this regard.

> The doctrine of contra non valentem provides some grace for those plaintiffs who are unaware that their injury was caused by a tort. The doctrine states that prescription begins to run when a plaintiff has actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. This occurs when the plaintiff has actual or constructive knowledge of a causal relationship between the object or product and the injury. There is no requirement that a patient be informed by an attorney or physician of a possible [claim] before prescription begins to run. Rather, prescription begins to run when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim. Accordingly, to toll prescription, a plaintiff who suspects that something is wrong must act reasonably to discover the cause of the problem; otherwise, contra non valentem will not apply. The ultimate issue is the reasonableness of the [plaintiff's] action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct.

*In re Taxotere Docetaxel Prods. Liab. Litig.,* 2020 WL 1815854 at *7.

Lastly, even if the facts had shown that Ms. Wooten' prescriptive period is barred from the face of the complaint, suspension, interruption or renunciation of prescription has occurred. *See id.* "In the face of a plaintiff who is unaware that the damage suffered is the fault of the defendant, *contra non valentem* suspends 'the running of prescription until such time as the plaintiff knew or reasonably should have known that his or her damages were the fault of the defendant's negligent act.'" *Crochet v. Bristol-Myers Squibb Co.,* 804 Fed. Appx. 249, 2020 U.S. App. LEXIS 8235, *7

(5th Cir. La. Mar. 13). *Contra non valentem* is particularly appropriate for medical causation cases. *See, e.g.*, *Sharkey v. Sterling Drug, Inc.,* 600 So.2d 701, 713 (La. App. 1 Cir.), writs denied, 605 So. 2d 1099, 1100 (La.1992) (no error finding suit timely filed within one year of actual knowledge of any link between aspirin and Reye's syndrome because "even if a plaintiff is aware that an undesirable condition developed at some point in time after medical treatment, prescription does not run until the plaintiff has actual or constructive notice of the causal connection between the medical treatment and the subsequent condition"). Moreover, whether *contra non valentem* tolled the prescription period until suit was filed is a question best left to the jury. *See Bruno v. Biomet, Inc.,* 74 F.4th 620, 623-624 (5th Cir. La. 2023); *see also M.R. Pittman Grp., L.L.C. v. Plaquemines Par. Gov't,* 182 So.3d 312, 324 (La. Ct. App. 2015) (summary judgment inappropriate where reasonable minds could differ as to whether *contra non valentem* applies).

Accord cites *Luckett v. Delta Airlines* for the proposition that "[t]he commencement of prescription does not *necessarily* wait for the pronouncement of a victim's physician." (Dkt 544-1, p. 8) (emphasis added). This does not mean, however, that diagnosis will never trigger the running of prescription, and Louisiana jurisprudence demonstrates that in certain circumstances, it **is** the actual diagnosis of an injury that starts the clock running. This is precisely one of those circumstances.

*Hughes v. Olin Corp* is instructive. 37,404 (La. App. 2 Cir. 10/3/03), 856 So. 2d 222, *writ denied,* 2003-3191 (La. 2/20/04), 866 So. 2d 868. There, Louisiana's Second Circuit Court of Appeal held the plaintiff's cause of action accrued when he had a definitive diagnosis of mesothelioma, even after the plaintiff filed a lawsuit for asbestosis and was told more than one year before filing suit that he probably had lung cancer and mesothelioma was a possibility. On April 14, 2000 a pathologist noted mesothelioma (asbestos-related) and large cell carcinoma (not

asbestos-related) should be considered in the differential diagnosis. *Id.* at 226. On April 18, 2000, plaintiff's post-operative report noted a probable malignancy, "mesothelioma vs. adenocarcinoma." Plaintiff's surgeons informed him on May 19 and 25 that there was a question whether his disease was adenocarcinoma or mesothelioma, and it was not until June 9, 2000 that the doctor communicated to plaintiff the diagnosis of mesothelioma. *Id.* Plaintiff filed his lawsuit on May 4, 2001. The plaintiff's physician testified as early as April 24, 2000 that he discussed the relevance of asbestos exposure to some of the diseases that plaintiff might have and that he most certainly had a malignant disease. *Id.* at 224, 226-227. The doctor also testified that at the time of plaintiff's May 25 visit, there was no definite pathological diagnosis of his condition and it was not until June 9 that he could inform plaintiff that he had a disease known to be associated with asbestos exposure. The court noted the significance of the doctor's testimony that "a diagnosis of adenocarcinoma would not trigger in his mind that a person has a cancer related to asbestos exposure because adenocarcinoma is not pathognomonic for asbestos exposure, whereas mesothelioma is pathognomonic for asbestos exposure and is a 'pretty rare' disease." *Id.*

In reversing, the appellate court held it was "clearly wrong" to grant exception of prescription because "it was not unreasonable for Mr. Hughes to delay bringing suit until May 4, 2001, which was within one year from June 9, 2000, the date on which he learned he had mesothelioma." *Id.* This is because "[p]rescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong." *Id.* (*citing Jordan v. Employee Transfer Corp.*, 509 So. 2d 420, 426 (La. 1987)). Indeed, it was undisputed the plaintiff was aware he had been exposed to asbestos and could develop mesothelioma, but it was reasonable to wait until he actually developed mesothelioma. *Id.*

Similarly here, before her June 22, 2020 canalicular stenosis diagnosis, Ms. Wooten was diagnosed by several eye specialists with Dry Eye Syndrome, Meibomian Gland Dysfunction, and other diseases, none of which put her on actual or constructive notice that she had an injury caused by docetaxel. SOF ¶¶ 13-18, 33, 36, 47, 60-67. Like *Hughes,* in which mesothelioma is a rare disease caused by asbestos exposure, canalicular stenosis is also a relatively rare disease that is pathognomonic of docetaxel exposure. And, as in *Hughes,* a previous lawsuit for a different injury (hair loss) does not impute, as a matter of law, the requisite knowledge to file a claim, especially here for a totally unrelated injury.

*Hughes* does not stand alone. Louisiana's Fourth Circuit has held *contra non valentem* suspended prescription of a plaintiff's medical malpractice claim until she received the results of conclusive testing because she did not reasonably know she had a claim. *Carter v. Grant*, 97-2106 (La. App. 4 Cir. 10/25/00), 772 So. 2d 835. The court noted that the plaintiff "did not have any reason to doubt her treating physician's diagnosis based on the fact that her doctors had the expertise to decipher medical testing results." *Id.* at 839; *see also Harrison v. United States*, 708 F.2d 1023, 1028 (5th Cir. 1983) ("It is not reasonable to suggest that…[plaintiff] possessed the requisite knowledge of the cause of her condition when doctors who knew immeasurably more than her were stymied and freely admitted their bewilderment. It would be unreasonable to hold [plaintiff] to a higher degree of medical competence and understanding than the many medical experts she consulted."); *Perrin v. Rodriguez*, La. App. 153 So. 555 (4th Cir. 1934) (holding prescription tolled while plaintiff did not know he had an actionable injury where the patient relied on the dentist's professional advice, despite complaining of pain for 14 months after a negligent dental procedure); *Bruno v. Biomet* 74 F.4th 620, 626 n.38 (5th Cir. 2023) ("We reject the implicit assertion that, as a matter of law, an individual is not allowed to rely on the advice and counsel of

a treating physician on complex matters of medicine."); *R.J. Reynolds Tobacco Co. v. Hudson*, 314 F.2d 776 (5th Cir. 1963) (affirming denial of defendant's motion for summary judgment, finding that the cause of action had not accrued until plaintiff knew or should have known of the causal link between his cancer and tobacco products, which was a question for the jury).

Ms. Wooten testified she did not know she had more than just excessive tearing because her oncologist never told her the underlying mechanism of her watery eyes:

> Q:    Do you recall Dr. Chauvin diagnosing you with epiphora due to insufficient drainage on [September 14, 2015]?
> A:    I don't recall her ever telling me that or using that term.
> Q:    Is it your testimony that Dr. Chauvin did not tell you that you were diagnosed with epiphora due to insufficient drainage or that you just do not remember it one way or the other?
> A:    I don't think she told me that.
> Q:    If Dr. Chauvin testifies that she did tell you that, do you have any reason to dispute that?
> A:    Yeah. I would say she did not specifically tell me that.

SOF ¶¶ 49-50.

> Q:    Do you recall whether Dr. Chauvin discussed with you her suspicion of whether your tear ducts were obstructed?
> A:    We never discussed any tear ducts being obstructed.
> Q:    If Dr. Chauvin testified that she did discuss that with you, would you have any reason to dispute that?
> A:    I would say she's mistaken.

SOF ¶ 52.

Ms. Wooten was adamant that Dr. Chauvin never told her that she suspected her epiphora might have been related to stenosis (as noted in the medical records) (SOF):

> Q:    Is it possible that Dr. Chauvin conveyed the information in her records to you regarding the chemotherapy-induced epiphora?
> A:    If she had conveyed that to me, I would have asked her specifics about what I could do to resolve that.
> Q:    And do you recall that discussion ever taking place?
> A:    We did not have that discussion.

SOF ¶ 54.

The conclusion that Dr. Chauvin did not tell Plaintiff her suspicions of canalicular stenosis that may need to be "recanalized" (Rec. Doc. 544-2 ¶ 25) is bolstered by Ms. Wooten's diligent actions, including seeing six providers. SOF ¶ 33. Had she known in 2015 she may need recanalization, the facts could easily lead reasonable minds to conclude that she would have acted on that information immediately, as she testified. SOF ¶ 58. Indeed, when she realized the potential link between docetaxel and canalicular stenosis, she scheduled an appointment that occurred within mere weeks.[2] SOF ¶ 53. Further, a jury is entitled to weigh the recollection of a doctor who has treated hundreds of breast cancer patients versus the testimony of the individual whose singular experience is the basis for this lawsuit and who showed a near militant diligence in trying to determine the cause of her tearing.

Accord argues Ms. Wooten failed to "investigate" her injury, ostensibly because she did not "google" her injury, but that merely supports that there is a genuine issue of material fact that precludes summary judgment. Whether seeing multiple eye specialists or consulting "google" is a reasonable inquiry is a material dispute. In the five years that elapsed between her final docetaxel infusion and her diagnosis of canalicular stenosis, Plaintiff consulted **six different doctors** regarding her watery eyes, including her oncologist, four ophthalmologists, and an oculoplastic surgeon:

> A: I did see several eye care professionals about [tearing].
> Q: Was one of those Dr. Kellum?
> A: He was one of them.
> Q: Who were the other eye care specialists that you saw?
> A: I'm sure it's in the record. Dr. Liu. I saw another doctor at SEECA.
> Q: Is that Dr. Guidry?
> A: Yeah.
> ****

---

[2] Here, again, a jury could decide that she was reasonable to abstain from filing a lawsuit until she obtained a diagnosis in light of the fact that multiple medical doctors had given her different diagnoses. *See Hughes,* 856 So. 2d, 222.

Q:  What do you recall about seeing Dr. Kellum?
A:  He said it was dry eye.
Q:  How about Dr. Guidry?
A:  I think he said the same thing.
Q:  What about Dr. Liu?
A:  Same thing. I kept getting diagnoses of dry eye.

SOF ¶ 33.

Accord is incorrect that Ms. Wooten failed to inform any ophthalmologic physician she saw between 2015 and 2017 that her tearing began during chemotherapy and that therefore the providers had no opportunity to even consider her docetaxel use as a risk factor for her tearing. Rec. Doc. 544-1, p. 9. In her first visit to a specialist after Dr. Chauvin's recommendation, occurring on November 11, 2015, notes under "History of Present Illness" indicate "Pt. did undergo chemotherapy at the beginning of the year and this caused excessive watering of the eyes. It has not stopped totally but she hopes that it will soon." SOF ¶ 13. At that visit, she was diagnosed with "MGD (Meibomian Gland Dysfunction) OU" and "Dry Eye Syndrome". SOF ¶ 13. The note for "Follow-up" is "Return to Clinic in 1 year". SOF ¶ 13. Dr. Kellum (the only one of these treaters deposed) testified that he takes a comprehensive history and typically asks his patients when their symptoms started and how long they have been going on. SOF ¶¶ 59, 70-71. Indeed, the records from her visits confirm she reported a history of breast cancer and that she was currently taking letrozole. SOF ¶¶ 15, 34.

While Plaintiff is an intelligent, well-educated woman, she is not a physician and it is not reasonable to expect a lay person to second-guess the medical diagnoses rendered by competent physicians, certainly not by searching Google, Facebook or other internet sites.[3] Despite her

---

[3] It should also be noted that publications from medical journals frequently are unavailable to the general public and require specific and costly subscriptions.

reasonable diligence, she was unable to ascertain the cause of her symptoms until June 22, 2020, when she was diagnosed with canalicular stenosis, a unique injury uniquely caused by docetaxel.[4] SOF ¶¶ 33, 37, 41-46, 52, 55-56.

Accord faults Ms. Wooten for *how* she investigated her injury because she did not conduct a social media or Google search,[5] but putting aside the fact question that contention creates, Accord has not shown even *if* Ms. Wooten conducted an internet search that she would have located (without a subscription) specialty medical journals and understood the complexity of her issues. Moreover, the opaque nature of search engine algorithms invalidates Accord's argument given that reconstructing what Ms. Wooten's browser would have shown years ago is not feasible. Search rankings, which are influenced by personalization, shape user exposure in unpredictable ways, and the use of algorithms can obscure authoritative sources.[6] Without evidence of Ms. Wooten's specific search behavior, Accord cannot prove she was on notice, as the "filter bubble" effect—where algorithms reinforce existing knowledge—could have excluded medical journals from her results. The burden of proof lies with Accord, and the documented variability of search outcomes renders their argument speculative and insufficient to establish notice as a matter of law.

---

[4] Accord references Plaintiff's deposition testimony that she believes she was misdiagnosed. Rec. Doc. 544-1, p. 9. Notably, however, Accord's counsel failed to ask her *when* she came to this conclusion. A jury could reasonably infer she reached this conclusion after she had surgical implantation of permanent glass tubes which finally alleviated her incessant tearing. *See Crochet*, 2020 WL 1242521 at *9-10 (noting that it was plausible that plaintiff's testimony that he was aware his symptoms were related to Abilify "was insight that came only with the benefit of hindsight" after diagnosis of tardive dyskinesia caused by Abilify).

[5] *See* https://www.brownhealth.org/be-well/dr-google-and-online-symptom-checkers ("So it's okay to look things up, but reach out to your doctor. A doctor can (usually) make sense of your symptoms more effectively, and they understand the science. Their experience also makes them better at knowing the difference between various possible diagnoses.").

[6] R. Epstein, & R.E. Robertson, The search engine manipulation effect (SEME) and its possible impact on the outcomes of elections, Proc. Natl. Acad. Sci. U.S.A. 112 (33) E4512-E4521, https://www.pnas.org/doi/10.1073/pnas.1419828112

Finally, that Ms. Wooten contacted a law firm is not dispositive. She testified that she obtained a list of doctors from the firm and immediately made an appointment with an oculoplastic surgeon on the list. SOF ¶ 53. She testified:

> Q:    It'd be fair to say, then, June 8, 2020, when you called NOMC [opthalmology], that you considered filing a lawsuit?
>
> A:    No. I was considering trying to get relief from my tearing.

SOF ¶ 53.

Again, the court in *Hughes* determined the plaintiff was reasonable in filing a lawsuit upon confirmation of his asbestos-related cancer more than one year after he had knowledge from his own doctor that he suspected the disease. Likewise, Ms. Wooten reasonably relied on advice from her doctors, not speculation from an attorney advertisement, and filed her lawsuit within one year of her first diagnosis of an injury caused by Accord's tortious actions.

It is entirely feasible a jury would conclude Ms. Wooten acted reasonably in relying on *multiple* medical opinions versus whatever speculative content might be available on the internet. Accord failed to establish, as a matter of law, that Ms. Wooten had actual or constructive notice of permanent damage to her nasolacrimal drainage system more than one year before filing suit. Accord has failed to show no material fact issue regarding the timing of her lawsuit, and its motion for summary judgment on prescription should be denied.

## III.    Accord Failed to Prove Its Learned Intermediary Defense As a Matter of Law

Likewise, Accord's motion for summary judgment on the learned-intermediary doctrine should be denied. Louisiana's learned-intermediary doctrine permits a drug manufacturer to discharge its duty to warn consumers by adequately warning physicians. *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 265 (5th Cir. 2002). Thus, "[t]he obligation to the consumer is fulfilled when the prescribing or treating physician is informed of any potential side effects or risks from the

drug's use so that they may intelligently decide on its use and advise the patient." *Id.* at 267

(quoting *McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 413 (E.D. La. 1999)). The Fifth

Circuit has held that there is a two-prong test governing inadequate warnings claims under the

Louisiana Products Liability Act (LPLA) when applying the learned intermediary doctrine:

> First, the plaintiff must show that the defendant failed to warn (or inadequately
> warned) the physician of a risk associated with the product that was not otherwise
> known to the physician.

> Second, the plaintiff must show this failure to warn the physician was both a cause
> in fact and the proximate cause of the plaintiff's injury.

*Id.* at 265-66.

Accord claims Ms. Wooten cannot make either showing. However, the evidence is squarely to

the contrary. At a minimum, the evidence is such that the learned-intermediary doctrine cannot be

resolved on summary judgment in this case.

### A.    Accord Failed to Warn Ms. Wooten's Oncologist of the Risk of Stenosis of the Nasolacrimal Drainage System and Dr. Chauvin Was not Otherwise Aware of the Risk.

"[A] mere reference to the adverse effect is not necessarily an 'adequate warning' under the

LPLA. The warning must contain language that is adequate to reasonably inform the recipient (i.e.

the doctor in a learned intermediary case) about the nature of the danger involved." *Stahl*, 283 F.3d

at 267. Moreover, an inadequate warning claim under Louisiana law "can appropriately be based

on alleged inadequacies in a recommended medical monitoring or testing regime." *Id.* at 270.

The LPLA provision defining an "adequate warning" encompasses "instructions" as well as

"warnings." *See La. Rev. Stat. Ann. §9:2800.53(9)* (West 1997) (defining an "adequate warning"

as a "warning or instruction that would lead an ordinary reasonable user or handler of a product to

contemplate the danger in using or handling the product and either to decline to use or handle the

product or, if possible, to use or handle the product in such a manner as to avoid the damage for

which the claim is made.") "Indeed, it is an accepted tenet of Louisiana products liability law that a manufacturer's duty to warn includes a duty to provide adequate instructions for safe use of a product." *Stahl*, 283 F.3d at 269-270 (citing *Hines v. Remington Arms Co., Inc.*, 648 So. 2d 331, 337 (La. 1994)).

Regarding the adequacy of Accord's label, from the time of Accord's docetaxel FDA approval in 2011 through the conclusion of Ms. Wooten's chemotherapy treatment in June 2015, the Accord docetaxel label failed to warn doctors of the risk of progressive/potentially permanent damage to the nasolacrimal drainage system or that permanent damage can be prevented and/or mitigated with monitoring and prompt intervention. SOF ¶¶ 72-74. Instead, during the pendency of Ms. Wooten's chemotherapy, Accord's docetaxel label only included the language that "lacrimal duct obstruction has been reported", which was "reversible upon discontinuation of the infusion." SOF ¶¶ 72-73. Simply put, Accord's label did not (and still does not) disclose the true risk of permanent stenosis or identify the preventative measures needed to treat it. Nor do these terms convey any sense of urgency due to the potentially rapid onset of stenosis or the need to monitor patients for stenosis.

These omissions in the Accord label caused physicians not to appreciate the risk of permanent damage and to inadequately advise their patients. For example, Ms. Wooten's oncology expert Dr. Kevin Knopf offers the following opinion:

> To the extent the label intended to warn oncologists of stenosis, it fails to convey to a reasonable oncologist that immediate intervention is needed to prevent injury. The label does not convey the immediate need for a patient to be referred to a lacrimal specialist upon early signs of tearing.

SOF ¶ 74. Similarly, numerous articles in the medical literature demonstrate that oncologists did not appreciate the risk of permanent stenosis. Even Sanofi's expert witness Bita Esmaeli acknowledged in her 2003 article that "ophthalmologists and oncologists must be aware that

docetaxel can induce obstruction of the lacrimal outflow, especially if this drug is used weekly or for prolonged periods." SOF ¶ 75. The 2006 article "Docetaxel-Associated Epiphora" likewise highlighted that epiphora may be underrecognized as an adverse effect because excess tearing after chemotherapy administration is not as "stringently monitored as life-threatening toxicities such as neutropenia and major organ dysfunction.... Moreover, effective management of docetaxel treatment-related epiphora hinges on early detection." SOF ¶ 76. Finally, Kang, *et al*.'s 2017 article in the British Journal of Ophthalmology states that "oncologists should be aware that LDO is treatable and that overlooking a treatable symptom for a long period makes it more difficult to treat ... early intervention ... may, thus, achieve a good treatment outcome for cancer-associated epiphora and may prevent permanent scarring and closure of the lacrimal drainage apparatus that might necessitate complicated surgical procedures." SOF ¶ 77.

If Accord's docetaxel label had provided an adequate warning there would presumably not be multiple publications over the course of more than a decade stating that oncologists do not appreciate the risk of permanent stenosis or the need to monitor patients for its development. *See Baudin v. AstraZeneca Pharms. LP*, 413 F. Supp. 3d 498, 501 (M.D. La. 2019) (applying Louisiana law) (finding label inadequate because it did not warn of the importance of properly monitoring patients).

Despite the fact that Accord's docetaxel label fails to warn that stenosis is progressive and may become permanent or of the importance of monitoring patients so that early medical intervention can occur, Accord nonetheless claims that Ms. Wooten's prescribing physician Dr. Chauvin was aware of the risk before her chemotherapy treatment. *See* Rec. Doc. 544-1 at 10. Thus, according to Accord, "[w]here the prescribing physician was independently aware of the risks contemplated by the proposed warning, any allegedly inadequate warning becomes moot and proximate cause

fails." *Id.* at 11. This argument should be rejected. While Dr. Chauvin may have been aware of docetaxel's potential for stenosis requiring intervention prior to prescribing Ms. Wooten's chemotherapy, she was not aware that the stenosis was progressive and could become permanent without prompt intervention. Nor was she aware of its potential severity. Indeed, Dr. Chauvin repeatedly testified that she was unaware that stenosis from docetaxel could become permanent:

> Q: Yes, whether there is a risk associated with docetaxel of excessive tearing attributable to potentially permanent stenosis regarding surgical intervention.
> A: To be honest, I thought it was fixable.
> \*\*\*
> Q: Okay. And do you recall – after having a patient with epiphora, when you looked at the literature, do you recall seeing literature published on the topic regarding potentially permanent stenosis?
> A: I don't.
> \*\*\*
> Q: And were you aware that these publications include discussion of docetaxel-associated obstruction or stenosis as being a potentially permanent side effect?
> A: I really did not ever read or pursue to the point that I thought it was permanent. I thought you could put the tubes in and it would fix it.

SOF ¶ 78. Additionally, Dr. Chauvin testified that at the time of Ms. Wooten's treatment she was not aware of the "more major surgery" that can be required to treat severe stenosis of the nasolacrimal drainage system. SOF ¶ 79. Similarly, Dr. Chauvin testified regarding stenosis from docetaxel, "everything that I reviewed was a mild expected thing and then you can get a tube in and patients were fine." SOF ¶ 80.

Accordingly, a stronger warning in the docetaxel label would have made Dr. Chauvin aware that stenosis is progressive and may become permanent without prompt intervention. A stronger warning would have also highlighted the severe damage to the nasolacrimal drainage system that can occur. Without knowing about the potential for permanent stenosis or about the potential severity of the stenosis, Dr. Chauvin was not aware of the "nature of the danger involved" from Docetaxel. *Stahl*, 283 F.3d at 267.

**B.    The Evidence Shows Accord's Failure to Warn Was Both the Cause in Fact and Proximate Cause of Plaintiff's Injury.**

As mentioned above, a plaintiff must also show that a drug company's failure to warn was the cause in fact and proximate cause of the plaintiff's injury. *Stahl*, 283 F.3d at 266. Accord incorrectly suggests that the only way to establish causation is through evidence that Ms. Wooten's prescribing physician would not have used or prescribed the drug had he received a stronger warning. *See* Rec. Doc. 544-1 at 11-13. This is one method to establish causation on a failure-to-warn claim; it is not, however, the exclusive means to do so.

Causation can also be established by showing that, if properly warned, a plaintiff's treating physician would have acted differently such that the injury alleged by the plaintiff could be avoided. *In Re: Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 2017 U.S. Dist LEXIS 58056, at *8 (E.D. La. Apr. 17, 2017) (summary judgment based on the learned intermediary doctrine inappropriate because "this Court finds that Plaintiffs do not contend that prescribing physicians never should have prescribed Xarelto. Instead, they argue their claim survives merely by showing the doctor would have acted differently had they been adequately instructed, and that Plaintiffs' injuries could have been avoided."); *see also Mingo v. Janssen (In re Xarelto (Rivaroxaban) Prods. Liab. Litig.)*, 2017 U.S. Dist LEXIS 115461, at *13 (E.D. La. July 24, 2017) ("The question in the instant case, and Plaintiffs argument here, is not whether Dr. Jordon would still have prescribed Xarelto, but rather whether he would have prescribed it differently if those instructions were given.").[7] Here, Ms. Wooten does not allege that with an adequate warning she would not have

---

[7] Other courts have similarly found that choosing not to prescribe a particular medication or device is not the only adequate means of proving causation on a failure-to-warn claim. *See, e.g., Georges v. Novartis Pharms. Corp.*, 2012 U.S. Dist. LEXIS 189174, 2012 WL 9083365, at *6 (C.D. Cal. Nov 2, 2012) (noting multiple courts have "held that even where physicians admitted that they still recommended the Treatment Drugs knowing of their ... risks [of causing deterioration of bones in the jaw], the changes to their prescription and treatment procedure nonetheless created triable

been prescribed docetaxel. Instead, Ms. Wooten argues that had Accord provided a stronger warning Dr. Chauvin would have monitored her for tearing and promptly referred her to a specialist to prevent potentially permanent stenosis of her nasolacrimal drainage system. *See* Master Long Form Complaint, Rec. Doc. 25 at ¶¶ 1, 5, 23, 28, 58.

To assist in easing the cause-in-fact burden on a plaintiff, Louisiana recognizes the "heeding presumption." This presumption assumes that if an adequate warning had been provided, that warning would have been followed and the plaintiff would not have been injured. *See Bloxom v. Bloxom*, 512 So.2d 839, 850 (La. 1987); *Wagoner v. Exxon Mobil Corp.*, 813 F.Supp.2d 771, 797 (E.D. La. Aug. 24, 2011); *In re: Xarelto*, 2017 U.S. Dist LEXIS 115461, at *8. This presumption may be rebutted with evidence showing that an adequate warning would have been futile under the circumstances. *Bloxom*, 512 So.2d at 850. Here, there is a presumption that if a stronger warning had been provided Dr. Chauvin would have promptly referred Ms. Wooten to an ocular specialist for intervention during chemotherapy after discovering that she was suffering from tearing to prevent the advanced stenosis that ultimately developed. SOF ¶ 89.

Deposition testimony and medical records support the conclusion that genuine issues of fact remain as to whether a different instruction or warning would have changed Dr. Chauvin's actions and avoided or lessened Ms. Wooten's injuries. Ms. Wooten testified that Dr. Chauvin never

---

questions of fact on specific causation"); *Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809, 830 (N.D. Cal.) ("Gilead asserts that Plaintiffs must allege that their physicians would not have prescribed the TFF drugs had Gilead given different warnings, but that position is not supported by the case law."); *In re Aredia & Zometa Products Liab. Litig. (White)*, 2009 U.S. LEXIS 72098, 2009 WL 2497692, at *3 (M.D. Tenn. Aug. 13, 2009) ("It is sufficient for Plaintiff to survive summary judgment to show that one of [plaintiff's] treating physicians ... would have behaved differently.") (applying California law); *Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 645 n.4 (4th Cir. 1981) ("In certain failure to warn cases (notably ones involving oral contraceptives), it is possible to establish evidence of causation not only by showing that a physician would not have given the patient a certain medicine but also by showing that a properly warned physician could have detected early signs of an adverse reaction to a drug and reduced the injury.").

warned her of the risk of tearing as a side effect of docetaxel "until it happened to me." SOF ¶ 83. Ms. Wooten first complained to Dr. Chauvin of "watering eyes" during her oncology appointment on May 26, 2015. SOF ¶ 4, 84. Plaintiff continued to complain of tearing during her oncology appointments with Dr. Chauvin on June 9, 2015, August 10, 2015, and September 14, 2015. SOF ¶¶ 5, 9-10, 85. Yet, there is no indication in the medical records for any of these appointments that Dr. Chauvin either referred Ms. Wooten to an ophthalmologist or discussed with her that she may have stenosis of the nasolacrimal drainage system which could require prompt surgical intervention. SOF ¶¶ 4-11, 51-52, 54, 85-86. In fact, Plaintiff testified that "we never discussed my tear ducts being obstructed." SOF ¶ 52.

It was not until April 7, 2016, nearly a year after Plaintiff first complained of tearing, that Dr. Chauvin indicated in her records for the first time that "[e]piphora persistent and I wonder if tear ducts are obstructed and if they need to be recanalized." SOF ¶¶ 87. Even then, Dr. Chauvin appears to have taken only mild interest in the status of Ms. Wooten's tearing as she admitted at her deposition that she did not know anything about Plaintiff's treatment for her tearing. SOF ¶ 88. Had Dr. Chauvin received a stronger warning about the potential severity, progressive nature, and permanency of stenosis from docetaxel she would have promptly referred Ms. Wooten during chemotherapy to an ophthalmologist after discovering that she was suffering from tearing. Dr. Chauvin's deposition testimony bears this out:

> Q: Dr. Chauvin, Ms. Wooten's claim is not focused on a different treatment regimen. Her claim is that had you been properly warned, that her injury could have been prevented or mitigated. With that understanding, if you understood that stenosis was a progressive injury and that, at least in part, it could be prevented with proper referral to an ophthalmologist during treatment, would you have referred Ms. Wooten to an ophthalmologist during her treatment with docetaxel.
> A: Yes.

SOF ¶ 89. Unfortunately, because Dr. Chauvin believed that stenosis was mild and did not have the potential to become permanent she failed to promptly refer Ms. Wooten during her chemotherapy. SOF ¶¶ 78-80.

Accord argues that Dr. Chauvin never read the Accord docetaxel label and, therefore, a stronger warning would not have changed her prescribing decision. Rec. Doc. 544-1 at 12. As an initial matter, Dr. Chauvin testified that she had reviewed the docetaxel label "a number of times" and that "some" of the information she knew about docetaxel and stenosis was from her review of the docetaxel label. SOF ¶ 81. She further testified, "The information that I have about risk of tear duct and epiphora, oh, I'm sure some of it's from the label and/or reading other literature that talk about it." SOF ¶ 81. Additionally, Dr. Chauvin testified that she relied on multiple sources for information on the benefits and risks and side effects of chemotherapy. SOF ¶ 81. These sources included UpToDate, Physicians' Desk Reference ("PDR"), and other online sources. SOF ¶ 81. Therefore, had Accord provided a stronger warning Dr. Chauvin would have learned of it through her review these sources and the medical literature. *See Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 277 (5th Cir. 2010) (the Court analyzed alternative ways the prescribing physician might have become aware of an update to the drug's label in order to demonstrate a genuine issue of material fact regarding causation).

Objective evidence also supports the conclusion that Ms. Wooten has satisfied the causation element of the learned-intermediary doctrine. Under Louisiana law, subjective testimony from the treating physician on causation may be "supplement[ed] ... with objective evidence of how a reasonable physician would have responded to an adequate warning." *Allgood v. GlaxoSmithKline PLC*, 2008 WL 483574, at n.6 (E.D. La. Feb. 20, 2008) (internal quotations and citations omitted). Ms. Wooten has supplemented Dr. Chauvin's testimony with the expert opinions of her oncology

expert Dr. Knopf. Dr. Knopf states in his report that a reasonable oncologist "may consider dose adjustments, cessation of a particular agent due to toxicity, delay of treatment, changes in anti-emetics or growth factors, *or management of toxicities including referrals to other specialists.*" SOF ¶ 90. In other words, Dr. Knopf opines that had a stronger warning been provided a reasonable oncologist would have concluded that excessive tearing might be a symptom of progressive stenosis, which, if managed early through immediate referral during chemotherapy could be prevented. SOF ¶ 74. Accordingly, the existence of both objective and subjective evidence of causation precludes the entry of summary judgment under the learned-intermediary doctrine.

CONCLUSION

Accord failed to meet its burden to show that summary judgment is warranted as a matter of law. Ms. Wooten has established, at the very least, a fact issue as to whether she timely filed her complaint. Likewise, Accord has failed to show that application of the learned intermediary doctrine forecloses her claims. Accord's motion for summary judgment should be denied.

Dated: July 9, 2025                          Respectfully submitted,

**PAUL LLP**                                 **HOTZE RUNKLE**

Richard M. Paul III (*pro hac vice*)         /s/ Patrick Hotze
Laura C. Fellows (*pro hac vice*)            Patrick O. Hotze (*pro hac vice*)
601 Walnut Street, Suite 300                 Karen Cannon Shanks, LA Bar 33049
Kansas City, Missouri 64106                  Justin E. Dunlap (*pro hac vice*)
Tel: 816-984-8100                            1101 S. Capital of Texas Highway
rick@PaulLLP.com                             Building C, Suite 100
laura@PaulLLP.com                            West Lake Hills, Texas 78746
                                             Tel: 512-476-7771
                                             photze@hotzerunkle.com
                                             karen@hotzerunkle.com
                                             justin@hotzerunkle.com


**COUNSEL FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 9, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.

<u>*/s/ Patrick Hotze*</u>