## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: TAXOTERE (DOCETAXEL) | ) | MDL NO. 3023 |
| EYE INJURY | ) | |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | |
| This document relates to: | ) | SECTION: "H" (5) |
| All cases | ) | |

## ORDER AND REASONS

Before the Court is Sanofi's Motion for Summary Judgment Based on Preemption (Doc. 445). For the following reasons, Sanofi's Motion for Summary Judgment Based on Preemption is **DENIED.**

## BACKGROUND

Plaintiffs in this multidistrict litigation ("MDL") are suing several pharmaceutical companies that manufactured and/or distributed a chemotherapy drug, Taxotere or docetaxel, that Plaintiffs were administered for the treatment of cancer.[1] Among these companies are Defendants Sanofi U.S. Services Inc. and sanofi-aventis U.S. LLC and (collectively, "Sanofi").

## I. Alleged Injury

Plaintiffs allege that Taxotere or docetaxel caused them to sustain injuries to their lacrimal systems, including punctal, canalicular, and/or nasolacrimal duct stenosis, which resulted in excessive tearing, otherwise known as epiphora.

---

[1] Taxotere is the brand name for the drug docetaxel.

While it has undergone certain revisions, as of 2002, Sanofi's label has warned about "excessive tearing which may be attributable to lacrimal duct obstruction." Plaintiffs allege that Sanofi failed to warn them that stenosis is a common but preventable side effect, and that Sanofi's label "has never identified stenosis as a cause of excessive tearing or warned of the rapid onset at which stenosis can occur, the potentially irreversible nature of the injury, or the urgent need to provide treatment and refer patients to a lacrimal specialist at the first sign of excessive tearing."[2] They allege that early referral could have prevented the progression to permanent stenosis. They further contend that while epiphora in some Plaintiffs may have fully or partially resolved, Plaintiffs are often left with scarring, disfigurement, and sometimes permanent tubes in their ducts.

Plaintiffs allege that the mechanism of the injury at issue occurs through secretion of Taxotere/docetaxel in the tears causing inflammation, scarring, and/or fibrosis in the lacrimal drainage system and that the punctal, canalicular, and sometimes nasolacrimal duct are predominately affected.[3]

Dr. Bita Esmaeli (Sanofi's proposed expert and ophthalmic plastic and orbital surgeon) and Dr. Vikram Durairaj (Plaintiffs' proposed expert and

---

[2] Doc. 25 at 7.

[3] Dr. Esmaeli opines that "[a]lthough I have hypothesized that stenosis/obstruction may develop due to secretion of docetaxel in the tear film and we have demonstrated the presence of docetaxel in the tear samples collected from patients 24 hours after administration of the drug, the exact mechanism of this side effect is not proven and may be multifactorial." Doc. 445-27 at 22.

oculoplastic and orbital surgeon) explain the injury at issue in detail.[4] Dr. Esmaeli provides the following illustration of the relevant ocular anatomy.[5]



The lacrimal drainage system comprises four main anatomical structures: the punctum, canaliculus, lacrimal sac, and the nasolacrimal duct. After tears are released from the lacrimal gland, the eye's drainage system functions through gravity and a blinking-induced pumping mechanism, which together move tears from the eye into the nose. The tears first flow from the surface of the eye though the puncta. Each eye has an upper punctum and lower punctum. The puncta then lead to the canaliculi, which are narrow tubes that drain into the lacrimal sac. Inferiorly, the lacrimal sac is continuous with

---

[4] Doc. 445-27 (Report of Dr. Esmaeli), Doc. 493-103 (Report of Dr. Durairaj).

[5] Doc. 445-27 at 4. Dr. Durairaj also provides illustrations in his Report. Doc. 493-103 at 6, 7.

the nasolacrimal duct, which opens into the nose under the inferior turbinate. The tears are then absorbed by the body.

Dr. Durairaj explains that there is a distinct lacrimal secretory system and a nasolacrimal excretory system. The secretory lacrimal system is responsible for the production of tears, while the "nasolacrimal system excretory apparatus" is responsible for the drainage of tears, as described above. He opines that excessive tearing can be caused by a problem in either of these two systems, and that it is important to distinguish between "excessive production of tears . . . in the secretory lacrimal system" and the "inability to drain tears in the excretory nasolacrimal system" because often, in this context, the former "will resolve once treatment is over whereas stenosis of the nasolacrimal drainage system does not."[6]

There are a few procedures used to determine the presence/location of stenosis. One is probing (sometimes with irrigation), which involves inserting a metal probe through the punctum and advancing it through the canaliculi and into the lacrimal sac. If irrigation is performed, saline is injected into the nasolacrimal drainage system. Another is the "dye disappearance test," which involves administering dyed drops into the eye and examining how the dye drains.

According to the parties' experts, treatment of stenosis (which Dr. Durairaj refers to as scarring and/or narrowing) depends on its anatomic location and severity. For example, stenosis of the punctum may be first treated with probing and irrigation and topical steroids. If these are

---

[6] Doc. 493-103 at 8.

4

unsuccessful, stenosis may be treated via punctoplasty, a surgical procedure intended to widen or open the puncta to restore drainage. A small stent may also be inserted temporarily to keep the puncta open.

Mild stenosis of the canaliculi and/or nasolacrimal duct is often treated with probing and irrigation, artificial tears, and/or topical steroids. Moderate stenosis of the canaliculi and/or nasolacrimal duct is often treated through bicanalicular silicone intubation, a surgical intervention involving the placement of a silicone stent through the canaliculi of both the upper and lower eyelids, passing through the nasolacrimal duct, and into the nasal cavity. For severe stenosis of the canaliculi and/or nasolacrimal duct, there are a number of surgical procedures. One is dacryocystorhinostomy ("DCR"), a surgical procedure intended to create a new tear drainage pathway to allow tears to drain directly into the nasal cavity, after which temporary silicone stents are inserted to keep the new passage open during healing. DCR may be performed externally or endoscopically.

Complete and/or severe closure of the canaliculi may require a "total bypass procedure" involving placement of a permanent Pyrex glass tube, or "Jones tube," through an opening inside the corner of the eye and into the opening in the nasal cavity to drain tears in the nose.[7]

## II.    Statutory and Regulatory Background

Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), a drug manufacturer must obtain approval from the Food and Drug Administration

---

[7]    Doc. 445-27 at 31, Doc. 493-103. This is known as a "conjunctivodacryocystorhinostomy," or "CDCR." Doc. 445-27 at 31. Dr. Durairaj also describes a surgical procedure called canaliculodacryocystorhinostomy, a reconstructive procedure used to connect the canaliculus to the lacrimal sac. Doc. 493-103 at 16.

("FDA") before selling its drug in the United States.[8] The FDCA lays out several methods of approval.[9] Pursuant to § 505(b)(1), a manufacturer seeking approval of the first drug of a specific kind, or reference listed drug ("RLD"), must submit a New Drug Application ("NDA") containing, "inter alia, 'full reports of investigations which have been made to show whether such drug is safe for use and whether such drug is effective in use.'"[10]

### A.    Labeling requirements

"The FDA regulates the safety information that appears on the labels of prescription drugs that are marketed in the United States."[11] "FDA regulations set out requirements for the content, the format, and the order of the safety information on the drug label."[12] The Supreme Court has explained that under the FDCA and its corresponding regulations, a drug manufacturer has "responsibility for the content of its label at all times."[13] "It is charged both

---

[8] Hickey v. Hospira, 102 F.4th 748, 750 (5th Cir. 2024) (citing 21 U.S.C. § 355(a)).

[9] *See id.* at 751.

[10] *Id.* at 750–51 (quoting 21 U.S.C. § 355(b)(1)(A)(i)). The Fifth Circuit and the parties refer to this provision and its counterparts—§§ 505(b)(2) and (j)—by their location in the FDCA rather than their location in the United States Code. *Id.* at 760 n.1.

[11] Merck Sharp & Dohme Corp. v. Albrecht, 587 U.S. 299, 304 (2019) (citing 21 U.S.C. § 355(b)(1)(F); 21 C.F.R § 201.57). This "FDA approved prescribing information" is referred to as the "United States Package Insert, or 'USPI.'" Doc. 445-4 at 6. As the Supreme Court has explained, although a drug's label is commonly understood to refer to the sticker affixed to the bottle, "in this context the term refers more broadly to the written material that is sent to the physician who prescribes the drug and the written material that comes with the prescription bottle when the drug is handed to the patient at the pharmacy." *Albrecht*, 587 U.S. at 303–04 (citation modified). These inserts are often lengthy and contain detailed information about the drug's medical uses and health risks. *Id.*

[12] *Albrecht*, 587 U.S. at 304.

[13] Wyeth v. Levine, 555 U.S. 555, 570–71 (2009).

with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market."[14]

In 2006, the FDA issued a Final Rule amending 21 C.F.R. §§ 201.56 and 201.57 to set forth the requirements for the content and format of labeling for human prescription drugs and biological products.[15] Pursuant to the regulations, "[l]abels must include various types of information, organized in a specific manner, by sections."[16] "As those requirements make clear, the category in which a particular risk appears on a drug label is an indicator of the likelihood and severity of the risk."[17] "The hierarchy of label information is designed to 'prevent overwarning' so that less important information does not 'overshadow' more important information."[18]

Two sections of the label are relevant here: the "Warnings and Precautions" section, described in § 201.57(c)(6), and the "Adverse Reactions" section, discussed in § 201.57(c)(7). "In the Warnings and Precautions section,

---

[14] *Id.* at 571.

[15] Final Rule, Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed. Reg. 3,922 (Jan. 24, 2006) (codified at 21 C.F.R. §§ 201.56, 201.57). This Rule is known as the Physician's Labeling Rule, or "PLR." *See* U.S. *ex rel.* Polansky v. Pfizer, Inc., 822 F.3d 613, 616 n.7 (2d Cir. 2016); *see also* Doc. 445-4 at 6. In the PLR, the FDA stated that "older drugs not subject to the revised labeling content and format requirements in § 201.57 remain subject to labeling requirements at former § 201.57, which is redesignated as § 201.80 by this final rule," and explained the phase-in schedule for certain other drugs. 71 Fed. Reg. 3,922, 3,965. The requirements for "older" drugs and "newer" drugs, however, shared similar language. *See* Tucker v. SmithKline Beecham Corp., 596 F. Supp. 2d 1225, 1228–30 (S.D. Ind. 2008) (comparing 21 C.F.R. § 201.80(e) with 21 C.F.R. § 201.57(c)(6)(i) and 21 C.F.R. § 201.57(e) (2002)).

[16] *In re* Fosamax (Alendronate Sodium) Prods. Liab. Litig., 118 F.4th 322, 329 (3rd Cir. 2024) (citing 21 C.F.R. § 201.57).

[17] *Albrecht*, 587 U.S. at 304.

[18] *Id.* (quoting Final Rule, Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, 73 Fed. Reg. 49,603, 49,605–06 (Aug. 22, 2008)).

a drug manufacturer 'must describe clinically significant adverse reactions[,] including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug[.]'"[19] "That section 'must be revised to include a warning about a clinically significant hazard as soon as there is *reasonable evidence of a causal association with a drug*,'" but "'a causal relationship need not have been definitely established' before making such a revision."[20]

"In the Adverse Reactions section of a label, the drug manufacturer must 'describe the overall adverse reaction profile of the drug.'"[21] An "'adverse reaction' is 'an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence.'"[22] But "this definition does not include all adverse events observed during use of a drug, only those adverse events for which there is *some basis to believe there is a causal relationship* between the drug and the occurrence of the adverse event."[23]

As the Third Circuit has explained, "[t]o summarize, risks described in the Warnings and Precautions section of a label (i.e., risks of clinically significant adverse reactions) are presumably more serious than those that appear only in the Adverse Reactions section."[24]

---

[19] *In re Fosamax*, 118 F.4th at 329 (quoting 21 C.F.R. § 201.57(c)(6)(i)) (alterations in original).

[20] *Id.* (quoting 21 C.F.R. § 201.57(c)(6)(i)) (citation modified).

[21] *Id.* (quoting § 201.57(c)(7)).

[22] *Id.* (quoting § 201.57(c)(7)).

[23] § 201.57(c)(7) (emphasis added).

[24] *In re Fosamax*, 118 F.4th at 329.

### B.     Changes-Being-Effected regulation

"When the FDA approves a new drug, it also approves the exact text that will be included on the drug's labeling."[25]  But "[a]fter the FDA approves a label for a drug, that label is not immutable."[26] Because "knowledge about a drug's safety and efficacy can change over time," the FDA provides several pathways for a label change.[27] Generally, a manufacturer cannot change a drug's label after approval until the FDA approves a supplemental application.[28] "But in some circumstances, the changes-being-effected ("CBE") regulation allows manufacturers to file a supplemental application with the FDA and simultaneously implement a labeling change before obtaining FDA approval."[29] The FDA, however, may still reject labeling changes made pursuant to the CBE regulation in its review of the supplemental application.[30]

Pursuant to 21 C.F.R. § 314.70(c)(6)(iii), a CBE change can be invoked for "[c]hanges in the labeling to reflect newly acquired information . . . to accomplish any of the following," including "to add or strengthen a contraindication, warning, precaution, or adverse reaction for which the

---

[25] *Hickey*, 102 F.4th at 750 (citing *Wyeth*, 555 U.S. at 568).

[26] *In re* Zofran (Ondansetron) Prods. Liab. Litig., 57 F.4th 327, 331 (1st Cir. 2023).

[27] *Id.*

[28] *Hickey*, 102 F.4th at 750 (citing *Wyeth*, 555 U.S. at 568).

[29] *Id.* (citing 21 C.F.R. § 314.70(c)(6)).

[30] *Wyeth*, 555 U.S. at 571. "If the FDA later disapproves the CBE application, 'it may order the manufacturer to cease distribution of the drug product(s)' with the new labeling." *Albrecht*, 587 U.S. at 321 (Thomas, J., concurring) (alterations in original) (quoting 21 C.F.R. § 314.70 (c)(7)). But "in practice, manufacturers typically consult with FDA prior to adding risk information to labeling." *In re Fosamax*, 118 F.4th at 330 (quoting 71 Fed. Reg. 3,922, 3934 (Jan. 24, 2006)).

evidence of a causal association satisfies the standard for inclusion in the labeling under § 201.57(c) of this chapter."[31]

Thus, the current CBE regulation allows a manufacturer to change a label to reflect (1) "newly acquired information" if the changes add or strengthen a warning for which there is (2) evidence of a causal association.[32]

21 C.F.R. § 314.3(b) defines "newly acquired information" as "data, analyses, or other information not previously submitted to the Agency," including but not limited to "data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events or analyses reveal *risks of a different type or greater severity or frequency* than previously included in submissions to FDA."[33]

In turn, as stated above, while the Warnings and Precautions section requires "'reasonable evidence of a causal association with a drug' before a risk will be listed," the Adverse Reactions section requires only "some basis to believe there is a causal relationship between the drug and the occurrence of an adverse event."[34]

## III. Approval History

Sanofi submitted the original Taxotere NDA on July 24, 1994.[35] On May 14, 1996, the FDA approved the Taxotere NDA for the treatment of patients

---

[31] 21 C.F.R. § 314.70(c)(6)(iii)(A).

[32] *See id.*

[33] (emphasis added).

[34] *In re Fosamax*, 118 F.4th at 329 (first quoting 21 C.F.R. 201.57(c)(6)(i); then quoting 21 C.F.R. § 201.57(c)(7)).

[35] Dr. Ross explains that Rhône-Poulenc Rorer (now Sanofi) submitted the original NDA, which first received FDA approval in 1996 under the Accelerated Approval regulations

with locally advanced or metastatic breast cancer whose disease progressed during anthracycline-based therapy, or whose disease has relapsed during anthracycline-based adjuvant therapy. The FDA subsequently approved Taxotere for additional indications, including as an adjuvant chemotherapy treatment for early-stage breast cancer in 2004.[36] All FDA-approved dosing indications for Taxotere involve infusions every three weeks. Although there are no FDA-approved indications involving weekly infusions of Taxotere, it is often prescribed off-label for such use.

Patients are treated with docetaxel in both the metastatic and adjuvant/neoadjuvant setting. Metastatic disease, or Stage IV cancer that is no longer curable, refers to cancer that has spread from its original site to other parts of the body. Chemotherapy administered in this setting is given to prevent cancer from spreading, that is, to prolong survival.[37]

By contrast, adjuvant chemotherapy is given as a supplement to the primary treatment—typically surgery—for the purpose of preventing the cancer from returning. Adjuvant chemotherapy is given after surgery, while neoadjuvant therapy is given before surgery for the purpose of shrinking a tumor before it is removed. Consequently, patients who receive docetaxel in the metastatic setting receive it for much longer periods of time than patients who are treated in the adjuvant/neoadjuvant setting.[38]

---

(21 C.F.R. §§ 314.500–.560). These regulations "allow provisional approval on the basis of an effect on a clinical endpoint other than survival or irreversible morbidity. Accelerated approval requires that the sponsor submit post-marketing data to describe and verify the benefit of the drug." Doc. 445-24 at 49.

[36] *Hickey*, 102 F.4th at 751–52; *see also* Doc. 445-4 at 36, Doc. 485-11 at 1.

[37] Doc. 445-27 at 13, 17 n.57.

[38] *Id.*

### A.    Correspondence with and submissions to the EMA

The parties provide evidence regarding Sanofi's correspondence with the European Agency for the Evaluation of Medicinal Products ("EMA") for background. In mid-2000, Sanofi received "a cluster" of nine "cases of canalicular fibrosis and lacrimation disorders, which were reported from a single non-[Sanofi] sponsored clinical trial" involving another drug, Herceptin, and docetaxel.[39] Afterwards, at the request of the EMA, Sanofi's Global Safety Officer for Taxotere prepared a cumulative review to "identify additional cases of canalicular fibrosis, blocked tear ducts, lacrimal stenosis, and excessive tearing."[40] The assessment was submitted to the EMA in the Eighth Periodic Safety Update Report for Taxotere ("PSUR 8") on February 1, 2001 and covered the period between February 1 and November 3, 2000.[41]

Sanofi reported in PSUR 8 that the nine patients from the study described above "experienced tearing (epiphora) diagnosed as canalicular fibrosis" (scarring), and that five of those patients required some form of surgery.[42] Sanofi also briefly summarized ten cases from spontaneous reports "without significant confounding factors and requiring procedural intervention."[43] seven cases of "excessive tearing," one case of "blocked tear

---

[39] Doc. 445-5 at 26.

[40] *Id.*

[41] *Id.*

[42] *Id.* at 29. Based on the case numbers listed in PSUR 8, it is unclear whether nine or ten patients were reported from this study. *See id*; *see also* Doc. 445-6 at 9 (noting that "10 cases of canalicular fibrosis were reported in the Phase II study of docetaxel plus trastuzumab").

[43] A "spontaneous report" is an adverse event reported once the drug is marketed which is unsolicited and which does not derive from a study or organized data collection scheme. 445-5 at 101.

ducts," one of "lacrimal stenosis," and one case of "canaliculitis" (inflammation and infection of the canaliculi).[44] Sanofi concluded that "[t]o date, there is *no clear mechanism of action* for docetaxel to cause canalicular fibrosis.[45]

After Sanofi submitted PSUR 8 to the EMA, the EMA directed Sanofi to submit the requisite documentation to add "lacrimal duct obstruction" to the European label within two months.[46] In response, Sanofi compiled an additional assessment, which was later integrated into the Ninth Periodic Safety Update Report for Taxotere ("PSUR 9") and submitted to EMA on November 20, 2001.[47]

Sanofi stated in PSUR 9 that ten cases of lacrimal duct/canaliculi stenosis were reported during the relevant period. Six of these cases were

---

[44] According to the American Academy of Ophthalmology Eye Wiki, canaliculitis is "an infection of the lacrimal canaliculus." American Academy of Ophthalmology Eye Wiki, https://eyewiki.org/Canaliculitis. (last visited Oct. 29, 2025). Dr. Esmaeli opines that "canaliculitis, or inflammation and chronic infection of the canaliculi," can cause "stenosis/obstruction." Doc. 445-27 at 11–12.

[45] 445-5 at 29 (emphasis added). In total, PSUR 8 referenced seventy cases from CIOMS Forms, which "provide a standardized format for sponsors to report suspected adverse drug reactions to regulatory authorities." Doc. 445-4 at 40. Nine of the seventy cases were reported from "intensified monitoring," and sixty-one were reported from from "spontaneous reports." *Id.* Forty-six of the sixty-one spontaneous reports were considered associated with docetaxel. 445-5 at 27. Only the cases described above were discussed in detail for various reasons. *Id.* at 26–27.

[46] Doc. 445-6 at 2. Specifically, the EMA instructed Sanofi to "provide a Type II variation" to add "lacrimal duct obstruction" to the SmPC, or "Summary of Product Characteristics," which Sanofi's proposed regulatory expert, Dr. Joohee Sul, explains "is EMA's functional equivalent to the USPI." Doc. 445-4 at 43. A Type II variation is a "major change to a marketing authorisation that may have a significant impact on the quality, safety or efficacy of a medicine, but does not involve a change to the active substance, its strength or the route of administration. Type II variations require a formal approval." European Medicines Agency, Type II Variation, GLOSSARY – REGULATORY TERMS, https://www.ema.europa.eu/en/glossary-terms/type-ii-variation (last visited Oct. 29, 2025).

[47] Doc. 527-9. The assessment was circulated to Sanofi's labeling group as a "Request for Global Labeling Discussion." Doc. 445-8.

reported from two publications, while four cases were from "spontaneous reports."[48] The first publication was an abstract titled "Early Recognition of Taxane-Associated Canaliculitis Important in Preserving Lacrimal Duct Function," which was published in 2000 by R. Kneuper Hall and others in Breast Cancer Research and Treatment ("2000 Kneuper Hall Abstract").[49] The second, "Canalicular Stenosis Secondary to Docetaxel (Taxotere): A Newly Recognized Side Effect," was published in 2001 in Ophthalmology by Dr. Bita Esmaeli and others ("2001 Esmaeli Ophthalmology Article").[50] The parties focus their arguments on these two publications.

Sanofi noted that in the articles, the authors suggested that docetaxel may play a role either through (1) direct secretion into tears, potentially causing fibrosis (scar tissue formation) in the canaliculi, which could lead to cicatricial ectropion (outward turning of the eyelid due to scarring) and/or dacryostenosis; or (2) through systemic effects of the drug similar to generalized edema (swelling/fluid retention).[51]

In the cumulative review section, PSUR 9 also briefly summarized the characteristics of thirty-five cases, including the ten described above, involving "lacrimation disorder requiring intervention, tear duct obstruction, stenosis, or canaliculitis," and noted that ophthalmological findings were reported for nine

---

[48] Doc. 445-9 at 21.

[49] Kneuper Hall R. et al., *Early Recognition of Taxane-Associated Canaliculitis Important in Preserving Lacrimal Duct Function*, 64 BREAST CANCER RES. TREAT. 89, abstract 356 (2000).

[50] Bita Esmaeli et al., *Canalicular Stenosis Secondary to Docetaxel (Taxotere): A Newly Recognized Side Effect*, OPHTHALMOLOGY (2001).

[51] Doc. 445-9 at 66. Neither the parties nor their experts provide or otherwise point to a definition for the term "dacryostenosis."

14

of these cases.[52] Sanofi further stated that "although various terms referring to the tear duct system were reported," twenty-three cases reported having undergone various procedures, including "stents/ tubes/ silicone intubation," "punctoplasty/ dilatation," "temporary punctal plugs," and "tear duct surgery not otherwise specified" for the relief of symptomatic epiphora.[53] Sanofi also noted that topical ocular medications and fluorouracil (another chemotherapy agent taken by some patients) had been described as being associated with tearing.

Finally, Sanofi estimated that, based on crude estimates of patient exposure data, the rate of cases reporting "tearing abnormality requiring intervention," as well as those possibly involving tear duct obstruction or blockage, were at rates less than or equal to 1/10,000 patients or .01%.[54] Sanofi also noted that "patient exposure data is not available based on dosing schedule."[55]

## B. Correspondence with and submissions to the FDA

### 1. *15-Day ADE Report*

As part of its post-marketing obligations, Sanofi submitted a 15-day Adverse Drug Experiences ("ADE") Report to the FDA in June 2001.[56] The

---

[52] Doc. 445-9 at 66. PSUR 9 also identified 147 cases of tearing abnormalities from Sanofi's database as of August 17, 2001. Doc. 445-9 at 65.

[53] *Id.* at 65.

[54] *Id.* Sanofi presented similar estimates in PSUR 8. Doc. 445-5 at 29.

[55] Doc. 445-9 at 66.

[56] Pursuant to 21 C.F.R. § 314.80(c), an applicant must submit Postmarketing 15–day "Alert reports," or reports on "each adverse drug experience that is both serious and unexpected, whether foreign or domestic, as soon as possible but no later than 15 calendar days from initial receipt of the information by the applicant," as well as "Periodic adverse drug experience reports."

Report contained MedWatch forms describing patients requiring surgical intervention described in the 2000 Kneuper Hall Abstract and the 2001 Esmaeli Ophthalmology Article.[57]

The 2000 Kneuper Hall Abstract reported on six patients who were treated with docetaxel and/or docetaxel and paclitaxel who experienced canaliculitis "symptomatically manifested as epiphora."[58] Of the six patients, three required "lacrimal duct stents"—two patients required "temporary silicone punctal plugs" and one patient required bilateral dacryocystorhinostomy with insertion of permanent Jones tubes.[59] The authors concluded that "[w]ith the increased use of taxanes it is important that medical oncologists be cognizant of this ocular toxicity which may lead to lacrimal canalicular fibrosis with permanent stenosis."[60]

In turn, the 2001 Esmaeli Ophthalmology Article was an observational study of three metastatic breast cancer patients who received weekly docetaxel and/or docetaxel and trastuzumab and who developed epiphora "secondary to punctal or canalicular stenosis during treatment with docetaxel."[61] Epiphora did not resolve after cessation of treatment in two of the three patients. One

---

[57] Doc. 445-10. Dr. Sul states in her Report that "FDA maintains MedWatch, a publicly available web-based reporting system for adverse events related to products regulated by FDA, including prescription drugs." Doc. 445-4 at 28.

[58] Doc. 445-10 at 23. Four patients treated adjuvantly received docetaxel every three weeks, and two patients with metastatic disease received docetaxel weekly followed by paclitaxel. *Id.*

[59] While the authors appear to refer to the treatment as both "stents" and "punctal plugs," the authors apparently intended to refer to stents. Dr Esmaeli distinguishes punctal plugs (used to treat dry eye) from stents and opines that "[p]atients with a history of having punctal plugs likely have a prior history of dry eye and tearing," and opines that "[p]unctal plugs can cause stenosis/obstruction." Doc. 445-27 at 7, 12.

[60] Doc. 445-10 at 23.

[61] *Id.* at 22. The patients also received dexamethasone coverage.

patient underwent snip punctoplasty with partial resolution of her symptoms, one patient underwent bicanalicular silicone intubation of each nasolacrimal duct with resolution of her symptoms, and one patient opted out of suggested procedures.

The authors stated that while "[c]analicular stenosis has been described in association with other chemotherapeutic agents . . . to our knowledge, it has not been reported as a side effect of docetaxel."[62] The authors concluded that

> [e]piphora is a newly recognized side effect of docetaxel and *may occur more frequently with weekly cycles of this drug.* The mechanism for epiphora seems to be punctal and canalicular stenosis. This side effect, in advanced cases, is not reversible with discontinuation of the drug. Patients being administered weekly cycles of docetaxel should be screened for epiphora and canalicular stenosis, and treatment in the form of silicone intubation or punctoplasty should be considered in early stages to prevent the need for conjunctivodacryocystorhinostomy.[63]

### 2.    *2002 CBE submission*

Pursuant to the CBE regulations, on January 9, 2002, Sanofi submitted a "Special Supplement-Changes Being Effected" to the FDA for Taxotere ("Supplement 17"). Supplement 17 included changes to the Adverse Reactions section of the Taxotere label to be implemented no later than May 31, 2002. Specifically, Sanofi proposed adding a new "Ophthalmologic" subsection to the Adverse Reactions section and provided the following rationale:

> The subsection **Ophthalmologic** has been added and contained the following events: *conjunctivitis, lacrimation or lacrimation with or without conjunctivitis* (line listings for these events are

---

[62] *Id.*

[63] *Id.* (emphasis added).

contained in Attachments 10 and 11). Based on our medical review . . . the event *lacrimal duct obstruction* has been classified as "rare." The addition of this event has been described in the following statement: "*Rare cases of lacrimal duct obstruction resulting in excessive tearing have been reported primarily in patients receiving other anti-tumor agents concomitantly*" (line listings for this event is contained in Attachment 12).[64]

Supplement 17 also included fifty-three case line listings for the event "lacrimal duct obstruction." The listings identified various terms including "lacrimal duct obstruction," "canaliculitis," "clogged tear ducts," and "canalicular stenosis."[65]

On March 27, 2002, the FDA responded to Sanofi's CBE application and sent a "request for changes," and countered with the following language:

Cases of lacrimal duct obstruction resulting in excessive tearing and/or *requiring silastic tube replacement* have been reported primarily in patients receiving other anti-tumor agents concomitantly.[66]

Following the FDA's response, Sanofi held further discussions regarding the FDA's addition of the silastic tubing language and internally circulated various draft responses to the FDA via email. In one email, a Sanofi employee objected to the inclusion of the "silastic tubing" language on the label, stating that "not patient 'requires' silastic tubing; it is merely an intervention of convenience."[67] In one draft, a Sanofi employee proposed responding to the

---

[64] Doc. 445-12 at 6–7. Sanofi classified the event as rare because there were fewer than 309 events, and advised that the events in postmarketing experiences should be described as "reported from a population of unknown size, so precise estimates of frequency could not be made." Doc. 493-24 at 5.

[65] Doc. 445-12, Doc. 445-13.

[66] Doc. 445-15 at 2 (emphasis added).

[67] Doc. 493-29 at 2.

FDA by stating that "[r]eview of the literature indicated that all fourteen patients were treated by a single ophthalmologist, outside of the context of a controlled clinical trial," and that "[t]he risk-benefit ratio for this procedure, in this clinical setting, has not been defined, and thus we respectfully request that it would not be appropriate at this time to include a specific medical procedure in the labeling."[68] In another draft, an employee questioned whether silastic tubing was a "widely accepted intervention."[69]

On May 28, 2002, Sanofi responded to the FDA with the following proposed language:

> Excessive tearing which may be attributable to lacrimal duct obstruction has been reported primarily in patients receiving other anti-tumor agents concomitantly.[70]

In its response, Sanofi noted that many of the patients managed with silastic tubes were treated at the same medical center and that some patients required other interventions (such as DCR, punctoplasty, etc.). Thus, Sanofi explained that it removed the silastic tubing language because it was "inappropriate" to recommend "a specific medical intervention," and stated that the "specific treatment modality" should be based on the treating physician's assessment and "the current standard of care for the management of this condition in the medical community."[71]

---

[68] Doc. 527 at 24.
[69] *Id.* at 25.
[70] Doc. 445-18.
[71] *Id.*

On May 29, 2002, the FDA countered Sanofi's language with the following, noting that excessive tearing had also been reported in patients receiving docetaxel alone:

> Excessive tearing which may be attributable to lacrimal duct obstruction has been reported.[72]

On June 5, 2002, Sanofi notified the FDA that it agreed to this proposal. On July 9, 2002, the FDA notified Sanofi that it had approved Supplement 17.

### 3.    *sNDA submission*

Around this time, on February 1, 2002, Sanofi also submitted a Supplemental NDA (sNDA) seeking approval for the use of Taxotere in combination with "cisplatin for treatment of patients with unresectable, locally advanced or metastatic non-small cell lung cancer," and "who have not previously received chemotherapy for this condition."[73] As part of this application, Sanofi submitted PSURs 8 and 9 to the FDA.[74] Taxotere was approved for this indication on November 27, 2002.[75]

### C.    Subsequent label revisions

From September 2002 until 2003, the warning on the label provided:

---

[72] Doc. 445-19.

[73] Doc. 445-14 at 2.

[74] In their Opposition, Plaintiffs dispute that Sanofi has proven that it submitted the documents to the FDA. The sNDA states that "[t]o represent the collective post-marketing experience of docetaxel, an overview assessment is presented with a copy of the Periodic Safety Update Reports (PSURs) compiled according to ICH E2 recommendations." Doc. 445-14 at 4. Sanofi attached to its Reply "[t]he file location data for the PSUR attachment with the NSCLC submission." Doc. 525 at 13 n.31.

[75] Doc. 527 at 4–5.

> Ophthalmologic: conjunctivitis, lacrimation or lacrimation with or without conjunctivitis. Excessive tearing which may be attributable to lacrimal duct obstruction has been reported.[76]

In 2003, Sanofi again revised the label to state:

> Ophthalmologic: conjunctivitis, lacrimation or lacrimation with or without conjunctivitis. Excessive tearing which may be attributable to lacrimal duct obstruction has been reported. Rare cases of transient visual disturbances (flashes, flashing lights, scotomata) typically occurring during drug infusion and in association with hypersensitivity reactions have been reported. *These were reversible upon discontinuation of the infusion.*[77]

This language remained largely the same until the label was revised in May 2020 to change the "reversible upon discontinuation" language.[78] Since May 2020, the label has contained the following warning:

> Ophthalmologic: conjunctivitis, lacrimation or lacrimation with or without conjunctivitis, cystoid macular edema (CME). Excessive tearing which may be attributable to lacrimal duct obstruction. Transient visual disturbances (flashes, flashing lights, scotomata), typically occurring during drug infusion and reversible upon

---

[76] Doc. 493-43.

[77] Doc. 493-44 (emphasis added).

[78] Doc. 493-64. In December 2013, the label was revised to include as the final sentence that "[c]ases of cystoid macular edema (CME) have been reported in patients treated with TAXOTERE." Doc. 493-58.

discontinuation of the infusion, in association with hypersensitivity reactions.[79]

## LEGAL STANDARD

On February 28, 2025, Sanofi filed the instant Motion for Summary Judgment based on Preemption.[80] Plaintiffs oppose.[81]

### I.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[82]

### II.    Law on Preemption

The doctrine of preemption derives from the U.S. Constitution's Supremacy Clause, which provides that "federal law 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'"[83] "Where state and federal law 'directly conflict,' state law must give way."[84] Such a conflict exists "where it is 'impossible for a private party to comply with both state and federal requirements.'"[85] "Impossibility preemption is a demanding defense."[86]

---

[79] Doc. 527 at 29.

[80] Doc. 445.

[81] Doc. 485.

[82] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).

[83] PLIVA v. Mensing, 564 U.S. 604, 617 (2011) (quoting U.S. CONST. art. VI, cl. 2) (alterations in original).

[84] Id. (quoting Wyeth, 555 U.S. at 583).

[85] Id. at 618 (quoting Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

[86] Wyeth, 555 U.S. at 573.

A preemption analysis must be guided by the two cornerstones of preemption jurisprudence.[87] First, a court should consider "the purpose of Congress."[88] Second, in all preemption cases, a court must assume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[89]

As the Supreme Court has explained, "the underlying question . . . is whether federal law (including appropriate FDA actions) prohibited the drug manufacturer from adding *any and all warnings* to the drug label that would satisfy state law."[90] "The question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it."[91] "A state law challenge to FDA-approved warnings, including a tort action under state law, can thus proceed only when the defendant had the unilateral ability to change that labeling; otherwise, the claim is preempted."[92]

As explained above, the CBE regulation allows a unilateral label change where there is (1) newly acquired information for which there is (2) evidence of a causal association between the drug and the harm. In *Hickey v. Hospira*, the Fifth Circuit established that in this preemption context, "the availability of the CBE regulation is a threshold issue" to the preemption analysis.[93] Thus, if

---

[87] *Id.* at 565.

[88] *Id.*

[89] *Id.*

[90] Knight v. Boehringer, 984 F.3d 329, 337 (4th Cir. 2021) (emphasis added) (quoting *Albrecht*, 587 U.S. at 313–314).

[91] *Mensing*, 564 U.S. at 604 (citing *Wyeth*, 555 U.S. at 573).

[92] *Knight*, 984 F.3d at 337.

[93] *Hickey*, 102 F.4th at 754.

the requirements of the CBE regulation are not satisfied, a plaintiff's claims are preempted.

If the CBE regulation is available, a plaintiff's claims are nevertheless preempted if a manufacturer can show "'clear evidence that the FDA would not have approved a change' to the label."[94] In *Merck Sharp & Dohme Corp. v. Albrecht*, the Supreme Court clarified that "clear evidence" is "evidence that shows the court that the drug manufacturer fully informed the FDA of the justifications for the warning required by state law and that the FDA, in turn, informed the drug manufacturer that the FDA would not approve a change to the drug's label to include that warning."[95]

To reiterate, in a case such as this one, the preemption inquiry is a two-part test. First, a court must determine if the CBE regulation (which allows for a unilateral change to the label) was available by assessing whether the requirements set forth in the regulation are satisfied. If so, a defendant can still prove impossibility preemption by showing there was "clear evidence" that the FDA would have rejected a label change.

## LAW AND ANALYSIS

Sanofi argues that Plaintiffs' state-law failure-to-warn claims are preempted by the FDCA and its corresponding regulations because it could not have invoked the CBE regulation to unilaterally change its label. Because Sanofi moves only on this threshold issue, it does not address the "clear evidence" standard. As explained above, the CBE regulation allowing for a

---

[94] *Albrecht*, 587 U.S. at 300 (quoting *Wyeth*, 555 U.S. at 571).
[95] *Id.* at 303.

change to "add or strengthen a warning" requires both "newly acquired information" and sufficient evidence of a causal association between the drug and a risk of harm.[96] Here, however, Sanofi argues only that it did not have "newly acquired information" as defined in the regulation.

Plaintiffs first respond that the CBE regulation was amended in 2008 to include the requirement of "newly acquired information." As such, "newly acquired information" was not required before then, and Sanofi could have used the CBE process to strengthen the warning even without such information. They further contend that, even if the regulation did require "newly acquired information," Sanofi had it as early as 2003, citing several scientific publications.

## I.    Burden of Proof

At the outset, the parties disagree about who bears the burden of proof regarding the availability of the CBE regulation. "The burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment."[97] "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party."[98] "The burden of production imposed by Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment."[99]

---

[96] While the CBE change allows for certain additional categories of label changes, the parties do not address those here.

[97] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (Brennan, J., dissenting) (citing 10A Wright & Miller's FEDERAL PRACTICE & PROCEDURE § 2727 (2d ed. 1983)).

[98] *Id.* (citing 10A Wright & Miller § 2727).

[99] *Id.* (citing 10A Wright & Miller § 2727).

In this preemption context, district courts, including this Court, have held that the manufacturer bears "the ultimate burden of persuasion," but the plaintiff "bears an initial burden of production."[100] This allocation reflects the unique posture of preemption as an affirmative defense: defendants must ultimately establish the absence of "newly acquired information" that would have permitted a unilateral labeling change, yet plaintiffs may bear a limited burden of production to identify evidence suggesting such information exists, so as not to require defendants to prove a negative.[101] Here, while Defendants agree with this approach, Plaintiffs assert that Defendants bear the full burden, including the burden of production.

In *Hickey v. Hospira, Inc.*, the Fifth Circuit held that "Defendants bear the ultimate burden of proving that the information at issue does not meet the requirements of the CBE regulation."[102] The court noted, however, that because the parties agreed that the defendants bear this burden, and because the plaintiffs had "already identified the information at issue," it "need not decide which party bears the initial burden of producing the information at issue."[103]

---

[100] *See* Silverstein v. Boehringer Ingelheim Pharms., Inc., No. 19-CIV-81188, 2020 WL 6110909, at *12 (S.D. Fla. Oct. 7, 2020). In another MDL, this Court adopted the approach set forth in *Silverstei*n; however, on appeal, the Fifth Circuit declined to decide the issue. *In re* Taxotere (Docetaxel) Prods. Liab. Litig., MDL No. 16-2740, 16-17583, 18-194, 17-12674, 18-9799, 18-4731, 2022 WL 3042639, at *8 (E.D. La. Aug. 2, 2022), *vacated and remanded on other grounds sub nom.*, *Hickey*, 102 F.4th 748.

[101] *See Silverstein*, 2020 WL 6110909, at *12.

[102] *Hickey*, 102 F.4th at 755. To the extent the question is a legal one, "the burden of proof is not a determining factor." *Roberto*, 2019 WL 5068452, at *11 n.9. "Standards of proof, such as preponderance of the evidence and clear and convincing evidence, have no place in the resolution of this question of law." *Albrecht*, 587 U.S. at 325 (Alito, J., concurring).

[103] *Hickey*, 102 F.4th at 761.

Here too, the Court finds that it need not decide the issue because Plaintiffs have already identified the relevant information.

## II. Whether "Newly Acquired Information" Is a Question for Jury Determination

The parties also appear to dispute whether the existence of "newly acquired information" is a question for a judge or a jury to determine.[104] In *Albrecht*, the Supreme Court—addressing only *Wyeth v. Levine*'s "clear evidence" standard—held that the question of agency disapproval in the evaluation of "clear evidence" is a question of law that a judge must decide.[105] The Court pronounced that "the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question."[106] The Court explained that judges are "better suited than are juries to understand and to interpret agency decisions in light of the governing statutory and regulatory context," and that even when "contested brute facts" are relevant, they are "subsumed within an already tightly circumscribed legal analysis."[107] It also made clear that "'courts may have to resolve subsidiary factual disputes' that are part and parcel of the broader legal question."[108]

For example, "in contexts as diverse as the proper construction of patent claims and the voluntariness of criminal confessions," such factual inquiries

---

[104] Sanofi also raises this issue in its Motion to Exclude Dr. Ross, arguing that his opinions on "newly acquired information" are legal conclusions. Doc. 456.

[105] *In re Zofran*, 57 F.4th at 337 n.7 (citing *Albrecht*, 587 U.S. at 316).

[106] *Albrecht*, 587 U.S. at 318 (quoting Markman v. Westview Instruments, 517 U.S. 370, 388 (1996)).

[107] *Id.* at 301.

[108] *Id.* at 317 (quoting Teva Pharms. USA, Inc. v. Sandoz, 547 U.S. 318, 319 (2015)).

"create a question that 'falls somewhere between a pristine legal standard and a simple historical fact.'"[109] The Court explained that although at times such quasi-factual inquiries may require credibility determinations, "any credibility determinations will be subsumed within the necessarily sophisticated analysis of the whole document, required by the standard construction rule that a term can be defined only in a way that comports with the instrument as a whole."[110]

The Court concluded that "courts should treat the critical question not as a matter of fact for a jury but as a matter of law for the judge to decide. And where that is so, the judge must simply ask himself or herself whether the relevant federal and state laws 'irreconcilably conflic[t].'"[111] The Court, however, "seemingly left open the question whether what constitutes 'newly acquired information' is a question of law or a question of fact."[112]

Following *Albrecht*'s reasoning, courts have confirmed that the question of whether information is "newly acquired" is not one for expert testimony or jury resolution. In *Roberto v. Boehringer Ingelheim Pharms., Inc.*, the Connecticut Superior Court reasoned that if the "clear evidence" prong is for judges, "it seems unlikely that the Supreme Court would hold that the first prong [newly acquired information] is triable to the jury while the second prong is not."[113]

---

[109] *Id.* (quoting *Markman*, 517 U.S. at 388).

[110] *Id.* In a concurring opinion, Justice Alito explained that "whether federal law allowed Merck to include in the Fosamax label the warning alleged to be required by state law is a question of law to be decided by the courts, not a question of fact." *Id.* at 323 (Alito, J., concurring).

[111] *Id.* at 315 (quoting Rice v. Norma Williams Co., 458 U.S. 654, 659 (1982)).

[112] *In re Zofran*, 57 F.4th at 337 n.7.

[113] No. CPLHHDCV166068484S, 2019 WL 5068452, at *3 (Conn. Super. Ct. Apr. 2, 2020).

Courts presiding over MDLs have precluded expert testimony on the ultimate issue of whether something is "newly acquired." For example, in *In re Zofran*, the First Circuit, "[f]ollowing the parties' lead," proceeded "under the assumption that determining whether certain information is 'newly acquired' is a legal question."[114] The court therefore found inadmissible the opinion of the plaintiffs' regulatory expert, Dr. Harvey, who opined that certain studies constituted "newly acquired information." The court explained that "[a]lthough experts can opine on the underlying factual questions, including providing interpretations of pharmaceutical studies, they provide little, if any, relevant assistance when they opine on the ultimate legal question of whether something is 'newly acquired information.'"[115] The court cited *Knight v. Boehringer*, in which the Fourth Circuit held that "preemption is a question of law that is reviewed de novo," and further determined, "as part of its preemption analysis, whether data was 'newly acquired information.'"[116]

In *In re Gardasil*, the District Court for the Western District of North Carolina, citing *Zofran* and *Albrecht*, also considered the admissibility the testimony of a regulatory expert, Dr. Amato, on "newly acquired information."[117] The court found that "[t]o the extent that Dr. Amato goes beyond presenting evidence of the alleged 'newly acquired information' for the Court to itself consider, he is offering his own interpretation as to whether the data was sufficient to meet the governing standard."[118] The court thus barred

---

[114] *In re Zofran*, 57 F.4th at 337.

[115] *Id.* at 340.

[116] *Id.* (citing *Knight*, 984 F.3d at 337).

[117] 3:22-MD-03036, 2025 WL 1782576, at *3 (W.D. N.C. Feb. 20, 2025) (quoting *In re Zofran*, 57 F.4th at 340).

[118] *Id.*

Dr. Amato's testimony "on the ultimate regulatory issue," reasoning that it went "to heart of what the Court must decide" because "opinions as to legal conclusions cannot assist the Court in deciding questions which the Court must answer as a matter of law."[119]

The court considered, however, the expert's testimony to the extent that the expert was "providing factual information" and "describing the details and timing of the warnings" that the plaintiffs contended should have been included on the defendants' label, finding that such testimony would "assist[] the Court in making its ruling."[120]

For the same reasons, the Court agrees that the question of whether information is "newly acquired" is a question for a judge, rather than a jury, to determine. And regardless of the precise nature of that question, to the extent that any expert is opining on the "ultimate issue" of whether any scientific literature satisfies the standard for "newly acquired information," the Court finds such testimony unhelpful and need not consider it.

## III. Whether "Newly Acquired Information" was Required Prior to 2008

Prior to 2008, a CBE change could be made to "accomplish any of the following," including, among other things, "add or strengthen a contraindication, warning, precaution, or adverse reaction."[121] The "newly acquired" information requirement was codified in a 2008 Final Rule.[122] As

---

[119] *Id.* at *3.

[120] *Id.*

[121] Doc. 493 at 3–4 (citing 21 C.F.R. § 314.70(c)(2)(i) (1985); 21 C.F.R. § 314.70(c)(6)(iii) (effective September 22, 2008)).

[122] 73 Fed. Reg. 49,603 (2008).

such, Plaintiffs contend that prior to 2008, "newly acquired information" was not required for a CBE change. Defendants respond that the 2008 amendment was not substantive, relying on the FDA's statements in the preamble to the 2008 Final Rule, including its assertion that the amendments "codified the Agency's longstanding view" as to when a CBE change was appropriate.[123]

Here, as explained below, the Court finds that regardless of whether "newly required information" was required to change a label under the CBE regulation prior to 2008, there exists on the record "newly acquired information" such that Sanofi could have changed its label as early as 2003 even under the amended regulation.[124]

---

[123] *Id.*

[124] To be sure, where a statute or regulation lacks an explicit requirement, the Fifth Circuit has cautioned against reading one in. Env't Integrity Project v. EPA, 969 F.3d 529, 541 (5th Cir. 2020) ("'The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it.'" (quoting Yates v. Collier, 868 F.3d 354, 369 (5th Cir. 2017))). "A number of cases have identified the *casus omissus pro omisso habendus est* canon, under which a statute should not be read to include matter it does not include." *Id.* (citing Lamie v. U.S. Tr., 540 U.S. 526, 538 (2004)). Because the regulation lacked the explicit definition of "newly acquired information" currently in place, the FDA's statements may not require deference under *Skidmore* or *Auer*. *See* Huntington Ingalls, Inc. v. Dir., Off. of Worker's Comp. Programs, U.S. Dep't of Labor, 70 F.4th 245, 254 (5th Cir. 2023) (first citing Skidmore v. Swift & Co., 323 U.S. 134 (1944); then citing Auer v. Robbins, 519 U.S. 452 (1997)); *but see* Gaetano v. Gilead Scis., Inc., 529 F. Supp. 3d 333, 348 n.10 (D.N.J. 2021) (concluding that the "FDA effectively had the newly acquired information requirement in place prior to 2008, even if it was not codified in the regulation"). Thus, prior to 2008, courts apparently did not address the issue in determining whether the CBE process was available, although some courts have suggested that there must at least be "reasonable" evidence supporting a label change, as is required to list a warning. *See In re* Actos (Pioglitazone) Prods. Liab. Litig., No. 6:11-md-2299, 2014 WL 60298 (W.D. La. 2014); Cartwright v. Pfizer, Inc., 369 F. Supp. 2d 876, 886 (E.D. Tex. 2005); Tucker v. SmithKline Beecham Corp., 596 F. Supp. 2d 1225, 1230 (S.D. Ind. 2008); Bueno v. Merck & Co., 746 F. Supp. 3d 853, 876 (S.D. Cal. 2024). Although Defendants point out that courts have also stated that the information at issue had to at least be "new," they also suggest that the definition of "newly acquired" is narrower than this. In any event, whether information was "new," or whether it had already been considered by the FDA, seems less central to the pre-2008 inquiry into whether the CBE regulation was

31

## IV.    Whether There Exists "Newly Acquired Information"

Plaintiffs argue that Sanofi had "newly acquired information" as early as 2003 allowing it to strengthen the warning on the label.[125] Specifically, Plaintiffs point to a study by Dr. Bita Esmaeli and others titled "Blockage of the Lacrimal Drainage Apparatus System as a Side Effect of Docetaxel" published in Cancer ("2003 Esmaeli Cancer Study").[126] Plaintiffs also point to additional pieces of literature published after this date that they contend constitute "newly acquired information."

---

available; rather, it appears to bear more directly on step two of the analysis—namely, whether there was "clear evidence" that the FDA would have rejected a label change. *See* Warner v. Amgen Inc., No. 1:24-cv-10632, 2025 WL 490720, at *7 (D. Mass. Feb. 13, 2025), *appealed docketed*, 25-1268 (1st Cir. Nov. 20, 2025) ("Stated differently, when the FDA has considered the safety and efficacy information required by state law in the course of approving a prescription drug's label, there exists clear evidence that the FDA would not have approved the warning required by state law."); *see also Hickey*, 102 F.4th at 759 n.8 (noting that the "line so drawn lets the FDA be the exclusive judge of safety and efficacy based on information available at the commencement of marketing, while allowing the states to reach contrary conclusions when new information not considered by the FDA develops" (quoting *In re* Celexa & Lexapro Mktg. & Sales Pracs. Litig., 779 F.3d 34, 39 (1st Cir. 2015))).

[125] As Sanofi points out, where a single plaintiff is involved in the litigation, or where a defendant's motion is tied to a specific plaintiff, the relevant time period to identify "newly acquired information" runs from the time the FDA approved the relevant label available to the plaintiff's physician to the plaintiff's exposure to the drug—although it is unclear whether that time period should end at the time a plaintiff is first exposed, or the time a plaintiff has finished treatment. *See, e.g.*, Goodell v. Bayer Healthcare Pharms. Inc., No. 18-CV-10694-IT, 2019 WL 4771136, at *4 (D. Mass. Sept. 30, 2019) (limiting preemption inquiry to 2007, when FDA approved most recent drug label, to 2010, when the plaintiff was administered the drug); *see also* Rayes v. Novartis Pharms. Corp., No. 21-55723, 2022 WL 822195, at *1 (9th Cir. Mar. 18, 2022) (limiting "newly acquired information" to information published before the plaintiff's final injection of the drug at issue). In their Opposition, Plaintiffs point to the 2003 Esmaeli Cancer Study as the earliest publication constituting "newly acquired information." Doc. 485 at 18.

[126] Esmaeli et al., *Blockage of the Lacrimal Drainage Apparatus as a Side Effect of Docetaxel Therapy*, 98 CANCER 504 (2003) (Doc. 445-26).

As stated above, "newly acquired information" is "data, analyses, or other information not previously submitted to the Agency," including but not limited to "data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events or analyses reveal *risks of a different type or greater severity or frequency than previously included in submissions to FDA*."[127] Thus, to assess whether information satisfies the definition of "newly acquired," the Court must measure it against the information previously submitted to FDA.[128]

Prior to 2003, Sanofi had submitted to the FDA (1) the 15-day ADE Report, which included cases from the 2000 Kneuper Hall Abstract and 2001 Esmaeli Ophthalmology Article; (2) Supplement 17, which included as attachments case line listings; and (3) the February 2002 sNDA, which included PSURs 8 and 9.[129] Sanofi argues that these submissions already (1) identified the risk of "permanent" stenosis, (2) indicated that surgical procedures could be required, and (3) warned about the need for prompt evaluation and referral. It therefore contends that the 2003 Esmaeli Cancer Study provided nothing new upon which a CBE change could be based. The Court disagrees.

In the 2003 Esmaeli Cancer Study, the authors evaluated the records of 148 patients with several types of cancer who had epiphora associated with

---

[127] 21 C.F.R. § 314.3(b) (emphasis added).

[128] *See Hickey*, 102 F.4th at 757. In *Hickey v. Hospira*, the question before the court was whether the plaintiffs' claims against certain "505(b)(2) manufacturers" were preempted; the court thus compared the publicly available "pre-approval" literature to the publicly available "post-approval" literature. *See id.* at 756 n.5.

[129] Although Dr. Sul contends in her report that Sanofi submitted other articles (in 2003 and afterwards) to the FDA, the parties do not mention those submissions.

docetaxel.[130]  The purpose of the 2003 Study was "to report on the severity and management of canalicular and nasolacrimal duct stenosis as a side effect of docetaxel therapy and to report the outcome of surgical intervention for this condition."[131]

Two patients received treatment in the neoadjuvant setting, while the remainder were treated in the metastatic setting. Seventy-one patients received docetaxel weekly, 5 patients received docetaxel every two weeks, and 72 patients received it every three weeks. Each patient underwent an ophthalmologic examination and in-office probing and irrigation. The patients were either treated with topical steroids or offered a surgical procedure, depending on the severity of the stenosis.[132]

Thirty patients who received weekly docetaxel underwent surgery to correct epiphora, including temporary silicone tube placement, DCR with temporary silicone tube placement, and DCR with permanent Pyrex glass tube placement. Twenty-nine of the 30 patients who underwent surgery reported improvement or total resolution of epiphora after the procedure. In one patient, the nasolacrimal duct and canaliculi scarred around the inserted silicone tube after DCR and silicone intubation, so her symptoms persisted. Ten additional patients who received weekly docetaxel had complete closure of their canaliculi but elected not to undergo surgery. The authors noted that "[o]f special note were two patients who received weekly docetaxel in the neoadjuvant setting and developed complete closure of the canaliculi."[133]

---

[130] Doc. 445-26.

[131] *Id.* at 2.

[132] *Id.*

[133] *Id.* at 4.

Of the patients who received docetaxel every two or three weeks, only 3 patients required a surgical intervention to correct epiphora. One patient underwent silicone intubation, 1 patient underwent DCR with silicone tube placement, and 1 patient underwent punctoplasty.

The authors stated that "the findings in this large cohort confirm our earlier observations that blockage of the lacrimal drainage apparatus is a common and important side effect of weekly docetaxel therapy," and that "this ocular complication can occur even in the neoadjuvant setting when the drug is used for a limited time, as evidenced by the finding of severe end-stage canalicular stenosis in two individuals with breast carcinoma who received adjuvant docetaxel."[134]

> The authors concluded that
>
> [c]analicular and nasolacrimal duct obstruction is a *common* side effect of weekly docetaxel therapy and can occur even when this drug is used in the neoadjuvant setting. The results of the current study indicate that early temporary silicone intubation in symptomatic patients receiving weekly docetaxel *can prevent further closure of the lacrimal drainage apparatus* and obviate more involved surgical interventions and permanent Pyrex glass tube placement. [135]

Here, the Court finds that the 2003 Esmaeli Cancer Study shows a "risk of a different type or greater severity or frequency" than what was previously submitted to the FDA. First, the authors indicated that stenosis was dose-dependent and observed that patients with a longer duration and higher cumulative dose of docetaxel were significantly more likely to exhibit complete

---

[134] *Id.*
[135] Doc. 445-26 at 2 (emphasis added).

canalicular closure. Contrary to Sanofi's assertion, such evidence is not merely cumulative evidence and/or further evidence of a causal connection.[136] Rather, as Plaintiffs argue, these observations—coupled with the authors' emphasis on the need for monitoring, early detection and/or surgical intervention—provide at least some evidence about the progressiveness of the injury.

While the authors of the 2001 Esmaeli Article and 2000 Kneuper Hall Abstract reported on similar injuries and surgical interventions and penned similar warnings regarding the need for referral to an ophthalmologist and/or prompt intervention, those warnings were based on a handful of reports and provided with little context, and the Hall Abstract was focused on "canaliculitis," rather than only on stenosis. At minimum, the 2003 Esmaeli Article provided further analysis on an injury that—according to the 2001 Esmaeli Article—had not been reported in any literature prior to 2001 and whose mechanism remained unclear.

Second, the authors of the 2003 Esmaeli Cancer Study found that stenosis occurred even in the neoadjuvant setting, where the drug is used for a limited time. Neither the Hall Abstract nor the 2001 Esmaeli Article reported on patients in this setting. They noted that "the role of weekly taxanes in the neoadjuvant setting is becoming better established," and opined that

---

[136] *See In re Zofran*, 57 F.4th at 339 (finding that certain animal studies, which differed in dose from prior animal studies, were not "newly acquired information" because, among other things, the studies indicated that the observed anomalies in the animal subjects were "not dose related" and/or "had no dose-dependency"). Sanofi contends that this is not a "no warnings case," so evidence about a stronger causal connection, standing alone, is not "newly acquired information." But even assuming the 2003 Study only provides evidence about a causal connection, Plaintiffs point out that the warning at issue was never in the Warnings and Precautions section (or pre-2006 equivalent).

"[b]ecause patients receiving adjuvant docetaxel have a longer life expectancy than patients receiving docetaxel in the metastatic setting, it is especially crucial to recognize canalicular obstruction early and offer the appropriate therapy in patients receiving adjuvant docetaxel."[137] The authors noted that the "[f]ailure to recognize canalicular obstruction early can leave patients with no options except DCR with Pyrex glass tube placement, an inferior option."[138] They further noted that "in patients treated with weekly administration of docetaxel, a regimen rarely associated with neutropenia and thrombocytopenia, it is safe to perform surgery while the patient continues to receive the previously planned chemotherapy regimen."[139]

Finally, although the 2003 Study apparently did not provide sufficient information from which an incidence rate could be determined (because only patients with epiphora were evaluated), the authors' pronouncement that stenosis was a common and important side effect arguably indicated an uptick in cases since Sanofi's rough estimate of 1/10,000 cases of "tearing abnormality requiring intervention" and/or "tear duct obstruction."[140]

---

[137] Doc. 445-26 at 4.

[138] *Id.*

[139] Dr. Esmaeli states in her Report that medical oncologists "occasionally used weekly infusion cycles because of dose-limiting neutropenia, which is a life-threatening complication, that can be seen when administered every three weeks." Doc. 445-27 at 13.

[140] *See Wyeth*, 555 U.S. at 570 (holding that as adverse incidents continued to occur, the manufacturer "could have analyzed the accumulating data and added a stronger warning"). Sanofi argues that frequency is not relevant here because Plaintiffs do not explicitly argue that frequency was an issue on the label, as evidenced by their expert's opinion. The Court declines Sanofi's invitation to address label adequacy here. The narrower question before the Court is whether federal law preempts Plaintiffs' state-law failure-to-warn claims.

As the First Circuit has explained, "[t]he CBE regulation covers virtually all situations in which new information indicates new or greater risks."[141] To be sure, the authors of the 2003 Study noted that they were reporting on their "expanded experience with epiphora and canalicular and nasolacrimal duct blockage," thus indicating that some of the data was not "new."[142] Notably, however, the authors also opined that they "frequently encounter[ed] advanced cases of this condition because of delayed diagnosis. Thus, it appears oncologists need to be become better educated regarding this side effect."[143] The authors also found it important to state that "in our opinion, canalicular stenosis may be the most important side effect of weekly docetaxel."[144]

At bottom, as the Supreme Court has made clear, the CBE regulation accounts for the fact that "risk information accumulates over time and that same data may take on a different meaning in light of subsequent developments."[145] The same is true here. The Court finds that the 2003 Esmaeli Study constitutes "newly acquired information."[146] Accordingly, the CBE

---

[141] *In re Celexa*, 779 F.3d at 41.

[142] Doc. 445-26 at 3.

[143] *Id.* at 5.

[144] *Id.*

[145] *Wyeth*, 555 U.S. at 569.

[146] Although it need look no further, the Court notes that at least one additional piece of literature constitutes "newly acquired information." In the 2001 Esmaeli Article, the authors noted that a "prospective study" was "currently underway at our institution to evaluate the incidence of canalicular stenosis secondary to docetaxel and the relationship between dosing and frequency of administration of this drug and the incidence of this form of toxicity." Doc. 445-10 at 22. In 2006, Dr. Esmaeli and others published a study titled "Prospective Study of Incidence and Severity of Epiphora and Canalicular Stenosis in Patients with Metastatic Breast Cancer Receiving Docetaxel" in the Journal of Clinical Oncology. Doc. 493-120. The Study, which was sponsored by Sanofi to meet an "unmet medical need," was conducted to "determine the incidence and severity of epiphora and canalicular stenosis in patients receiving docetaxel weekly or every 3 weeks," and appears to

regulation was available for Sanofi to change its label, and it was not impossible for Sanofi to comply with both state and federal obligations. Plaintiffs' claims are therefore not preempted under impossibility preemption.[147]

## CONCLUSION

For the foregoing reasons, Sanofi's Motion for Summary Judgment is **DENIED.**

New Orleans, Louisiana this 1st day of December, 2025.

_____

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

be the one of the first prospective studies examining incidence rates of stenosis, as well surgical outcomes. *Id.* at 2. In her Report, Dr. Esmaeli states that this "important research article" was published in "arguably one of the highest impact journals read by medical oncologists throughout the world." Doc. 441-2 at 18.

[147] As explained above, Sanofi does not move for summary judgment on the issue of "clear evidence"; nor does it argue that the CBE regulation's causal association requirement is not satisfied.