## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: TAXOTERE (DOCETAXEL) | ) | MDL NO. 3023 |
| EYE INJURY | ) | |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | |
| This document relates to: | ) | SECTION: "H" (5) |
| All cases | ) | |

## ORDER AND REASONS

Before the Court are two Motions: (1) Accord's Motion for Summary Judgment on Preemption Grounds (Doc. 439) and (2) Sandoz's Motion for Summary Judgment on Preemption Grounds (Doc. 458). For the reasons set forth herein, the Motions are **GRANTED.**

## BACKGROUND

Plaintiffs in this multidistrict litigation ("MDL") are suing several pharmaceutical companies that manufactured and/or distributed a chemotherapy drug, Taxotere or docetaxel, that Plaintiffs were administered for the treatment of cancer, primarily breast cancer.[1] Among these companies are Defendants sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. (collectively, "Sanofi"), Accord Healthcare, Inc. ("Accord"), and Sandoz Inc. ("Sandoz"). Plaintiffs allege that Taxotere or docetaxel caused them to sustain injuries to their lacrimal systems, including punctal, canalicular, and/or nasolacrimal duct stenosis (narrowing and/or scarring), which resulted in excessive tearing, otherwise known as epiphora. On February 27 and 28, 2025,

---

[1] Taxotere is the brand name for the drug docetaxel.

Accord and Sandoz filed Motions for Summary Judgment, respectively.[2] Defendants argue that Plaintiffs' state-law failure-to-warn claims are preempted under the Federal Food, Drug, and Cosmetic Act ("FDCA") and its corresponding regulations under the theory of "impossibility preemption." Plaintiffs oppose.[3]

## I.    Statutory Background

The Court begins by addressing the complex statutory framework under the FDCA. Under the FDCA, a drug manufacturer must obtain approval from the Food and Drug Administration ("FDA") before selling its drug in the United States.[4] "Meeting those requirements involves costly and lengthy clinical testing."[5] Originally, the same rules applied to all drugs.[6] The Drug Price Competition and Patent Term Restoration Act of 1984, or "Hatch-Waxman Amendments," however, were enacted to allow for certain "manufacturers to develop generic drugs inexpensively, without duplicating the clinical trials already performed on the equivalent brand-name drug."[7]

Under those amendments, "there are three primary routes through which a manufacturer can obtain approval of drugs."[8] Pursuant to § 505(b)(1) of the FDCA, a manufacturer seeking approval of the first drug of a specific kind, or reference listed drug ("RLD"), must submit a New Drug Application ("NDA") containing, "inter alia, 'full reports of investigations which have been

---

[2] Doc. 439; Doc. 458. The Court held oral argument on August 19, 2025.

[3] Doc. 485.

[4] Hickey v. Hospira, 102 F.4th 748, 750 (5th Cir. 2024) (citing 21 U.S.C. § 355(a)).

[5] *Id.*

[6] *Id.* (citing PLIVA v. Mensing, 564 U.S. 604, 612 (2011)).

[7] *Id.* (citing *Mensing*, 564 U.S. at 612).

[8] *See id.* at 751.

made to show whether such drug is safe for use and whether such drug is effective in use.'"[9]

Thereafter, manufacturers who prepare drugs that are either the same or similar enough to the RLD "may use two abbreviated pathways to obtain FDA approval with less burden and expense."[10] Pursuant to § 505(j), "the manufacturer of a generic drug" may "submit an Abbreviated New Drug Application," or "ANDA."[11] On the other hand, pursuant to § 505(b)(2), a manufacturer seeking approval of drugs that "differ in ways that are slight enough for the manufacturer to still rely on the RLD's safety and efficacy data" must submit an NDA,[12] which "need contain only that information needed to support the modification(s) of the listed drug."[13] "Unlike § 505(j) drugs, § 505(b)(2) drugs are not required to use the exact same labeling as the RLD."[14]

---

[9] *Id.* at 750–51 (quoting 21 U.S.C. § 355(b)(1)(A)). The Fifth Circuit and "the parties refer to this provision and its counterparts—§§ 505(b)(2) and (j)—by their location in the FDCA rather than their location in the United States Code." *Id.* at 760 n.1.

[10] *Id.* at 751.

[11] *Id.* (citing 21 U.S.C. § 355(j)).

[12] *Id. (*citing 21 U.S.C. § 355(b)(2)).

[13] *Id.* (quoting 21 C.F.R. § 314.54).

[14] *Id.* (citing 21 C.F.R. § 314.54 (a)(2)). Plaintiffs' proposed regulatory expert, Dr. Ross, explains that a drug approved through a 505(b)(2) NDA usually has a label that differs from the innovator drug used to support approval. Doc. 493-101 at 44. He also notes that for a 505(b)(2) NDA that relies on full reports of safety and effectiveness from a 505(b)(1) NDA, similarities between the labels of the two drugs are due "entirely to the similarity between the scientific evidence underlying approval of both NDAs. In other words, the drug labels are similar because they both make use of the same 'full reports,' not because of statutory and/or regulatory dictates." *Id.* at 45.

### A.    Labeling requirements

"The FDA regulates the safety information that appears on the labels of prescription drugs that are marketed in the United States."[15] "FDA regulations set out requirements for the content, the format, and the order of the safety information on the drug label."[16] Pursuant to these regulations, "[l]abels must include various types of information, organized in a specific manner, by sections."[17] "As those requirements make clear, the category in which a particular risk appears on a drug label is an indicator of the likelihood and severity of the risk."[18] "The hierarchy of label information is designed to 'prevent overwarning' so that less important information does not 'overshadow' more important information."[19]

Two sections of the label are relevant here: the "Warnings and Precautions" section, described in 21 C.F.R. § 201.57(c)(6), and the "Adverse Reactions" section, discussed in § 201.57(c)(7). "In the Warnings and Precautions section, a drug manufacturer 'must describe clinically significant adverse reactions[,] including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug[.]'"[20] "That section must be revised to include a warning about a clinically significant hazard as soon as there is *reasonable evidence of a causal*

---

[15] Merck Sharp & Dohme Corp. v. Albrecht, 587 U.S. 299, 304 (2019) (citing 21 U.S.C. § 355(b)(1)(F); 21 C.F.R § 201.57).

[16] *Id.* at 304 (citing 21 C.F.R. § 201.57).

[17] *In re* Fosamax (Alendronate Sodium) Prods. Liab. Litig., 118 F.4th 322, 329 (3rd Cir. 2024) (citing 21 C.F.R. § 201.57).

[18] *Albrecht*, 587 U.S. at 304.

[19] *Id.* (quoting 73 Fed. Reg. 49605–49606 (2008)).

[20] *In re Fosamax*, 118 F.4th at 329 (quoting 21 C.F.R. § 201.57(c)(6)(i)).

*association with a drug*," but "a causal relationship need not have been definitely established before making such a revision."[21]

"In the Adverse Reactions section of a label, the drug manufacturer must describe the overall adverse reaction profile of the drug."[22] An "'adverse reaction' is 'an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence.'"[23] But "this definition does not include all adverse events observed during use of a drug, only those adverse events for which there is *some basis to believe there is a causal relationship* between the drug and the occurrence of the adverse event."[24]

"To summarize, risks described in the Warnings and Precautions section of a label (i.e., risks of clinically significant adverse reactions) are presumably more serious than those that appear only in the Adverse Reactions section."[25]

**B.    Changes-being-effected ("CBE") regulation**

"When the FDA approves a new drug, it also approves the exact text that will be included on the drug's labeling."[26] A drug manufacturer, however, "bears responsibility for the content of its label at all times."[27] Even so, generally, a manufacturer cannot change a drug's label after approval until the FDA approves a supplemental application.[28] "But in some circumstances, the

---

[21] *Id.* (citation modified).

[22] *Id.* (citation modified).

[23] *Id.* (citation modified).

[24] 21 C.F.R. § 201.57(c)(7) (emphasis added).

[25] *In re Fosamax*, 118 F.4th at 329.

[26] *Hickey*, 102 F.4th at 750 (citing Wyeth v. Levine, 555 U.S. 555, 568 (2009)).

[27] *Wyeth*, 555 U.S. at 570–71.

[28] *Hickey*, 102 F.4th at 750 (citing *Wyeth*, 555 U.S. at 568).

changes-being-effected ("CBE") regulation allows manufacturers to file a supplemental application with the FDA and simultaneously implement a labeling change before obtaining FDA approval."[29] The FDA, however, may still reject labeling changes made pursuant to the CBE regulation in its review of the supplemental application.[30]

Pursuant to 21 C.F.R. § 314.70(c)(6)(iii), a CBE change can be invoked for "[c]hanges in the labeling to reflect newly acquired information" to, among other things, "add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under § 201.57(c) of this chapter . . . ." Thus, the CBE regulation allows a manufacturer to change a label to reflect (1) "newly acquired information" if the changes add or strengthen a warning for which there is (2) evidence of a causal association.[31]

In turn, 21 C.F.R. § 314.3(b) defines "newly acquired information" as "data, analyses, or other information not previously submitted to the Agency," including but not limited to, "data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events or analyses reveal *risks of a different type or greater severity or frequency* than previously included in submissions to FDA."[32]

---

[29] *Id.* (citing 21 C.F.R. § 314.70(c)(6)).

[30] *Wyeth*, 555 U.S. at 571. "If the FDA later disapproves the CBE application, 'it may order the manufacturer to cease distribution of the drug product(s)' with the new labeling." *Albrecht*, 587 U.S. at 321 (Thomas, J., concurring) (alterations in original) (quoting 21 C.F.R. § 314.70 (c)(7)).

[31] 21 C.F.R. § 314.70(c)(6)(iii)(A).

[32] (emphasis added).

## II.  Factual Background

### A.  Alleged injury

With this background in mind, the Court turns to the events that gave rise to the present suit. Taxotere is a chemotherapy drug manufactured by Sanofi. Defendants Accord and Sandoz, who filed the instant Motions, each manufacture versions of docetaxel, which were approved for use by the FDA based on the RLD Taxotere. Here, Plaintiffs allege that Taxotere/docetaxel caused punctal, canalicular, and/or nasolacrimal duct stenosis (i.e., narrowing), resulting in excessive tearing (otherwise known as epiphora) and leading to disabling and irreversible, or potentially irreversible, damage.

Understanding the injuries at issue requires some background on the eye's complex tearing production and drainage systems.[33] Epiphora can occur due to overproduction of tears or, in the case of stenosis, impairment of the eye's ability to drain tears. Tears are produced by the lacrimal glands, which are located just above the eye, and are spread across the surface of the eye when a person blinks. The nasolacrimal excretory system apparatus—which is comprised of the puncta, canaliculi, lacrimal sac, and nasolacrimal duct—is responsible for the drainage of tears from the ocular surface to the nasal cavity, where the tears are ultimately absorbed by the body. Tears first enter the nasolacrimal system via the puncta, which are small openings on the surface of the upper and lower eyelid margin. The tears then flow from the puncta to the lacrimal sac via narrow drainage canals (called the canaliculi). The tears

---

[33] For reference, this Court previously provided an illustration of the pertinent anatomy in its Order and Reasons denying Sanofi's Motion for Summary Judgment on Preemption. Doc. 583.

are then drained from the lacrimal sac into the attached nasolacrimal sac, which opens into the nasal cavity.

The published scientific literature indicates that the mechanism by which Taxotere/docetaxel causes stenosis may be through secretion of the drug in the tears, causing inflammation, scarring, and/or fibrosis of the nasolacrimal drainage system.[34] This scarring/fibrosis may progress until pathways are closed and predominately affects the punctal and canalicular systems, and sometimes the nasolacrimal duct.

There are a few examinations used to diagnose stenosis of the nasolacrimal drainage system, including (1) administering dye to the eye to monitor drainage, (2) probing and irrigation, and (3) imaging. Probing and irrigation, which are typically done together, test for the patency of the punctum and canalicular system and sometimes may provide for relief of symptoms. A probe is passed through the punctum, then through the canaliculi, and into the lacrimal sac. Irrigation involves injecting saline into the nasolacrimal drainage system.

Treatment of epiphora resulting from stenosis depends on the severity of symptoms, as well as the degree to which stenosis has progressed and its anatomical location. Treatments may include antibiotics/steroid drops or more serious interventions. For stenosis of the punctum, a surgical treatment called a punctoplasty may be used to widen or open the puncta to restore proper drainage. A temporary stent may be inserted to allow the punctum to remain

---

[34] For example, in a 2002 study published in the Annals of Oncology, Dr. Esmaeli and others stated that "[c]analicular stenosis associated with weekly docetaxel is most likely caused by secretion of docetaxel in the tear film and resultant chronic inflammation of the canaliculi due to direct contact with the drug." Doc. 493-108.

open during healing. Mild stenosis of the canaliculi and/or nasolacrimal duct is often treated with probing and irrigation, artificial tears, and/or topical steroids. Moderate stenosis of canaliculi/nasolacrimal duct is often treated with bicanalicular silicone intubation, which involves surgical placement of a silicone stent. For more severe cases, there are a number of surgical procedures. One is dacryocystorhinostomy ("DCR"), a surgical procedure intended to create a new tear drainage pathway to allow tears to drain directly into the nasal cavity, after which temporary silicone stents are inserted to keep the new passage open during healing. Complete and/or severe closure of the canaliculi may require a "total bypass procedure" involving placement of a permanent Pyrex glass tube, or "Jones tube," through an opening inside the corner of the eye and into the nasal cavity to drain tears in the nose.

Here, Plaintiffs contend that they sustained disfiguring and sometimes permanent damage to their nasolacrimal systems due to docetaxel, with many plaintiffs undergoing the various surgical procedures just described. They also contend that stenosis is a progressive but preventable injury and that prompt referral to an ophthalmologist and/or early intervention is critical to prevent the progression of stenosis.

### B.    Regulatory background

In May 1996, the FDA approved a New Drug Application ("NDA") submitted by Sanofi for Taxotere, the brand name and Reference Listed Drug for docetaxel. At this time, Taxotere was approved for the treatment of patients with locally advanced or metastatic breast cancer whose disease progressed during anthracycline-based therapy, or whose disease has relapsed during

anthracycline-based adjuvant therapy.[35] In 2004, the FDA also approved Taxotere as an adjuvant chemotherapy treatment for early-stage breast cancer. All FDA approved indications for Taxotere involve infusions every three weeks.[36] Although there are no indications for Taxotere involving weekly infusions, it is often prescribed off-label for such use.

The Taxotere and docetaxel labels have never included a warning explicitly using the term "stenosis." Rather, Taxotere's label, which was first changed in 2002 and remains largely the same today, includes a warning that "[e]xcessive tearing which may be attributable to lacrimal duct obstruction has been reported."[37] This label change was prompted in mid-2000 when Sanofi received a group of cases of "canalicular fibrosis and lacrimation disorders" from a non-Sanofi sponsored clinical trial involving docetaxel and another drug.[38] Afterwards, the European Agency for the Evaluation of Medicinal Products ("EMA") requested that Sanofi further investigate and submit information on this adverse reaction.[39] Ultimately, the EMA requested that Sanofi add a warning about excessive tearing and "lacrimal duct obstruction" to the European label.[40]

On July 9, 2002, Sanofi submitted a CBE change to update the label to include similar language under the Adverse Reactions section (in the

---

[35] Generally, patients treated in the metastatic setting have late-stage cancer that cannot be cured. Neoadjuvant (pre-surgery) and adjuvant (post-surgery) therapies are given in earlier stages. Docetaxel is usually used every three weeks and for a shorter duration when used in the adjuvant setting compared with when used in the metastatic setting.

[36] Doc. 485-11 at 1; Doc. 527 at 4–5.

[37] Doc. 583 at 19.

[38] *Id.*

[39] *Id.*

[40] Doc. 527 at 7, 9.

Postmarketing Experiences subsection) of the Taxotere United States Package Insert ("USPI").[41] In September 2002, the label was updated to include the following language:

> Ophthalmologic: conjunctivitis, lacrimation or lacrimation with or without conjunctivitis. Excessive tearing which may be attributable to lacrimal duct obstruction has been reported.[42]

In February 2003, the Taxotere label was again revised as follows:

> Ophthalmologic: conjunctivitis, lacrimation or lacrimation with or without conjunctivitis. Excessive tearing which may be attributable to lacrimal duct obstruction has been reported. Rare cases of transient visual disturbances (flashes, flashing lights, scotomata) typically occurring during drug infusion and in association with hypersensitivity reactions have been reported. *These were reversible upon discontinuation of the infusion.*[43]

This language remained until 2013, after which this section of the label was revised to include as a final sentence the warning that "Cases of cystoid macular edema (CME) have been reported in patients treated with Taxotere."[44] In 2020, the "reversible upon discontinuation" language was revised.

With Sanofi's patent for Taxotere set to expire in 2010, Accord and Sandoz sought FDA approval under § 505(b)(2) to sell docetaxel. Accord and Sandoz submitted their NDAs on December 21, 2009 and September 16, 2010,

---

[41] *Id.* at 14. Although a drug's label is commonly understood to refer to the sticker affixed to the bottle, "in this context the term refers more broadly to the written material that is sent to the physician who prescribes the drug and the written material that comes with the prescription bottle when the drug is handed to the patient at the pharmacy." *Albrecht*, 587 U.S. at 303–04 (citation modified). These inserts are often lengthy and contain detailed information about the drug's medical uses and health risks. *Id.*

[42] Doc. 458-7; Doc. 439-6.

[43] Doc. 493-44 at 28 (emphasis added).

[44] Doc. 527 at 27–28.

respectively. Accord's docetaxel differed from Taxotere in the inclusion of two inactive ingredients: citric acid and polyethylene glycol.[45] Sandoz's differed in the addition and concentrations of certain excipients and in that it was a one vial, ready-to-use formulation, in contrast to the two vial Taxotere (which had a diluent vial).[46]

Defendants' applications relied on the RLD Taxotere's clinical studies supporting the pharmaceutical product and the FDA's findings of safety and effectiveness from Taxotere's NDA.[47] The FDA approved Accord's application on June 8, 2011, and Sandoz's on June 29, 2011. Accord's approved label matched the 2003 Taxotere label. Sandoz's label was nearly the same as the Taxotere label, although it contained certain differences with respect to information on dosage forms and strengths. Sandoz and Accord subsequently revised their labels to essentially match the updates to the Taxotere label described above.

---

[45] Doc. 485-1 at 7.

[46] *See* Doc. 458-3 at 2.

[47] Doc. 485-1 at 7 ("Accord fully relied on the RLD Taxotere's clinical studies supporting the pharmaceutical product and the FDA's finding of safety and efficacy as well as its approved warnings for its NDA."); Doc. 485-7 at 2 ("The NDA [submitted by Sandoz] contained no new non-clinical information other than the concentration of the formulations . . . ."). Additionally, the Court takes judicial notice of the documents in the FDA's "Approval Package" regarding Sandoz's NDA No. 201525. *See* Drugs@FDA: FDA-Approved Drugs, located at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm (last accessed Dec. 5, 2025). The Clinical Pharmacology Biopharmaceutics Review, located at the Review Tab, states that "[s]ince the Sandoz drug product is pharmaceutically equivalent to the listed drug, the current 505(b)(2) application did not include clinical studies and relies on the FDA's findings of safety and effectiveness for Taxotere® for Injection." CENTER FOR DRUG EVALUATION AND RESEARCH, *Clinical Pharmacology and Biopharmaceutics Review(s)*, p.3, located at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/201525Orig1s000ClinPharmR.pdf (last accessed December 5, 2025).

As part of its pharmacovigilance obligations, Sandoz subsequently submitted to the FDA three periodic "Postmarketing 15-day 'Alert reports.'"[48] Such reports cover "each adverse drug experience that is both serious and unexpected."[49] An adverse drug experience is "unexpected" if it is "not listed in the current labeling for the drug product."[50] The first report, which covered the period from September 2012 to November 2012, contained two cases of "ocular drainage system stenosis/bilateral blockage at the lower canaliculus."[51] The second, which covered a period between June 2014 and May 2015, described one case of "[m]ild stenosis of lower lacrimal puncta."[52] The third report, which covered the period from June 2019 to May 2020, included one case of "punctal stenosis."[53] In all three reports, Sandoz listed these events as "serious unlisted" events. Sandoz advised the FDA that "[t]he nature and frequency of the cases reported during this period provide no reasonable evidence for any change in the established safety profile." Sandoz further noted that "[g]iven the data available to Sandoz at this time, the current prescribing information for this

---

[48] The parties do not present evidence of any adverse events reported and/or received by Accord.

[49] 21 C.F.R. § 314.80(c)(1)(i). An "adverse drug experience" is "[a]ny adverse event associated with the use of a drug in humans, whether or not considered drug related . . . ." 21 C.F.R. § 314.80(a). The regulations further define a "serious adverse drug experience" as "[a]ny adverse drug experience occurring at any dose that results in," among other things, death, a life-threatening adverse drug experience, persistent/significant disability, or prolonged hospitalization. *See id.* This definition also includes adverse drug experiences that "may require medical or surgical intervention to prevent" one of the listed outcomes. *Id.*

[50] 21 C.F.R. § 314.80(a). This definition "includes events that may be symptomatically and pathophysiologically related to an event listed in the labeling but differ from the event because of greater severity or specificity." *Id.*

[51] Doc. 493-95.

[52] Doc. 493-96.

[53] Doc. 493-97.

product continues to accurately reflect the benefit-risk balance and requires no modification for safety reasons."

## LEGAL STANDARD

### I.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[54]

### II.    Law on Preemption

The doctrine of preemption derives from the U.S. Constitution's Supremacy Clause, which provides that "federal law 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'"[55] A preemption analysis must be guided by the two cornerstones of preemption jurisprudence.[56] First, a court should consider "the purpose of Congress."[57] Second, in all preemption cases, a court must assume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[58]

---

[54] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).

[55] PLIVA v. Mensing, 564 U.S. 604, 617 (2011) (quoting U.S. CONST. art. VI, cl. 2)) (alterations in original).

[56] *Wyeth*, 555 U.S. at 565.

[57] *Id.*

[58] *Id.* (quoting Medtronic. v. Lohr, 518 U.S. 470, 485 (1996)).

Congress may preempt state law expressly (via language directly defining the existence or scope of preemption), or implicitly.[59] One way in which Congress may implicitly preempt state law is via federal law that "directly conflicts" with state law.[60] "Where state and federal law 'directly conflict,' state law must give way."[61] "Conflict preemption" applies, among other things, "where complying with both federal law and state law is impossible."[62] "Impossibility preemption" is a "demanding defense."[63]

In the failure-to-warn context, "[t]he question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it."[64] A party cannot act "independently" under federal law if it "cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency."[65] "The underlying question . . . is whether federal law (including appropriate FDA actions) prohibited the drug manufacturer from adding any and all warnings to the drug label that would satisfy state law."[66] "A state law challenge to FDA-approved warnings, including a tort action under state law, can thus proceed only when the defendant had the *unilateral* ability to change that labeling; otherwise, the claim is preempted."[67]

---

[59] Crystal Clear Special Util. Dist. v. Jackson, 142 F.4th 351, 363–64 (5th Cir. 2025).

[60] *Id.*

[61] *Mensing*, 564 U.S. at 617 (quoting U.S. CONST. art. VI, cl. 2) (alterations in original).

[62] *Crystal Clear Special Util. Dist.*, 142 F.4th at 364 (quoting Barrosse v. Huntington Ingalls, Inc., 70 F. 4th 315, 320 (5th Cir. 2023)).

[63] *Wyeth*, 555 U.S. at 573.

[64] *Hickey*, 102 F.4th at 753 (quoting *Mensing*, 564 U.S. at 620) (alterations in original).

[65] *Mensing*, 564 U.S. at 624.

[66] Knight v. Boehringer Ingelheim Pharms., Inc., 984 F.3d 329, 337 (4th Cir. 2021) (quoting *Albrecht*, 587 U.S. at 313–314) (alterations in original).

[67] *Id.* (emphasis added).

The CBE regulation allows a unilateral label change (that is, a change without prior FDA approval) where there is (1) newly acquired information for which there is (2) evidence of a causal association between the drug and the harm.[68] In *Hickey v. Hospira*, the Fifth Circuit established that, in this preemption context, "the availability of the CBE regulation is a threshold issue" to the preemption analysis.[69] "[A]ll requirements of the CBE regulation must be met before a manufacturer can unilaterally change its label."[70] If the CBE regulation is not available, a plaintiff's claims are preempted.

If the CBE regulation is available, a plaintiff's claims are nevertheless preempted if a manufacturer can show "'clear evidence that the FDA would not have approved a change' to the label."[71] In *Merck Sharp & Dohme Corp. v. Albrecht*, the Supreme Court clarified that "clear evidence" is "evidence that shows the court that the drug manufacturer fully informed the FDA of the justifications for the warning required by state law and that the FDA, in turn, informed the drug manufacturer that the FDA would not approve a change to the drug's label to include that warning."[72]

## LAW AND ANALYSIS

Defendants argue that under the theory of impossibility preemption, Plaintiffs' state-law failure-to-warn claims are preempted under the FDCA

---

[68] "[I]n practice, manufacturers typically consult with [the] FDA prior to adding risk information to labeling." *In re Fosamax*, 118 F.4th at 330 (alterations in original).

[69] *Hickey*, 102 F.4th at 754.

[70] *Id.* at 756 (citing Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices, 73 Fed. Reg. 49603, 49606 (Aug. 22, 2008)).

[71] *Albrecht*, 587 U.S. at 300 (quoting *Wyeth*, 555 U.S. at 571).

[72] *Id.* at 303.

16

because there is no evidence establishing that they had "newly acquired information" that would have permitted them to unilaterally "add or strengthen a contraindication, warning, precaution, or adverse reaction" via the CBE process. Because Defendants only address this threshold issue, they do not raise the "clear evidence" standard. Citing to several pieces of scientific literature, Plaintiffs argue that Defendants had "newly acquired information" as early as 2012.[73]

## I.    Standard for "Newly Acquired Information" in the § 505(b)(2) Context

"Newly acquired information" is defined as "data, analyses, or other information not previously submitted to the Agency," including but not limited to, "data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA."[74] "Importantly, 'newly acquired information is not limited to new data, but also encompasses new analyses of previously submitted data.'"[75] "This 'rule accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent developments.'"[76] "Still, the new

---

[73] *See* Doc. 493. Plaintiffs' Omnibus Opposition, which also addresses Sanofi's Motion for Summary Judgment on Preemption (previously denied by this Court), also cites literature published before the § 505(b)(2) Defendants' docetaxel was approved. To the extent that Plaintiffs assert that any of this literature constitutes "newly acquired information," Plaintiffs' argument must be rejected. *See Hickey*, 102 F.4th at 759 n.8 (citing *In re* Celexa & Lexapro Mktg. & Sales Pracs. Litig., 779 F.3d 34, 41 (1st Cir. 2015)).

[74] 21 C.F.R. § 314.3(b) (emphasis added).

[75] *Knight*, 984 F.3d at 338 (quoting *Wyeth*, 555 U.S. at 569).

[76] *Id.* (quoting *Wyeth*, 555 U.S. at 569).

analysis must reveal 'risks of a different type or of greater severity or frequency' to constitute 'newly acquired information.'"[77]

In a case involving a name-brand manufacturer, courts assess whether information is "newly acquired" by determining whether such information shows a "risk of a different type, or greater severity or frequency" than that of the information previously submitted to the FDA (presumably by the name-brand manufacturer).[78] The analysis, however, becomes more complicated when assessing a plaintiff's claims against a manufacturer whose drug was approved under the hybrid § 505(b)(2) pathway. Generally, although a § 505(b)(2) applicant may rely on the RLD's safety and efficacy data to obtain approval, it does not have a "right of reference" to at least some of that data.[79] Stated another way, without access to the RLD's underlying submissions, a § 505(b)(2) manufacturer theoretically cannot know the entirety of what was "previously submitted to the FDA" at the time of the RLD's approval; thus, one cannot say that any information reveals anything "new" from the § 505(b)(2) manufacturer's perspective because it has no prior submission data with which to compare it.

Even so, a § 505(b)(2) manufacturer must still "submit its own safety and efficacy data concerning the differences between its drug and the RLD";

---

[77] *Id.* (quoting Wyeth, 555 U.S. at 569).

[78] *Id.*

[79] A "505(b)(2) application is an NDA submitted under section 505(b)(1) of the Federal Food, Drug, and Cosmetic Act for a drug for which at least some of the investigations described in section 505(b)(1)(A) of the Federal Food, Drug, and Cosmetic Act and relied upon by the applicant for approval of the NDA were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted." 21 C.F.R. § 314.3.

therefore, "it would be able to compare post-approval data related to such differences against its own submissions to the FDA."[80] But where—as is the case here—those differences are not alleged to have caused a plaintiff's injury, such data is not relevant.[81]

In *Hickey v. Hospira*, the Fifth Circuit addressed this issue, clarifying that the "newly acquired information" inquiry centers on what happens *after* the FDA approves a § 505(b)(2) drug.[82] While the claims in *Hickey* were different, the case involved the same drug at issue here.[83] The court acknowledged that, at the time the § 505(b)(2) defendants' drugs were approved in 2011, they lacked a right of reference to the clinical-trial data and adverse event reports submitted by Sanofi (the name-brand manufacturer) when the RLD was approved.[84] But this did not mean that information arising after could never be "newly acquired."

The court noted that after the FDA initially approved the RLD, Sanofi was required—"as part of its pharmacovigilance duties"—to submit to the FDA "publicly available scientific literature" concerning the drug.[85] It explained that "because there was publicly available scientific literature [prior to approval] . . . on the drugs," there was "something for these Defendants to review and be aware of and responsive to."[86] Accordingly, that scientific literature provided "a baseline comparator for determining whether"

---

[80] *Hickey*, 102 F.4th at 756 (citing 21 C.F.R. § 314.54(a)).

[81] *See id.*

[82] *Id.* at 755.

[83] Hospira and Accord moved for summary judgment in *Hickey. Id.* at 752.

[84] *Id.*

[85] *Id.* at 754 (citing 21 C.F.R. § 314.80(b)–(d); 21 C.F.R. § 314.81(b)).

[86] *Id.* at 756.

information arising after 2011, or "post-approval information," revealed "risks of a different type or greater severity or frequency than previously included in submissions to FDA."[87]

The Fifth Circuit did not determine whether this "baseline" information was *actually* submitted to and/or considered by the FDA; rather, it assumed it had been—or deemed it equally available to the FDA—for purposes of the analysis. And it rejected the plaintiffs' contention that any individual study that Sanofi was required to submit before approval of the § 505(b)(2) defendants' drugs in 2011 "independently" constituted "newly acquired information."[88] In short, the court declined to consider as "newly acquired information" any publicly available information published before the § 505(b)(2) manufacturers' drugs were approved.[89]

The court concluded that "for post-approval information to meet the requirements of 'newly acquired information,' it must *at least* 'reveal risks of a different type or greater severity or frequency' than the risks revealed in the scientific literature available" to the 505(b)(2) defendants.[90] This conclusion is consistent with the fact that, once its own drug is approved, a § 505(b)(2) manufacturer has the same post-market pharmacovigilance obligations as the RLD and therefore has access to relevant data after approval.

---

[87] *Id.* at 756 n.5. The court noted that "Plaintiffs do not dispute that, before the FDA approved Defendants' drugs, Sanofi had an obligation to submit to the FDA" the scientific literature at issue. *Id.*

[88] *Id.* at 759 n.8.

[89] *Id.* (explaining that "the line so drawn lets the FDA be the exclusive judge of safety and efficacy based on information available at the commencement of marketing, while allowing the states to reach contrary conclusions when new information not considered by the FDA develops" (quoting *In re* Celexa & Lexapro, 779 F.3d 34, 41 (1st Cir. 2015)).

[90] *Id.* at 756.

To summarize, the Fifth Circuit established the following framework for addressing "newly acquired information" in the § 505(b)(2) context. First, the court determined that the publicly available literature that existed prior to the § 505(b)(2) manufacturer's approval was the baseline for the analysis. Second, the court compared the pre-approval literature (baseline) to the information available to the § 505(b)(2) manufacturer after the approval of its drug, which included publicly available literature and any adverse event reports that the § 505(b)(2) manufacturers received. The court made clear that to constitute "newly acquired information," this post-approval information had to reveal a "risks of a different type, or greater severity or frequency" than the pre-approval literature.[91]

## II. Whether There Was "Newly Acquired Information" After Approval of Defendants' Docetaxel

To determine if there existed "newly acquired information" such that Defendants could have changed their labels, the Court must determine whether any information that was publicly available (or otherwise available to Defendants) after approval of their drugs in 2011 reveals risks of permanent stenosis that differed in type, severity, or frequency than the publicly available literature published before that date.

### A. Risks of a greater frequency

#### 1. *Pre-approval literature*

In 2006, Dr. Bita Esmaeli and others published an article summarizing the results of a prospective clinical trial, which aimed "[t]o determine the

---

[91] 21 C.F.R. § 314.3.

incidence and severity of epiphora and canalicular stenosis in patients receiving docetaxel weekly or every 3 weeks" ("2006 Esmaeli Study").[92] The study, which was sponsored by Sanofi, included fifty-six patients with metastatic breast cancer: twenty-eight patients received docetaxel weekly, and twenty-eight patients received it every three weeks. Patients underwent a comprehensive ophthalmologic exam, including probing and irrigation before and during treatment, and patients with "preexisting epiphora or canalicular or nasolacrimal duct blockage on probing and irrigation" were excluded.[93] If a patient developed epiphora, antibiotic and steroid drops were administered to the eyes. If epiphora worsened or did not improve with drops, or if findings on probing and irrigation suggested further narrowing of the canaliculi, the patient was advised to consider a range of surgical procedures based on the severity of stenosis.

Of the patients who received weekly docetaxel, eighteen developed epiphora. Nine patients (32%) had worsened canalicular stenosis, and surgery

---

[92] Doc. 458-22. Sandoz also cites incidence rates of stenosis from literature published by Dr. Esmaeli and others between 2001 and 2003, contending that these show a greater frequency of permanent stenosis than the post-approval literature. *See* Doc. 458-23 at 20–21. In the 2006 Esmaeli Study, the authors noted that "[d]espite substantial literature documenting canalicular stenosis as an adverse effect of docetaxel, the exact incidence of this important adverse effect is unknown." Doc. 458-19. Citing to the same publications cited by Sandoz, the authors reasoned that "[a]ll previous publications were based on retrospective studies at tertiary ophthalmology practices, and only patients who had symptoms of epiphora were evaluated." *Id.* Further, the only study published prior to 2002 that focused on determining an incidence rate appears to be a study published in 2002 by Dr. Esmaeli and others in Ophthalmology ("2002 Ophthalmology Study"). Doc. 458-19. The 2002 Ophthalmology Study, which was a retrospective, non-randomized comparative trial, reported stenosis requiring surgery in 50% of patients taking weekly docetaxel and 0% in patients taking docetaxel every three weeks. Doc. 458-19.

[93] Doc. 458-22.

was recommended in all nine. Six patients agreed to undergo surgery, and while no patient required Pyrex Jones tubes, these surgeries included temporary silicone tube placement and DCR with temporary and permanent silicone tubes. Of the patients receiving docetaxel every three weeks, eleven developed epiphora, with nine patients seeing resolution of symptoms. The two patients (7%) who did not improve had grade 1 (mild) canalicular stenosis and underwent DCR with placement of silicone tubes. Thus, the authors concluded that moderate or severe canalicular stenosis was seen in about one-third of patients in the weekly group and in none of the patients in the every-three-weeks group.[94]

### 2. *Post-approval literature*

In 2013, Arlene Chan and others published "Prevalence of Excessive Tearing in Women with Early Breast Cancer Receiving Adjuvant Docetaxel-Based Chemotherapy" in the Journal of Clinical Oncology, reporting the results of a prospective study of early-stage breast cancer patients receiving adjuvant docetaxel every three weeks. The study—described by its authors as the first to evaluate potential lacrimal duct obstruction in the adjuvant setting—aimed to "define the incidence and impact of tearing in patients receiving adjuvant docetaxel-based chemotherapy and assess for lacrimal duct obstruction (LDO) as a causative factor."[95]

---

[94] Two additional prospective studies were published prior to 2011, but both studies focused only on patients taking weekly docetaxel. *See* Doc. 493-116; Doc. 493-121. Plaintiffs do not produce or cite to any post-approval literature reporting incidence rates in patients taking weekly docetaxel. *See* Doc. 485; Doc. 493.

[95] Doc. 493-129.

At the beginning of and throughout treatment, patients completed questionnaires regarding tearing symptoms and underwent serial ophthalmic examinations that included slit-lamp evaluation, probing, and irrigation—the same methods used in the 2006 Esmaeli Study. Patients also underwent an imaging test, computed tomographic dacryocystography ("CT-DCG"), before and after chemotherapy. Among patients who returned for follow-up evaluations, the authors reported that 30% demonstrated LDO on CT-DCG and 22% demonstrated LDO on ophthalmic examination.[96] Overall, the study reported that the majority of patients experienced tearing—but concluded that tearing occurred at similar rates in patients with and without LDO and that "docetaxel-related tearing is not caused by LDO."[97]

Although these reported rates of "LDO" are numerically higher than the rates of stenosis reported in the 2006 Esmaeli Study, they do not establish "risks of a greater frequency" for several reasons.[98] First, Chan reported that at baseline, "some degree of lacrimal duct obstruction" was present in 17 patients on ophthalmic examination and 18 patients on CT-DCG. The authors did not, however, stratify post-treatment findings by baseline LDO status. As

---

[96] Rather than give a specific denominator, the Chan authors noted that "approximately 25% of patients" failed to attend follow-up evaluations. *Id.* at 4. The agreement table presented in the article shows that 22 of 73 patients (30%) who underwent both assessments had LDO on CT-DCG, while only 13 of those 73 (18%) had LDO on ophthalmic examination, implying that 4 additional patients returned for ophthalmic examination alone. Thus, 17/77 (22%) of patients who returned for ophthalmic exam were found to have LDO. *Id.*

[97] This conclusion is puzzling given that the authors state that their study "was not designed to evaluate specific causes of tearing." *Id.* at 5.

[98] Plaintiffs also argue that Chan's reported rates of *epiphora* are higher than the pre-approval literature. Here, however, those rates are irrelevant because (1) the label already warned about "excessive tearing, which may be due to lacrimal duct obstruction," and (2) the 2013 Chan Study found that tearing and LDO were not necessarily associated.

a result, the study does not permit calculation of the incidence of new-onset LDO. Put differently, without knowing which patients had baseline obstruction, the number of new cases cannot be determined.

In fact, shortly after its publication, Dr. Esmaeli and others published an editorial in the same journal responding to and critiquing the 2013 Chan Study ("2013 Esmaeli Editorial"). The authors noted "nearly 20% of patients had asymptomatic partial lacrimal duct obstruction at baseline" and that these patients should have been excluded from the 2013 Chan Study, "given that nasolacrimal duct obstruction was one of the primary study end points."[99]

Even accepting Chan's reported rates at face value—which Plaintiffs themselves do not do—comparison to the 2006 Esmaeli Study is not an "apples to apples" comparison.[100] In the 2006 Study, stenosis was defined anatomically, graded by severity, and explicitly linked to clinical outcomes, including the need for surgical intervention.[101] Although Chan employed similar ophthalmic

---

[99] Doc. 493-131 at 2. Further, based on the stated methodology, it seems these patients should have been excluded from the 2013 Chan Study, but the results suggest otherwise.

[100] Plaintiffs concede that the baseline LDO rates should not be included in the incidence rate. They aver, however, that "[o]f those 73 patients, 30% and 22% of patients, based on CT-DCG and ophthalmic review, respectively, had 'LDO,' compared with 17% and 18% before treatment, indicating between 13% and 4% of patients developed 'LDO' during treatment with docetaxel, compared to baseline examinations." Doc. 485 at 21. As explained above, Plaintiffs' calculations are incorrect. First, the 30% and 22% rates are based on patients who returned, whereas the baseline percentages are based on all 100 patients. As such, the baseline and post-chemo percentages share different denominators. Second, the true incidence rate cannot be determined, because it is not clear which patients returned and which did not.

[101] In the 2006 Study, patients underwent probing of canaliculi and irrigation of the nasolacrimal ducts. Canalicular stenosis was graded by the ophthalmologist as follows: 0, no stenosis; 1, mild stenosis—puncta were small but could be probed after dilation, and the probe came to a bony stop; 2, moderate stenosis—canaliculi could be only partially probed, the probe did not come to a bony stop, and insertion of the probe was associated with pain; or 3, severe canalicular stenosis—canaliculi could not be probed, probing was associated with

examination techniques, the study provides little detail regarding the location, severity, or clinical significance of the "LDO" it reports. Specifically, the authors generally classified LDO as present or absent.[102] While the authors reported that 27% of patients had punctal stenosis at baseline, they did not report punctal stenosis rates at the end of chemotherapy. Nor did they conclude that surgical intervention was required in any case or meaningfully link obstruction findings to the severity or persistence of symptoms. To the contrary, the authors concluded that tearing was "generally short lived" and that "in the majority of cases, surgical intervention is not required." Under these circumstances, it is unclear that the injury reported in Chan is comparable to the pre-approval literature.

Finally, Chan reported that six patients (6%) demonstrated worsening obstruction on irrigation during the study, with one patient developing complete obstruction, and that nine patients (9%) demonstrated worsening obstruction on CT-DCG.[103] The 2006 Esmaeli Study reported that approximately 7% of patients receiving docetaxel every three weeks developed canalicular stenosis. Even assuming these figures are comparable—which

---

severe pain or bleeding, or the nasolacrimal duct was not patent to irrigation through the upper or lower canaliculi. Doc. 458-22 at 3.

[102] As to tearing, the authors reported that "[s]ix patients (6%) reported grade 3 tearing at some time during their chemotherapy, with complete resolution in four patients and improvement to grade 1 in one patient at the post chemotherapy follow-up visit." *Id.* at 3–4. Further, "[t]he remaining patient, who reported grade 3 tearing at the time of follow-up, had patent lacrimal ducts on both post-chemotherapy CT-DCG and ophthalmic examination." *Id.* at 4.

[103] The authors represent that this number reflects 8.8% of the patient population, which would include 102, rather than 100, patients as the denominator. Only 100 patients, however, were included in the study after 2 patients withdrew. Doc. 493-129 at 3.

Chan does not establish—they do not demonstrate an increased frequency of clinically relevant stenosis in the post-approval literature.[104]

In sum, the 2013 Chan Study does not provide the information necessary to determine that permanent stenosis, stenosis requiring surgery, or progressive stenosis occurred at a greater frequency than reported in the pre-approval literature.[105]

## B.    Risks of a different type or greater severity

Plaintiffs also argue that the post-approval literature reveals risks of a different type or greater severity because it reveals new information about the mechanism of injury, surgical outcomes, prompt referral, and/or various indications and treatment settings. The Court disagrees.

In 2001, Dr. Esmaeli and others first reported on docetaxel-related stenosis in the weekly setting, publishing a case series describing this "newly recognized side effect" in Ophthalmology.[106] The article described three patients who developed punctal and/or canalicular stenosis and epiphora after being administered weekly docetaxel (in combination with other drugs). Then, in 2003, Dr. Esmaeli published an article summarizing a retrospective report, wherein she found that this adverse event occurred much more frequently in

---

[104] The only other study published after approval of Defendants' drugs from which an incidence rate may be determined appears to be a retrospective study published by Blake H. Fortes and others in the European Journal of Ophthalmology. Doc. 439-10. That study, however, showed an incidence rate of <1.1%, which is lower than the incidence rates in the pre-approval literature.

[105] The 2013 Chan Study also does not show risk of a different type or greater severity. The authors conclude that "patients receiving docetaxel-based treatment . . . should be reassured that tearing is generally mild and transient in the majority of cases, and surgical intervention is not required." Doc. 493-129 at 6.

[106] Doc. 458-17.

patients taking weekly docetaxel and that the severity of canalicular stenosis resulting from weekly docetaxel increased with higher cumulative doses of this drug and longer duration of therapy. From 2001 to 2011, numerous studies, case reports, and scientific articles—including Sanofi-sponsored studies—were published addressing the risk of permanent stenosis, with the majority of these including Dr. Esmaeli as an author.

The post-approval literature identified by the parties does not show new or different risks. Rather, it restates or emphasizes points that were present in the pre-approval literature. For example, Plaintiffs argue that a 2017 article published in the British Journal of Ophthalmology ("Kang Article") shows new information about the level of obstruction and treatment outcomes. The 2017 Kang Article found that, in patients taking docetaxel, the punctum or canaliculus was the most common obstruction site and that in all cases, stenosis could be managed with less invasive surgical treatment. The pre-approval literature, however, revealed the risk of stenosis occurring at these levels and reported on surgical outcomes. Likewise, although Plaintiffs spend little time addressing them in their Opposition, articles produced by Plaintiffs that (1) focus exclusively on epiphora, rather than stenosis and/or (2) merely summarize the pre-approval literature do not reveal new information.[107]

---

[107] *See* Doc. 493 at 55–64 (citing articles published by Sorbe, Ho, Kang, Mansur, and Sodhi). Although not mentioned in their Opposition, Plaintiffs produce a study authored by their expert, Gerald McGwin, and published in 2023 in Current Eye Research ("2023 McGwin Study"). The 2023 McGwin Study, which was a "disproportionality analysis" conducted using the FDA Adverse Event Reporting Systems (FAERS), sought to "investigate the association between lacrimal and retinal disorders and the use of docetaxel and paclitaxel." Doc. 493-137. The 2023 McGwin Study, however, is not "newly acquired information" because it does not show any new or different risks. But even if it did, the 2023 Study (though published outside of this litigation) likely constitutes an expert report and/or report prepared with the benefit

28

Although "newly acquired information is not limited to new data," it must still reveal "risks of a different type or of greater severity or frequency' to constitute 'newly acquired information."[108] Here, the literature does not.

Nor does the literature reveal risks that are more severe. Plaintiffs cite to a case report published by Tomoko Yamagishi and others in 2014 ("2014 Yamagishi Article"), arguing that it shows "irreversible stenosis" occurring in patients taking docetaxel every three weeks in the small cell lung cancer setting. The 2014 Yamagishi Article reported one patient who developed epiphora that continued after cessation of docetaxel. This patient was found to have mild stenosis of the lower lacrimal puncta, and epiphora resolved after probing and irrigation. Because Dr. Esmaeli had previously reported cases of permanent stenosis and/or stenosis requiring surgery, including in patients taking docetaxel every three weeks, the 2014 Yamagishi Article cannot be "newly acquired information."[109]

---

of hindsight, which courts outside of this jurisdiction have held cannot constitute "newly acquired information." *See* Bueno v. Merck & Co., Inc., 746 F. Supp. 3d 853, 877–78 (S.D. Cal. 2024) (noting that "[w]hile 'new analyses of previously submitted data' can constitute 'newly acquired information' in certain circumstances, 21 C.F.R. § 314.3(b), new analyses do not comprise 'newly acquired information' when 'conducted by an expert in preparation for litigation with the benefit of hindsight.'" (quoting R.S.B. v. Merck & Co., No. 20-C-1402, 2021 WL 6128161, at *4 (E.D. Wis. Dec. 28, 2021))).

[108] *Knight*, 984 F.3d at 338 (quoting *Wyeth*, 555 U.S. at 569).

[109] *See* Doc. 439-9 (article published by Dr. Esmaeli and others in 2003). And the fact that patients in the 2014 Yamagishi Article had lung cancer, rather than breast cancer, is of no moment because the article does not purport to associate the risk with cancer type. *See In re Zofran*, 57 F.4th at 339 (finding that certain animal studies that differed in dose from animal studies previously submitted to the FDA were not "newly acquired information" because, among other things, the studies indicated that the observed anomalies in the animal subjects were "not dose related" and/or "had no dose-dependency").

Finally, Plaintiffs contend that Defendants interpret "risks of a different type, or greater severity" too narrowly, arguing that newly acquired information need only alter the risk–benefit profile known to the FDA at the time of approval. To the extent these formulations are not merely two ways of expressing the same standard, Plaintiffs' argument still fails: the post-approval literature does not reflect any change as compared to the publicly available information.[110]

The Court finds that Defendants had no "newly acquired information" rendering the CBE process available them, and Defendants could not have unilaterally changed their labels. Plaintiffs' state-law claims are therefore preempted by federal law.

## CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment are **GRANTED.**

New Orleans, Louisiana this 16th day of January, 2026.

_____
JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

---

[110] To the extent Plaintiffs argue that Sandoz's Adverse Event reports are "newly acquired information," the Court rejects that argument. The reports, which described cases of "ocular drainage system stenosis/bilateral blockage at the lower canaliculus," "[m]ild stenosis of lower lacrimal puncta," and "punctal stenosis," do not show a different or more severe risk than the pre-approval literature. Further, they do not report on or otherwise estimate a patient population from which these patients were drawn, so it is not possible to calculate an incidence rate.