UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: TAXOTERE (DOCETAXEL) ) | MDL NO. 3023 |
| EYE INJURY ) | |
| PRODUCTS LIABILITY LITIGATION ) | |
| ) | |
| **This document relates to:** ) | SECTION: "H" (5) |
| All cases naming Sanofi ) | |

## ORDER AND REASONS

Before the Court is Defendant Sanofi's Motion to Certify Order for Interlocutory Appeal Under 28 U.S.C. § 1292(b) (Doc. 595). Plaintiffs do not oppose. For the following reasons, the Motion is **GRANTED.**

## BACKGROUND

Plaintiffs in this multidistrict litigation ("MDL") are suing several pharmaceutical companies that manufactured and/or distributed a chemotherapy drug, Taxotere or docetaxel, that Plaintiffs were administered for the treatment of cancer, primarily breast cancer.[1] Among these companies are Defendants sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. (collectively, "Sanofi"), Accord Healthcare, Inc. ("Accord"), and Sandoz Inc. ("Sandoz"). Plaintiffs allege that Taxotere or docetaxel caused them to sustain injuries to their lacrimal systems, including punctal, canalicular, and/or nasolacrimal duct stenosis (narrowing), which resulted in excessive tearing, otherwise known as epiphora. Plaintiffs bring state-law claims for strict products liability (failure to warn) and negligence.

---

[1] Taxotere is the brand name for the drug docetaxel.

Sanofi manufactures Taxotere, the brand name and Reference Listed Drug ("RLD") for docetaxel. In 1996, Sanofi sought approval via the method for a "brand new drug" as "laid out in § 505(b)(1) of the FDCA," or 21 U.S.C. § 355(b)(1).[2] This method "requires manufacturers to file a New Drug Application ("NDA"), which includes, inter alia, 'full reports of investigations which have been made to show whether such drug is safe for use and whether such drug is effective in use.'"[3] Thus, the RLD is the first drug of a specific kind to be approved under § 505(b)(1).[4]

"Thereafter, other manufacturers who want to prepare the same drug or a drug that is similar enough may use two abbreviated pathways to obtain FDA approval with less burden and expense."[5] One of these pathways—laid out in § 505(j), or 21 U.S.C. § 355(j) —is available to manufacturers of what is generally considered a "true generic" drug.[6] In seeking approval with the FDA, § 355(j) allows such manufacturers to submit an "Abbreviated New Drug Application" that relies on the safety and efficacy data submitted in the RLD's NDA.[7]

In 2011, Sandoz and Accord each sought approval for their docetaxel drugs pursuant to a third pathway set forth in § 505(b)(2) of the FDCA, or 21 U.S.C. § 355(b)(2). In simple terms, this pathway is available for

---

[2] *See* Hickey v. Hospira, 102 F.4th 748, 750–51 (5th Cir. 2024) (explaining the various pathways for approval under the FDCA). The Court and the parties "refer to this provision and its counterparts—§§ 505(b)(2) and (j)—by their location in the FDCA rather than their location in the United States Code," because "doing so is common practice." *See id.* at 750 n.1.
[3] *Id.* at 751 (quoting 21 U.S.C. § 355(b)(1)(A)(i)).
[4] *See id.*
[5] *Id.*
[6] *See id.* (citing 21 U.S.C. § 355(j)).
[7] *See id.* (citing 21 U.S.C. § 355(j)(2)(A)).

2

manufacturers whose drugs fall somewhere in the middle of the two types of drugs just described. More specifically, these drugs "differ from the RLD in ways that are slight enough for the manufacturer to still rely on the RLD's safety and efficacy data."[8] A § 505(b)(2) manufacturer must submit an NDA that contains only "that information needed to support the modification(s) of the listed drug."[9] "Unlike § 505(j) drugs, § 505(b)(2) drugs are not required to use the exact same labeling as the RLD."[10]

In 2002, Sanofi's Taxotere label was updated to include the following warning as an "adverse event" in the "Post-marketing Experiences" subsection of the label:

> Ophthalmologic: conjunctivitis, lacrimation or lacrimation with or without conjunctivitis. Excessive tearing which may be attributable to lacrimal duct obstruction has been reported.[11]

In 2003, this section was again revised to state:

> Ophthalmologic: conjunctivitis, lacrimation or lacrimation with or without conjunctivitis. Excessive tearing which may be attributable to lacrimal duct obstruction has been reported. Rare cases of transient visual disturbances (flashes, flashing lights, scotomata) typically occurring during drug infusion and in association with hypersensitivity reactions have been reported. These were reversible upon discontinuation of the infusion.[12]

When Accord's and Sandoz's docetaxel drugs were approved in 2011, the labels essentially matched the 2003 warning on the Taxotere label.

---

[8] *Id.* (citing 21 U.S.C. § 355(b)(2)).
[9] *Id.* (first citing 21 U.S.C. § 355(b)(2); then citing 21 C.F.R. § 314.54(a)).
[10] *Id.* (citing 21 C.F.R. § 314.54(a)(2)).
[11] Doc. 583 at 21; Doc. 493-13.
[12] Doc. 493-44.

## I.    Sanofi's Motion for Summary Judgment on Preemption

On February 28, 2025, Sanofi filed a Motion for Summary Judgment arguing that under the theory of "impossibility preemption," Plaintiffs' claims were preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA") and its corresponding regulations.[13] Briefly, federal law impliedly preempts state law when state and federal law "conflict," in other words, when "it is impossible for a private party to comply with both state and federal law."[14] In this failure-to-warn-context, "impossibility" means that the drug manufacturer could not have added and/or updated the warnings on its drug's label *independently*—i.e., without preapproval from FDA—in order to satisfy any alleged state law duties to warn.[15]

In the Fifth Circuit, the threshold question in a case such as this one is whether a manufacturer could have unilaterally changed the label on its drug via the changes-being-effected ("CBE") regulation.[16] Relevant here, the CBE regulation "permits drug manufacturers to change a label without prior FDA approval if the change is designed to 'add or strengthen a . . . warning' where there is 'newly acquired information' about the 'evidence of a causal association' between the drug and a risk of harm."[17] If these requirements are not satisfied, a plaintiff's claims are preempted. If they are satisfied, however,

---

[13] Doc. 445.
[14] Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372–373 (2000).
[15] *See Hickey*, 102 F.4th at 753 (quoting PLIVA v. Mensing, 564 U.S. 604, 620 (2011)).
[16] *Id.* at 751, 754 (citing 21 C.F.R. § 314.70(c)(6)).
[17] Merck Sharp & Dohme Corp. v. Albrecht, 586 U.S. 299, 305 (2019) (alterations in original) (quoting 21 C.F.R. § 314.70(c)(6)(iii)(A)).

4

a plaintiff's claims are nevertheless preempted if a manufacturer can show "'clear evidence' that the FDA would not have approved a change to the label."[18] Sanofi moved for summary judgment only on the threshold question, arguing that there existed no "newly acquired information" as required to invoke the CBE process.

Pursuant to 21 C.F.R. § 314.3(b), "newly acquired information" must "reveal risks of a different type or greater severity or frequency than *previously included in submissions to FDA*."[19] On summary judgment, Sanofi provided evidence that it submitted three "groups" of evidence. First, consistent with its pharmacovigilance obligations, it submitted to the FDA a "15-day ADE Report," which included cases from two publications. The first was an abstract titled "Early Recognition of Taxane-Associated Canaliculitis Important in Preserving Lacrimal Duct Function," which was published in 2000 by R. Kneuper Hall and others in Breast Cancer Research and Treatment ("2000 Kneuper Hall Abstract"). The second publication, "Canalicular Stenosis Secondary to Docetaxel (Taxotere): A Newly Recognized Side Effect," was published in 2001 in Ophthalmology by Dr. Bita Esmaeli and others ("2001 Esmaeli Ophthalmology Article").

Second, in conjunction with the 2002 label change, Sanofi submitted to the FDA Supplement 17, which included as attachments case line listings. Finally, in February 2002, Sanofi submitted a Supplemental NDA ("sNDA"), which included the Eighth Periodic Safety Update Report for Taxotere ("PSUR 8"), as well the Ninth Periodic Safety Update Report for Taxotere ("PSUR 9").

---

[18] *Id.* at 300 (quoting Wyeth v. Levine, 555 U.S. 555, 571 (2009)).
[19] (emphasis added).

PSURs 8 and 9 were previously prepared and submitted to the European Agency for the Evaluation of Medicinal Products ("EMA"). In PSUR 8, Sanofi concluded that "[t]o date, there is no clear mechanism of action for docetaxel to cause canalicular fibrosis."[20] PSUR 9's summary included cases from the 2000 Kneuper Hall Abstract and 2001 Esmaeli Ophthalmology Article. In PSUR 9, Sanofi estimated that "tearing abnormality requiring intervention," as well as those possibly involving tear duct obstruction or blockage, were at "rates less than or equal to 1/10,000 patients," or .01%, and noted that "patient exposure data is not available based on dosing schedule."[21]

In their Opposition, Plaintiffs first argued that prior to the 2008 amendments to the regulations, newly acquired information was not required for a manufacturer to unilaterally change its label. They contended that regardless, several pieces of scientific literature constituted newly acquired information.

On December 1, 2025, this Court issued an Order and Reasons denying Sanofi's Motion (the "Sanofi Order"), wherein it first acknowledged that neither the Fifth Circuit nor the Supreme Court had addressed the issue of whether the 2008 amendments were consistent with previous regulations. The Court declined to decide the issue, however, because two pieces of published scientific literature satisfied the definition of newly acquired information. That is, as compared to Sanofi's previous submissions, they revealed "risks of a different type, or greater severity or frequency." The first was an article published in 2003 in Cancer by Dr. Esmaeli and others titled "Blockage of the

---

[20] Doc. 583 at 13.
[21] *Id.* at 15.

6

Lacrimal Drainage Apparatus as a Side Effect of Docetaxel Therapy" ("2003 Esmaeli Study"). The 2003 Esmaeli Study was a retrospective study that evaluated the records of 148 patients with epiphora associated with docetaxel therapy. The purpose of the study was "to report the severity and management of canalicular and nasolacrimal duct stenosis as a side effect of docetaxel therapy and to report the outcomes of surgical intervention for this condition."[22]

The second was a study titled "Prospective Study of Incidence and Severity of Epiphora and Canalicular Stenosis in Patients with Metastatic Breast Cancer Receiving Docetaxel" that was published in the Journal of Clinical Oncology ("2006 Esmaeli Study"). The purpose of the 2006 Esmaeli Study was to "determine the incidence and severity of epiphora and canalicular stenosis in patients receiving docetaxel weekly or every 3 weeks." The authors reported that among the 28 patients who received weekly docetaxel, 9 patients (32%) developed stenosis. Among patients taking docetaxel every three weeks, 2 out of 28 patients (7%) developed stenosis.[23]

## II. Sandoz's and Accord's Motions for Summary Judgment on Preemption

On February 27 and 28, 2025, Defendants Accord and Sandoz respectively filed similar Motions for Summary Judgment, arguing that there existed on the record no newly acquired information published after approval of their drugs in 2011.[24] On January 28, 2026, this Court issued an Order and

---

[22] Doc. 493-111.
[23] Doc. 493-120.
[24] Doc. 439 (Accord's Motion for Summary Judgment); Doc. 458 (Sandoz's Motion for Summary Judgment).

7

Reasons granting both Motions ("505(b)(2) Order"), finding that there existed no newly acquired information such that Accord and Sandoz could have unilaterally changed their labels.[25]

In so holding, this Court followed the Fifth Circuit's decision in *Hickey v. Hospira*, which set the standard for the newly acquired information analysis as applied to § 505(b)(2) manufacturers.[26] Although *Hickey* involved different claims than those alleged by Plaintiffs here (the plaintiffs there alleged permanent chemotherapy-induced alopecia, or "PCIA"), it involved the same drug and defendant-manufacturers.[27]

In *Hickey*, the Fifth Circuit explained that a § 505(b)(2) manufacturer may submit an NDA that relies, at least in part, on the RLD's safety and efficacy data when seeking approval.[28] But generally, those manufacturers do not have access, or "right of reference," to that information during the relevant time.[29] Nor did the § 505(b)(2) defendants have access to the RLD's adverse event reports at that time.[30] With respect to newly acquired information, this creates a knowledge gap: a § 505(b)(2) manufacturer theoretically could not know if information was "new" without knowing what was already submitted to the FDA.

---

[25] Doc. 591.
[26] *Hickey*, 102 F.4th 748.
[27] *Id.* In *Hickey*, the court addressed motions for summary judgment filed by the defendant-manufacturer Accord, as well as Hospira (another § 505(b)(2) manufacturer). *Id.* at 752.
[28] *Id.* at 751.
[29] *See id.* at 755 (citing 21 U.S.C. § 355(b)(2)).
[30] *See id.*

Thus, the question was how to interpret the requirement that newly acquired information "reveal risks of a different type or greater severity or frequency *than previously included in submissions to FDA*."[31] The record indicated that prior to approval of the defendants' drugs in 2011, numerous scientific studies and articles were published describing the "risk of docetaxel-induced PCIA."[32] Because this literature was available to the public, there was something for the defendants to "be aware of" and "responsive to."[33] The court also noted that Sanofi (the RLD manufacturer) was presumably required to submit those studies in the years before the defendants' drugs were approved. This publicly available literature formed the baseline for the analysis—that is, "prior submissions to the FDA."[34]

The court concluded that "for post-approval information to meet the requirements of 'newly acquired information,' it must at least 'reveal risks of a different type or greater severity or frequency' than the risks revealed in the scientific literature available to" the 505(b)(2) defendants.[35] Stated another way, the "baseline comparator" was the publicly available scientific literature that existed prior to approval of the § 505(b)(2) manufacturers' drugs in 2011.[36]

Turning back to this Court's analysis, in its 505(b)(2) Order, the Court concluded that the post-approval (i.e., post-2011) information available to Defendants Accord and Sandoz did not reveal "risks of a different type, or

---

[31] *See id.* (emphasis added) (quoting 21 C.F.R. § 314.3(b)).
[32] *See id.* at 757.
[33] *Id.* at 756.
[34] *Id.* at 757.
[35] *Id.* As to post-approval information, this included scientific literature published after 2011, as well as any adverse event reports the defendants may have received. *Id.*
[36] *Id.*

9

greater severity or frequency" than the publicly available scientific literature published prior to 2011. As was the case in *Hickey*, the post-approval information did not reveal any new or more severe risks; nor did it reveal a "frequency" that was any higher than the established frequency in the publicly available pre-approval literature, namely, the 2006 Esmaeli Study.

### III. Instant Motion to Certify

On January 27, 2026, Sanofi filed the instant Motion for Certificate of Appealability requesting that the Court certify for interlocutory appeal its December 1, 2025 Order and Reasons denying Sanofi's Motion for Summary Judgment. Plaintiffs do not oppose.[37]

### LEGAL STANDARD

Pursuant to 28 U.S.C. § 1292, a court can allow for interlocutory appeal of orders without directing entry of a final judgment on the order. For an interlocutory order to be appealable pursuant to § 1292(b), the Court must certify in writing that: (1) the order involves a controlling question of law, (2) there exists a substantial ground for difference of opinion on that question of law, and (3) an immediate appeal from the order may "materially advance the ultimate termination of [the] litigation."[38] The moving party carries the burden of showing the necessity of interlocutory appeal.[39] An interlocutory appeal is

---

[37] On February 12, 2026, Plaintiffs informed the Court via email that they did not intend to oppose Defendants' Motion to Certify.

[38] 28 U.S.C. § 1292; *see also* Rico v. Flores, 481 F.3d 234, 238 (5th Cir. 2007).

[39] Chauvin v. State Farm Mut. Auto. Ins. Co., Nos. 06-7145, 06-8769, 2007 WL 4365387, at *2 (E.D. La. Dec. 11, 2007) (citing Complaint of L.L.P. & D. Marine, Inc., Nos. Civ. A. 97-1668, 97-2992, 97-3349, 1998 WL 66100, at *1 (E.D. La. Feb. 13, 1998)).

10

"exceptional," and "assuredly does not lie simply to determine the correctness of a judgment of liability." [40]

## LAW AND ANALYSIS

Sanofi argues that this Court's Sanofi Order presents a controlling question of law that, if appealed, may materially advance the ultimate termination of the litigation. Sanofi further contends that there is a substantial ground for difference in opinion because this Court's Sanofi Order is "inconsistent" with its 505(b)(2) Order. Sanofi also argues that, in holding that the 2003 and 2006 Esmaeli Studies constituted "newly acquired information," the Court "expanded" the regulatory definition. The Court will consider each argument in turn.

## I.  (1) Controlling Question of Law and (3) Material Advancement

"A controlling question of law is one 'that would require reversal on appeal from a final judgment or would materially affect the outcome of the case.'"[41] Resolution of a controlling question of law need not terminate the litigation entirely so long as it "would have some significant impact on the advancement of the litigation."[42] "To this extent, the 'controlling question' inquiry is inherently related to the requirement that resolution of the issue

---

[40] Clark-Dietz and Associates-Engineers, Inc. v. Basic Const. Co., 702 F.2d 67, 68, 69 (5th Cir. 1983).

[41] D.H. Griffin Wrecking Co. v. 1031 Canal Dev., LLC, No. 20-1051, 2020 WL 7626817, at *3 (E.D. La. July 14, 2020) (quoting Jesclard v. Babcock & Wilcox, Civ. A. No. 82-1570, 1990 WL 182315, at *1 (E.D. La. Nov. 21, 1990)).

[42] *Id.* (citing Ryan v. Flowserve Corp., 444 F. Supp. 2d 718, 723 (N.D. Tex. 2006)).

11

materially advance the litigation."[43] "Additionally, controlling questions of law generally must be purely legal in nature."[44]

The Fifth Circuit has held that federal preemption "certainly falls within the ambit of 28 U.S.C. § 1292(b)."[45] Although this Court noted in its Sanofi Order that both steps of the preemption question may require resolution of subsidiary factual disputes, it also recognized that preemption is ultimately a question of law for a judge to determine.[46] And as Sanofi points out, an immediate appeal would advance the litigation because a Fifth Circuit ruling in Sanofi's favor would require dismissal of claims against Sanofi. Sanofi also argues, and Plaintiffs do not dispute, that Plaintiffs would not be prejudiced if Sanofi's interlocutory request were granted. Thus, the first and third requirements are satisfied.

## II.    (2) Substantial Ground for Difference in Opinion

The more difficult question here is whether the second requirement is satisfied. Courts often find that a substantial ground for difference of opinion exists if "novel and difficult questions of first impression are presented."[47] First, Sanofi argues that this Court's Sanofi Order is inconsistent with its

---

[43] *Id.*

[44] *Id.* (citing Williams v. Taylor, No. CIV.A. 15-321, 2015 WL 4755162, at *2 (E.D. La. Aug. 11, 2015)).

[45] Spong v. Fidelity Nat'l Prop. & Cas. Ins. Co., 787 F.3d 296, 304 (5th Cir. 2015).

[46] *See* Doc. 583 at 27–30; *In re* Fosamax (Alendronate Sodium) Prods. Liab. Litig., 118 F.4th 322, 344 (3d Cir. 2024) (holding that, although the ultimate question is a question of law that is reviewed de novo, when a district court resolves subsidiary factual matters in the course of deciding that ultimate legal question, it would review those findings under a "clearly erroneous" standard).

[47] Mitchell v. Hood, No. 13-5875, 2014 WL 1764779, at *5 (E.D. La. May 2, 2014) (quoting Couch v. Telescope, Inc., 611 F.3d 629, 633 (9th Cir. 2010)).

505(b)(2) Order. From that premise, Sanofi sets out in its Motion two separate issues that raise a substantial ground for difference in opinion:

1. Whether FDA's approval of later-in-time (i.e. 2011) 505(b)(2) drugs with identical warning language to the RLD holder on the alleged risk provides evidence that intervening publicly available medical literature does not constitute "newly acquired information"; and

2. In light of the Court's 505(b)(2) Order, whether the publicly available literature available to Sanofi before 2011 and considered by the Court satisfies the plain text definition of newly acquired information.

### a. Whether this Court's Orders conflict

Contrary to what Sanofi suggests, this Court's application of *Hickey*'s reasoning in the 505(b)(2) Order does not render it "irreconcilable" with the Sanofi Order. *Hickey* created a rule that applies to § 505(b)(2) defendants. The plain terms of the regulation require the Court to assesses if information reveals different, more severe, or more frequent risks than previous submissions to the FDA. [48] As to Sanofi, the Court must necessarily evaluate Sanofi's previous submissions as the baseline comparator. In Sanofi's case, Plaintiffs argued that studies that were published after 2002 constituted newly acquired information. The Court therefore compared those post-2002 studies to the evidence in the record that Sanofi contended it submitted to the FDA prior to (and in) 2002. Under the plain terms of the regulation, this is all that is required.

---

[48] *See, e.g., Wyeth*, 555 U.S. at 569–70.

13

By contrast, in *Hickey*, the court considered how to apply the regulation to the § 505(b)(2) defendants, whose drugs were approved after the RLD manufacturer via a different process. The *Hickey* court concluded that the relevant "pre-approval" publicly available literature created the baseline for the analysis. This Court applied that rule to Sandoz and Accord. In short, the Sanofi Order does not conflict with the 505(b)(2) Order. Rather, the Orders are chronological.

### b. Whether FDA approval of Accord's and Sandoz's labels in 2011 affects the "newly acquired information" inquiry as to Sanofi

In any event, Sanofi's argument is not about conflicting orders, though Sanofi frames it as such. Rather, Sanofi argues that information cannot be newly acquired as to Sanofi if the FDA had it when it approved Accord's and Sandoz's labels in 2011. Indeed, Sanofi posits that this Court assumed in its 505(b)(2) Order that prior to 2011, Sanofi had submitted the 2003 Esmaeli Study and the 2006 Esmaeli Study to the FDA. Sanofi contends that this implies that the FDA considered both studies prior to approving Accord's and Sandoz's labels in 2011, both of which were identical to Taxotere's label in 2003. According to Sanofi, this creates an "untenable result" vis-à-vis the Sanofi Order. This is so because if the 2003 and 2006 Studies did "in fact present additional risk information that was not adequately captured" by the 2003 labeling, then the "FDA could not have approved the 505(b)(2) applications without requiring revised warnings."[49] Stated another way, if the 2003 and 2006 studies were "newly acquired information" allowing Sanofi to

---

[49] Doc. 595-1 at 7.

14

change its 2003 label, Accord's and Sandoz's labels could not have been approved in 2011 without also changing.

The Fifth Circuit in *Hickey* bolstered its reasoning that the "publicly available literature" served as the baseline by adding, in a footnote, that Sanofi was required to submit publicly available literature as part of its "postmarketing" pharmacovigilance obligations, but the court made no explicit finding that Sanofi had done so.[50] As *Hickey* noted, requiring the § 505(b)(2) defendants to look back in time and sift through pre-approval information would put "the highest standard on secondary manufacturers rather than original ones, which does not comply with the overall framework."[51]

Sanofi seeks to impose a rule that the FDA's 2011 label approval as to Accord and Sandoz cannot be "second guessed" by Sanofi. But in their Motion for Summary Judgment, Sanofi failed to raise *any* of the issues it attempts to raise here—namely, that the 2011 label approvals are relevant. Sanofi further failed to point to any evidence as to what it submitted between 2002 and 2011. Ordinarily, Sanofi's failure to present these issues would be fatal to raising them now.[52] Even so, given Plaintiffs' failure to oppose, the Court will address Sanofi's argument.

---

[50] *See Hickey*, 102 F.4th at 756 n.5 (citing 21 C.F.R. § 314.80(b)–(d) and 21 C.F.R. § 314.81(b)). Plaintiffs do not dispute that issue here. Plaintiffs did note in their Opposition, however, that there was no evidence that certain studies were ever submitted, including the 2003 Study.

[51] *See id.* at 755.

[52] *See* Morrow v. Jones, 140 F.4th 257, 261 (5th Cir. 2025); *see also* Rollins v. Home Depot USA, Inc., 8 F.4th 393, 397 (5th Cir. 2021) (discussing forfeiture and waiver); *In re Zicam Cold Remedy Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 09–md–2096–PHX–FJM, 2011 WL 2784803, at *2 (D. Ariz. July 15, 2011) (denying motion for interlocutory appeal, in part because the defendants' "[f]ailure to argue the issue on summary judgment is fatal to raising it now").

In support of the proposition that the FDA "could not have approved the 505(b)(2) applications without requiring revised warnings," Sanofi cites 21 C.F.R. § 314.125(b), which provides that the "FDA *may* refuse to approve an NDA" in a number of circumstances.[53] Specifically, pursuant to 21 C.F.R. § 314.125(b)(6), the FDA may refuse approval where "[t]he proposed labeling is false or misleading in any particular." Pursuant to § 314.125(b)(8), the FDA may also refuse approval where "[t]he drug product's proposed labeling does not comply with the requirements for labels and labeling in part 201." Part 201 requires that the Warnings and Precautions section of the labeling "describe clinically significant adverse reactions . . . as soon as there is reasonable evidence of a causal association with the drug" and that the Adverse Reactions section describes "undesirable effect[s], reasonably associated with use of a drug[.]"[54]

First, Sanofi may overread the regulations, particularly in light of the Supreme Court's pronouncement that "it is a central premise of the [FDCA] and the FDA's regulations that the manufacturer bears responsibility for the content of its label at all times."[55] Second, the FDA's actions in 2011 (or inaction) seem more pertinent to the "clear evidence" inquiry—the second step of the preemption analysis—as first established in *Wyeth* v. *Levine*.[56] In *Merck Sharpe and Dohme Corp. v. Albrecht*, the Supreme Court clarified that to establish "clear evidence," a drug manufacturer must show that it "*fully informed* the FDA of the justifications for the warning required by state law

---

[53] (emphasis added).
[54] 21 C.F.R. §§ 201.57(c)(6)(i), (c)(7).
[55] *Wyeth*, 555 U.S. at 570–71.
[56] *Id.* at 572.

16

and that the FDA, in turn, informed the drug manufacturer that the FDA *would not* approve a change to the drug's label to include that warning."[57] Assuming the issue had been raised, it is unclear that the present facts satisfy that standard.[58]

Finally, Sanofi cites the First Circuit's decision in *In re Celexa* for the proposition that the FDA is "the exclusive judge of safety and efficacy based on information available at the commencement of marketing[.]"[59] In *Celexa*, the court ultimately found that there existed no "newly acquired information" after approval of the manufacturer's Supplemental NDA ("sNDA").[60] Notably, *Celexa* did not involve a separate manufacturer's label.[61] Although Sanofi began marketing well before 2011, Sanofi seeks to extend *Celexa*'s "pre-marketing" rule here to have the Fifth Circuit hold that subsequent approval of Accord's and Sandoz's drugs in 2011 means that nothing arising before it can be newly acquired as to *Sanofi*. Sanofi leaves out, however, that *Celexa* emphasized that drawing the line at the commencement of marketing also allows "the states to reach contrary conclusions when new information not considered by the FDA develops."[62] And there, unlike here, the plaintiffs "made no claim" that the two relevant pieces of scientific literature were "based on

---

[57] *Albrecht*, 587 U.S. at 303 (emphasis added).
[58] Sanofi stated in its Motion for Summary Judgment that because it "moves for summary judgment only on the threshold issue of newly acquired information, it does not address the clear evidence standard." Doc. 445-1 at 5 n.2.
[59] Doc. 595-1 at 6 (citing *In re* Celexa & Lexapro Mktg. Sales Pracs. Litig., 779 F.3d 34, 41 (1st Cir. 2015)).
[60] *In re Celexa*, 779 F.3d at 42–43.
[61] *See id.* at 35 (noting that the defendant manufactured both Lexapro and Celexa).
[62] *Id.* at 41.

17

new data," so the court ultimately found that there existed on the record no "newly acquired information."[63]

At bottom, while Sanofi did not raise on summary judgment the issues of (1) approval of Accord's and Sandoz's docetaxel labels in 2011 or (2) what it submitted between 2002 and 2011, the Fifth Circuit has not addressed the question of how, if it all, the subsequent label approval of a *different* manufacturer's drug affects the preemption question. Considering this, and the fact that (1) the first and third requirements are satisfied and (2) Plaintiffs chose not to oppose Sanofi's Motion, the Court will grant Sanofi's request to certify its Order for interlocutory appeal.[64]

## CONCLUSION

For the foregoing reasons, Sanofi's Motion to Certify Order for Interlocutory Appeal is **GRANTED.**

New Orleans, Louisiana this 27th day of February, 2026.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[63] *Id.* at 42.
[64] As such, the Court need not reach Sanofi's second argument that this Court "expanded" the regulatory definition of newly acquired information.