**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: TAXOTERE (DOCETAXEL) | ) | MDL NO. 3023 |
| EYE INJURY | ) | |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | |
| This document relates to: | ) | SECTION: "H" (5) |
| All cases | ) | |

**ORDER AND REASONS**

Before the Court are four Motions filed by Defendant Sanofi: (1) Motion to Exclude Testimony of Dr. Gerald McGwin (Doc. 462); (2) Motion to Exclude General Causation Opinions of Dr. Josef Thundiyil (Doc. 446); (3) Motion to Exclude Certain Testimony of Dr. Vikram Durairaj (Doc. 455); and (4) Motion for Summary Judgment on General Causation (Doc. 450). For the reasons set forth herein, Sanofi's Motion to Exclude Dr. Gerald McGwin is **DENIED.** Sanofi's Motion to Exclude Dr. Thundiyil is **DENIED.** Sanofi's Motion to Exclude Dr. Durairaj is **GRANTED IN PART** and **DENIED IN PART.** Sanofi's Motion for Summary Judgment is **DENIED.**

**BACKGROUND**

Plaintiffs in this multidistrict litigation ("MDL") are suing several pharmaceutical companies that manufactured and/or distributed a chemotherapy drug, Taxotere or docetaxel, that Plaintiffs were administered for the treatment of cancer, primarily breast cancer.[1] Among these companies are Defendants sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc.

---

[1] Taxotere is the brand name for the drug docetaxel.

(collectively, "Sanofi"), Accord Healthcare, Inc. ("Accord"), and Sandoz Inc. ("Sandoz"). Plaintiffs allege that Taxotere or docetaxel caused them to sustain injuries to their lacrimal systems, including punctal, canalicular, and/or nasolacrimal duct stenosis (narrowing), which resulted in excessive tearing, otherwise known as epiphora.[2]

On May 2, 2023, this Court issued Case Management Order No. 16 ("CMO 16").[3] Among other things, CMO 16 set deadlines for discovery and motion practice, and bifurcated general dispositive issues, including but not limited to preemption, adequacy of the label, and general causation. Pursuant to CMO 16, Plaintiffs provided the expert reports of (1) Dr. Gerald McGwin, expert epidemiologist; (2) Dr. Josef Thundiyil, expert toxicologist; and (3) Dr. Vikram Durairaj, a board-certified oculoplastic surgeon whom Plaintiffs contend specializes in treating the injury at issue. On February 28, 2025, Defendants Accord, Sandoz, and Sanofi jointly filed three Motions seeking to exclude certain opinions, including those related to general causation, of Drs. Thundiyil,[4] Durairaj,[5] and McGwin.[6] The same day, Defendants filed a Motion for Summary Judgment on General Causation as to the claims of Plaintiffs naming them as Defendants.[7] Plaintiffs oppose all four Motions.[8]

---

[2] For reference, this Court provided extensive background on the injury at issue and the facts giving rise to this case in its prior Orders addressing preemption. Doc. 583; Doc. 591.

[3] Doc. 115.

[4] Doc. 446.

[5] Doc. 445.

[6] Doc. 462.

[7] Doc. 450.

[8] Doc. 488; Doc. 482; Doc. 487; Doc. 492.

On December 1, 2025, this Court denied Sanofi's Motion for Judgment based on Preemption.[9] On January 16, 2026, this Court granted Accord's and Sandoz's Motions for Summary Judgment based on preemption. This Court entered Judgment in favor of Defendants Accord and Sandoz on March 6, 2026, dismissing Plaintiffs' claims against them with prejudice.[10] On February 27, 2026, this Court entered an Order and Reasons granting Sanofi's Motion to Certify this Court's December 1, 2025 Order and Reasons for Interlocutory Appeal.[11] As such, as to the four Motions now before the Court, Sanofi is the only remaining Defendant.

## LEGAL STANDARD

### I.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[12]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[13] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts

[9] Doc. 583.
[10] Doc. 606.
[11] *Id.* The Order certifying this Court's December 1, 2025 Order and Reasons was entered on March 4, 2026. Doc. 604.
[12] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).
[13] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 532 (5th Cir. 1997).

showing the existence of a genuine issue for trial."[14] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[15] "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[16] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[17] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[18]

## II.    Federal Rule of Evidence 702

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[14] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).

[15] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

[16] Johnson v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

[17] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).

[18] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

The current version of Rule 702 reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms., Inc.*,[19] and *Kumho Tire Co. v. Carmichael.*[20] The threshold inquiry is whether the expert possesses the requisite qualifications to render opinion on a particular subject matter.[21] Having defined the permissible scope of the expert's testimony, a court next inquires whether the opinions are reliable and relevant.[22] "Under Federal Rule of Evidence 702 and *Daubert*," expert testimony is reliable if "the reasoning or methodology underlying the [expert's] testimony is scientifically valid."[23] In assessing reliability, the Court may consider several nonexclusive factors, such as "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community."[24] "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."[25]

---

[19] 509 U.S. 579 (1993).

[20] 526 U.S. 137 (1999).

[21] Wagoner v. Exxon Mobil Corp., 813 F. Supp. 2d 771, 799 (E.D. La. 2011); *see also* Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.").

[22] *See* United States v. Valencia, 600 F.3d 389, 424 (5th Cir. 2010).

[23] Ruffin v. BP Expl. & Prod., Inc., 137 F.4th 276, 280 (5th Cir. 2025) (alterations in original) (citation modified).

[24] Burleson v. Tex. Dept. of Crim. Just., 393 F.3d 577, 584 (5th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94).

[25] Nestle v. BP Expl. & Prod., Inc., 627 F. Supp. 3d 577, 583 (E.D. La. 2022) (alterations in original) (quoting Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 355 (5th Cir. 2007)).

In turn, "[i]n determining admissibility of expert testimony, the court must determine whether expert's reasoning or methodology fits facts of case, and whether it will thereby assist trier of fact to understand evidence; in other words, it must determine whether it is relevant."[26]

In undertaking this tripartite analysis, courts must give proper deference to the traditional adversary system and the role of the jury within that system.[27] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[28] As the "gatekeeper" of expert testimony, the trial court enjoys broad discretion in determining admissibility.[29]

## III.  Applicable Law

In this case, Plaintiffs assert claims under the products liability laws of their respective states. Because this Court exercises diversity jurisdiction, it applies state substantive law.[30] Where a transferee court presides over multiple diversity actions consolidated for multidistrict litigation, it must apply the substantive law of each transferor forum.[31] Here, however, Plaintiffs

---

[26] *Id.* at 583.

[27] *See Daubert*, 509 U.S. at 596.

[28] *Id.*

[29] Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 881 (5th Cir. 2013).

[30] *See* Newsome v. Int'l Paper Co., 123 F.4th 754, 761 (5th Cir. 2024) (citing Smith v. Christus Saint Michaels Health Sys., 496 F. App'x 468, 470 (5th Cir. 2012)); *see also Ruffin*, 137 F.4th at 282.

[31] *In re* Taxotere (Docetaxel) Prods. Liab. Litig., MDL No. 16-2740, 2022 WL 110494, at *2 (E.D. La. Jan. 12, 2022) (quoting *In re* Air Disaster at Ramstein Air Base, Germany on 8/29/90, 81 F.3d 570, 576 (5th Cir. 1996)); *In re*: Zicam Cold Remedy Mktg., Sales Pracs., & Prods. Liab. Litig., 797 F. Supp. 2d 940, 942 (D. Ariz. 2011) ("Where a transferee court presides over several diversity actions consolidated under the multidistrict rules, the choice

do not dispute that they must provide expert evidence on general causation to survive summary judgment.[32] While state law supplies the elements of a plaintiff's claims and the relevant burden of proof, the admissibility of expert testimony is generally governed by the Federal Rules of Evidence and *Daubert*.[33] Sanofi moves for summary judgment solely on the basis that Plaintiffs' experts' general causation testimony is inadmissible, and the parties do not dispute that Fifth Circuit law applies.[34] The Court therefore assesses Sanofi's Motion for Summary Judgment through this lens, and will address the

---

of law rules of each jurisdiction in which the transferred actions were originally filed must be applied.").

[32] *See* Doc. 450-1 at 3. Several courts—including those presiding over pharmaceutical MDLs—have concluded that most, if not all, jurisdictions require expert testimony to show general causation in complex medical cases. *See In re* Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig., 93 F.4th 339, 349 (6th Cir. 2024) ("So we conclude that the district court did not err in finding that all jurisdictions require expert testimony to show general causation in complex medical cases such as this MDL."); *see also In re* Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig., 227 F. Supp. 3d 452, 469 (D.S.C. 2017), *aff'd*, 892 F.3d 624 (4th Cir. 2018) ("While the specific language used by courts vary to some degree, all jurisdictions require expert testimony at least where the issues are medically complex and outside common knowledge and lay experience."); *In re* Mirena IUD Prods. Liab. Litig., 202 F. Supp. 3d 304, 311 (S.D. N.Y. 2016) ("The parties agree, and the substantive law across all relevant jurisdictions holds, that where a causal link is beyond the knowledge or expertise of a lay jury, expert testimony is required to establish causation." (citation modified)).

[33] *See* Coleman v. United States, 912 F.3d 824, 832 (5th Cir. 2019) (citing Huss v. Gayden, 571 F.3d 442, 452 & n.7 (5th Cir. 2009)). State rules, however, "become pertinent to the extent that the federal rules make them so." *See id.*; *see also Ruffin*, 137 F.4th at 280 n.1, 282.

[34] *See In re* Chinese-Manufactured Drywall Prods. Liab. Litig., No. 09-02047, 2017 WL 1476595, at *18 (E.D. La. April 12, 2017) ("noting that "[a]s the MDL transferee court, this Court is required to apply the substantive state law of the transferor court, and the federal law of its own circuit"); *see also In re* Taxotere (Docetaxel) Prods. Liab. Litig., MDL No. 16-2740, 2018 WL 5016219, at *3 (E.D. La. Oct. 16, 2018) (agreeing that "when interpreting and applying the federal Constitution, any federal statute, or the Federal Rules of Civil Procedure," an MDL court should apply the law of the circuit in which it sits).

admissibility of each expert's general causation testimony separately. The Court will then turn to the remaining arguments in the Motions to Exclude.

## IV.   Law on General Causation

General causation is generally defined as "whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury."[35] This terminology and the distinction between general and specific causation are "widely recognized."[36]  General causation "has typically been understood to mean the capacity of a toxic agent . . . to cause the illnesses complained of by plaintiffs. If such capacity is established, 'individual causation' answers whether that toxic agent actually caused a particular plaintiff's illness."[37]

Before proceeding with the analysis, the Court provides background on the methodologies at issue. "Epidemiology is the scientific field that 'attempts to define a relationship between a disease [in humans] and a factor suspected of causing it.'"[38] Toxicology is primarily concerned with "identifying and understanding the adverse effects of external chemical and physical agents on biological systems."[39] Whereas epidemiology focuses on "what *causes* disease

---

[35] Wells v. SmithKline Beecham Corp., 601 F.3d 375, 377–378 (5th Cir. 2010); *see also Knight*, 482 F.3d at 351.

[36] Steve C. Gold et al., REFERENCE GUIDE ON EPIDEMIOLOGY, in FED. JUD. CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 901 n.8 (4th ed. 2025) ("RMSE") (collecting cases).

[37] *In re* Hanford Nuclear Rsrv. Litig., 292 F.3d 1124, 1129 (citing Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1200 (6th Cir. 1988)).

[38] *Wagoner*, 813 F. Supp. 2d at 799 (quoting Brock v. Merrell Dow Pharm., Inc., 874 F.2d 307, 311 (5th Cir.1989), *modified by* 884 F.2d 166 (5th Cir. 1989)).

[39] David L. Eaton et al., REFERENCE GUIDE ON TOXICOLOGY, in RMSE, *supra* note 36, at 1030.

in humans," toxicology focuses on "what *effects* substances have on humans and animals."[40] Toxicology provides scientific information relevant to the following questions: "(1) What hazards does a chemical or physical agent present to human populations or the environment? (2) What degree of risk is associated with chemical exposure at any given dose?"[41]

## A.    Epidemiologic Methodology

The Fifth Circuit has recognized that epidemiological evidence is "the most useful and conclusive type of [general causation] evidence"—specifically "in toxic tort cases."[42] In this context, "[t]o assess whether general causation exists between an agent and a disease, the case law recognizes a two-prong test."[43] First, there must be an association between exposure to a drug and a disease.[44] "An association exists between exposure to a drug and a disease when the two 'occur together more frequently than one would expect by chance.'"[45] In other words, an association exists when people exposed to the drug have a higher incidence of the disease and the difference is not simply due to chance.[46]

---

[40] Perrotti v. Lockheed Martin Corp., No. 6:22-cv-1338, 2025 WL 2554425, at *11 (M.D. Fla. Sept. 2, 2025).

[41] RMSE, *supra* note 36, at 1031.

[42] *Ruffin*, 137 F.4th at 282 (emphasis added) (citation modified); *see also* Burst v. Shell Oil Co., No. 14-109, 2015 WL 3755953, at *4 (E.D. La. June 16, 2011), *aff'd*, 650 F. App'x 170 (5th Cir. 2016).

[43] *In re* Taxotere (Docetaxel) Prods. Liab. Litig., MDL No. 2740, 2021 WL 311865, at *3 (E.D. La. Jan. 19, 2021) (citing *Burst*, 2015 WL 3755953, at *5).

[44] *Wagoner*, 813 F. Supp. 2d at 803–04.

[45] *In re* Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig., 174 F. Supp. 3d 911 (D.S.C. 2016) (quoting Michael D. Green et. al, REFERENCE GUIDE ON EPIDEMIOLOGY, IN FED. JUD. CTR., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 566 (3d ed. 2011) ("2011 RMSE") (collecting cases).

[46] *Id.*

An association, however, "is not equivalent to causation."[47] "An association identified in an epidemiologic study may or may not be causal."[48] Thus, as to the second prong, once an association is found, the expert assesses whether a true causal relationship underlies the association.[49] Typically, an expert applies the Bradford Hill criteria to evaluate this second prong.[50] The Bradford Hill criteria are: (1) temporal relationship; (2) strength of the association; (3) dose-response relationship; (4) replication of findings; (5) biological plausibility; (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge.[51] Determining whether an association is causal is a matter of scientific judgment, and scientists "reliably applying the Bradford Hill factors may reasonably come to different conclusions about whether a causal inference may be drawn."[52]

The Reference Manual on Scientific Evidence (hereinafter "RMSE") describes the common ways of expressing the existence of an association between exposure and disease, including in terms of a relative risk (RR), an odds ratio, (OR) or an attributable risk (AR). The most commonly used approach is "relative risk," defined as the "ratio of the risk of disease or death among people exposed to an agent to the risk among the unexposed."[53] "For

---

[47] RMSE, *supra* note 36, at 902.

[48] *Id.*

[49] *See id.*

[50] *See id.* at 973.

[51] *Burst*, 2015 WL 3755953, at *5 (citing 2011 RMSE, *supra* note 45, at 600).

[52] *In re* Abilify (Aripiprazole) Prods. Liab. Litig., 299 F. Supp. 3d 1291, 1307 (N.D. Fla. 2018) (citing Milward v. Acuity Spec. Prods. Grp., Inc., 639 F.3d 11, 18 (1st Cir. 2011)).

[53] RMSE, *supra* note 36, at 1019.

instance, if 10% of all people exposed to a chemical develop a disease, compared with 5% of people who are not exposed, the disease occurs twice as frequently among the exposed people," and the relative risk is 2.[54] A relative risk of 1 indicates no association between exposure and disease.[55] "A relative risk ratio above 1 indicates an increased risk in the exposed group, and a relative risk ratio less than one indicates a decreased risk in the exposed group."[56]

Next, epidemiologists consider whether an association may be due to chance, bias, or confounding. Two common ways for evaluating whether a difference between those exposed to a drug and those not exposed could have occurred simply by chance are by calculating a p-value or a confidence interval for the relative risk.[57]

A p-value "represents the probability that an observed positive association could result from random error even if no association were in fact present."[58] "A p-value of .1 means that if in fact there is no association, 10% of all similar studies would be expected to yield an association the same as, or greater than, the one found in the study due to random error."[59] Stated another way, there is a 10% chance that values at least as large as the observed relative risk could have occurred by random error, with no association actually present in the population.[60]

---

[54] *Id.*

[55] *Id.*

[56] *In re Lipitor*, 174 F. Supp. 3d at 915.

[57] *Id.* at 914 (citing 2011 RMSE, *supra* note 45, at 576, 580).

[58] RMSE, *supra* note 36, at 933.

[59] *Id.* at 934 n.107.

[60] *See id.*

"To minimize false positives, epidemiologists use a convention that the p-value must fall below some selected level known as alpha or significance level for the results of the study to be statistically significant."[61] "The lower the p-value, the less likely that random error would have produced  the observed relative risk if the true relative risk is 1."[62] "The most common significance level in science is .05." [63] Thus, "the statement 'p < .05' means that p is less than 5%, and, by convention, the result is deemed statistically significant."[64]

A confidence interval is "a range of values that reflects random error."[65] "A confidence interval is essentially a 'margin of error' for the estimated relative risk ratio."[66] If the confidence interval for relative risk includes results which do not show any increased risk, that is, includes values less than or equal to 1, "we would say the study does not demonstrate a 'statistically significant' increased risk of an adverse outcome."[67]

## B.    Types of Evidence

In assessing causation, epidemiologists evaluate several types of studies, including randomized and/or clinical trials, observational studies, and toxicological studies. Randomized or clinical trials, which are considered the "gold standard," evaluate the development of a disease in two groups of patients: one group that is exposed to the agent and one group that is not.[68]

---

[61] *In re Lipitor*, 174 F. Supp. 3d at 915 (citing 2011 RMSE, *supra* note 45, at 580).

[62] RMSE, *supra* note 36, at 1018.

[63] *In re Lipitor*, 174 F. Supp. 3d at 915 (citing 2011 RMSE, *supra* note 45, at 577).

[64] RMSE, *supra* note 36, at 1018.

[65] *Id.* at 1011.

[66] *In re Lipitor*, 174 F. Supp. 3d at 915 (quoting *In re* Bextra & Celebrex Mktg. Sales Pracs. & Prods. Liab. Litig., 524 F. Supp. 2d 1166, 1174 (N.D. Cal. 2007)).

[67] *Id.* (citation modified).

[68] *See* RMSE, *supra* note 36, at 905.

Observational studies observe a group of individuals who are exposed and compare them with individuals who are not exposed.[69] The categories of observational studies include: (1) cohort studies; (2) case control studies; (3) cross-sectional studies; and (4) ecological studies.[70] "Cohort studies measure and compare health outcomes . . . in the exposed and unexposed groups . . ., while case-control studies measure and compare the frequency (or level) of exposure in the group with the disease (the cases) and the group without the disease (the controls)."[71] In cohort studies, "the subjects' exposure is determined before their health status," and the "risk of disease among the exposed can then be compared with the risk of disease among the unexposed."[72] By contrast, in a case-control study, "the health status is determined first," and "[t]he odds that someone with the disease was exposed to a suspected agent can then be compared with the odds that someone without the disease was similarly exposed."[73] In cross-sectional studies, individuals are examined for the presence of both the exposure of interest and the disease of interest at a single point in time.[74] Ecological studies, or demographic studies, focus on the occurrence of disease based on data from populations, rather than from individuals.[75] Finally, toxicological studies may be based on animals or human or animal tissue.[76]

---

[69] *Id.* at 906.
[70] *Id.* at 906–11.
[71] *Id.* at 907.
[72] *Id.*
[73] *Id.*
[74] *Id.* at 911.
[75] *Id.* at 1013.
[76] *See id.* at 1037.

Notably, all studies have limitations that add uncertainty about the proper interpretation of the results.[77] "Assessing whether an association is causal requires an understanding of the strengths and weaknesses of the study's design and implementation, as well as a judgment about how the study findings fit with other scientific knowledge."[78]

### C.     Background on Dose-Related Issues

Because Sanofi raises several issues related to dose, a brief explanation is warranted. As to the third Bradford Hill criterion, "dose-response relationship," the RMSE explains that "[i]f exposure to an agent causes a disease, higher exposures would generally be expected to increase the incidence or severity of that disease."[79] The RMSE defines the term as a "relationship in which a change in amount, intensity, or duration of exposure to an agent is associated with a change—either an increase or decrease—in risk of disease."[80]   In turn, "dose" "refers to the intensity or magnitude of exposure to an agent, taking into account the amount or concentration of the agent and the duration or frequency of exposure."[81] "A linear dose response exists when the response increases proportionally to increasing dose," though "[s]ome causal agents do not exhibit a linear dose–response relationship. For example, some agents may not cause disease until the exposure exceeds a

---

[77] *See id.* at 903.

[78] *Id.* at 902–03.

[79] *Id.* at 977.

[80] *Id.* at 1013; *see also In re* Deepwater Horizon Belo Cases, 119 F.4th 937, 941 (11th Cir. 2024) (alterations in original) (quoting McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1241–42 (11th Cir. 2005)).

[81] RMSE, *supra* note 36, at 1012.

14

certain dose."[82] "[A] dose-response relationship is strong, but not essential, evidence that the relationship between an agent and disease is causal."[83]

A dose-response relationship is also an important component of toxicological research. "Thus, most toxicological studies generally test a range of doses of the chemical."[84] In this context, "dose-response relationships" are defined as "[t]he extent to which a living organism responds to specific doses of a toxic substance. The more time spent in contact with a toxic substance, or the higher the dose, the greater the organism's response."[85] For example, "a small dose of carbon monoxide will cause drowsiness; a large dose can be fatal."[86]

Finally, "[e]vidence of a dose-response relationship as bearing on whether an inference of general causation is justified is analytically distinct from determining whether evidence of the dose to which a plaintiff was exposed is required in order to establish specific causation."[87]

## LAW AND ANALYSIS

Sanofi seeks to exclude the general causation testimony of Drs. McGwin, Thundiyil, and Durairaj as inadmissible pursuant to Federal Rule of Evidence 702. Sanofi also requests that the Court exclude certain testimony of Drs. McGwin and Durairaj related to label adequacy and regulatory obligations. Relying primarily on the arguments advanced in its Motions to Exclude, Sanofi

---

[82] *Id.* at 980.
[83] *Id.* at 981.
[84] *Id.* at 1051.
[85] *Id.* at 1098.
[86] *Id.*
[87] *Id.* at 981 n.244.

moves for summary judgment solely on the basis that Plaintiffs lack general causation evidence. The Court will address each expert in turn.

## I.   MOTION TO EXCLUDE DR. MCGWIN

Plaintiffs proffered Dr. McGwin as an expert in epidemiology and in the design and analysis of observational and non-observational (i.e., clinical trial) studies. At the outset, Sanofi does not challenge Dr. McGwin's qualifications. Indeed, he is a tenured professor and Vice Chair in the Department of Epidemiology at the University of Alabama at Birmingham (UAB). He holds an M.S. degree from Harvard University and a Ph.D. from UAB. He is a former associate editor for the American Journal of Epidemiology and has authored or co-authored more than 850 peer-reviewed manuscripts, with an emphasis on the epidemiology of eye disease. He has specifically published work related to the association between chemotherapeutic drugs, including Taxotere/docetaxel, and epiphora.

Sanofi moves to exclude Dr. McGwin's "regulatory opinions," as well as his general causation opinions.  As to the former, Sanofi requests that the Court preclude Dr. McGwin from testifying that "[s]ince Sanofi's 2002 label change, new and accumulating evidence contradicts the characterization that docetaxel-related excessive tearing and cases of 'lacrimal duct obstruction' that required procedural intervention were rare adverse reactions."[88] Sanofi argues that in opining on "new and accumulating information," Dr. McGwin is attempting to opine that there existed "newly acquired information" such that Sanofi could have changed its label pursuant to the changes-being-effected

---

[88] Doc. 462-4 at 10.

("CBE") regulation. In its December 1, 2025 Order and Reasons denying Sanofi's Motion for Summary Judgment, this Court held that Sanofi had "newly acquired information" such that Sanofi could have changed its label pursuant to the CBE regulation. Sanofi does not argue that Dr. McGwin is attempting to offer any other type of "regulatory" opinion. As such, Sanofi's request to exclude Dr. McGwin's purported regulatory opinions must be **DENIED AS MOOT.**

As to general causation, in his report, Dr. McGwin applies the two-prong methodology described above. He opines that "the epidemiological research is sufficient to support a causal relationship between docetaxel and stenosis of the nasolacrimal drainage system of the eye."[89] In reaching this conclusion, he first notes that between 2001 and 2014, several case series, as well as descriptive and prospective studies, were published describing "docetaxel-associated stenosis of the nasolacrimal drainage system of the eye and epiphora."[90] He also cites five "etiological studies" published between 2020 and 2023 regarding the association between docetaxel and eye disorders, as well as Sanofi's clinical trial data. Next, he considers whether the association is causal by applying the Bradford Hill criteria.

Sanofi raises four arguments in support of its position that Dr. McGwin's opinion is unreliable. First, Sanofi argues that in identifying an association, Dr. McGwin impermissibly relied on a "disproportionality analysis." Second, it argues that Dr. McGwin must identify a statistically significant association at each relevant "dose" (every-three-week and weekly docetaxel administration).

---

[89] *Id.* at 17.
[90] *Id.* at 12.

17

Third, Sanofi points out that Dr. McGwin did not identify a "threshold dose" at which Taxotere causes stenosis. Fourth, according to Sanofi, Dr. McGwin did not reliably apply the Bradford Hill Factors because (1) he relied on studies that do not focus on stenosis and/or docetaxel specifically and/or studies that had overwhelming confounders and (2) failed to identify a "background rate" of stenosis.

### A.   Statistically Significant Association

"An epidemiological study identifying a statistically significant association between the use of a drug and a particular adverse effect, accompanied by a reliable expert opinion that the association is causal, is 'powerful' evidence of general causation."[91] "The purpose of statistical significance . . . is to indicate a certain level of confidence in the results of an analysis."[92] Here, Sanofi appears to argue that general causation testimony is per se unreliable absent epidemiologic studies showing a statistically significant association. To the extent they do so, the Court rejects that argument.

While an expert who invokes the epidemiologic methodology must reliably apply it, there is no requirement that an expert use it at all. In displacing the Frye "general acceptance" test, *Daubert* established that the inquiry into the reliability of expert testimony under Rule 702 is a "flexible one"; nothing in Rule 702 renders any particular type of proof an absolute

---

[91] *In re Abilify*, 299 F. Supp. 3d at 1306.

[92] *In re* Lipitor, 892 F.3d at 641. "That a study's results are statistically significant says nothing about the importance of the magnitude of any association (i.e., the relative risk or odds ratio) found in a study or about the biological or clinical importance of the finding." RMSE *supra* note 36, at 930.

prerequisite to admissibility.[93] After *Daubert*, per se evidentiary rules requiring experts to employ specific methodologies or to produce specific forms of proof as a condition of admissibility are "not viable."[94] In the Fifth Circuit, epidemiologic evidence is not necessarily required for a plaintiff to prove general causation.[95] That is not to say that Plaintiffs' experts need not choose a reliable methodology. And naturally, an expert must also "reliably apply the method he chooses—but that does not mean only that method is reliable."[96] Here, the Court will follow other courts and "decline to establish a bright-line rule requiring experts to rely only on [epidemiologic] evidence that is statistically significant or else have their opinions excluded."[97]

Regardless, Dr. McGwin *does* purport to identify a statistically significant association, primarily relying on the disproportionality analysis in his own study published in 2023 ("2023 McGwin Study"). The 2023 McGwin Study investigated the association between lacrimal and retinal disorders and the use of docetaxel and paclitaxel using the FDA Adverse Event Reporting

---

[93] *See* U.S. v. Posado, 57 F.3d 428, 435 (5th Cir. 1995).

[94] *See id.* at 432.

[95] *See Ruffin*, 137 F.4th at 283.

[96] *Perrotti*, 2025 WL 2554425, at *11.

[97] *In re Lipitor*, 892 F.3d at 642. In *Lipitor,* the Fourth Circuit noted that "[a] significant p-value is not, however, some all-purpose salve, nor is it a get-out-of-*Daubert*-free card. Just as statistically significant evidence won't result in automatic admission, the absence of a p-value that is smaller than .05 (or some other threshold) isn't necessarily fatal to a case." *Id. See also* RMSE, *supra* note 36, at 936 n.114 (collecting cases declining to require epidemiological studies showing statistically significant results); Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 40 (2011) (noting that, in the context of materiality, "[a] lack of statistically significant data does not mean that medical experts have no reliable basis for inferring a causal link between a drug and adverse events," and that "courts frequently permit expert testimony on causation based on evidence other than statistical significance").

Systems ("FAERS").[98] The FDA describes "disproportionality methods" as "largely used to identify statistical associations between products and events in their respective databases of safety reports."[99] These methods "compare the observed count for a product-event combination with an 'expected' count."[100] "Unexpectedly high reporting associations 'signal' that there may be a causal association between the particular adverse event and the product."[101] The "Proportional Reporting Ratio (PRR)," which is the "foundational concept for many disproportionality methods," is "the degree of disproportionate reporting of an adverse event for a product of interest compared to this same event for all other products in the database," so the "entire database is used as a background 'expected.'"[102] Stated another way, a signal of disproportionality such as a PRR measures a statistical association within a collection of adverse event reports.

In the 2023 McGwin Study, all adverse event reports including the terms "docetaxel" or "paclitaxel" were selected, and lacrimal adverse events were identified using the lacrimal disorders Standardization MedDRA Query ("SMQ"). The PRR for the association between docetaxel and any lacrimal disorder, as well as "dacryostenosis" specifically, was calculated. As to the association between docetaxel and lacrimal events, the PRR is 2.47, and the range is reported at 2.03-3.02 with a 95% confidence interval ("CI"). The p-value is calculated at <.001.[103] With regard to the association between

---

[98] Doc. 487-2 at 3.

[99] Doc. 521-1 at 3 (FDA WHITE PAPER, DATA MINING AT FDA (Aug. 20, 2018)).

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

docetaxel and dacryostenosis, the PRR is 19.54, with a range of 7.19-53.13, (95% CI); the p-value is the same (<.001). Dr. McGwin concludes that the "specific events of dacryostenosis, lacrimation disorder and lacrimation increased" demonstrated "significant increased risks."[104] Therefore, the 2023 McGwin Study provides a statistically significant disproportionality signal for lacrimal adverse events, including dacryostenosis, indicating that these events are reported more frequently with docetaxel than comparator drugs. The 2023 McGwin Study, however, did not specify its findings as to frequency of administration and/or dosages.

Dr. McGwin also provides context by citing studies "wherein it is possible to calculate the proportion of docetaxel-treated patients that are either recommended for or receive surgical intervention," though these studies provide no comparators.[105] Next, he references "case series of docetaxel-associated stenosis of the nasolacrimal drainage system of the eye and epiphora reported in the scientific literature."[106] Much of this literature was authored by Sanofi's expert, Dr. Bita Esmaeli.

He then cites, in addition to the 2023 McGwin Study, four "observational epidemiological studies" regarding the association between docetaxel and eye disorders. The first is a retrospective study published by Blake H. Fortes and others in 2022 ("Fortes Study"), wherein the authors compared docetaxel to paclitaxel in a defined clinical population (371 vs 1,533 patients) and found "nasolacrimal duct adverse effects" occurred only in the docetaxel group (4/371

---

[104] Doc. 487-1 at 14.
[105] Doc. 462-4 at 9.
[106] *Id.* at 12.

vs 0/1533, p < .01).[107] The Fortes Study therefore supplies a direct exposed-versus-comparator incidence comparison, albeit with small numbers.

Second, he cites the findings of a large claims-based, retrospective cohort study published by Mohit Sodhi and others in 2022 ("Sodhi Study"). The authors reported an approximately five-fold increased risk of epiphora in taxane users compared to tamoxifen users. The adjusted hazard ratio ("HR") for epiphora was 5.15 (95% CI, 2.79-9.54).[108] The Sodhi Study provides a true epidemiologic risk estimate, although it is not stenosis-specific and does not isolate docetaxel alone.[109]

Third, he cites to a case-control study published by Yusuke Noguchi and others published in 2020, which focused on patients administered docetaxel every three weeks ("Noguchi Study").[110] The Noguchi Study revealed that a cumulative docetaxel dose of ≥300 mg/m² (odds ratio: 15.50, 95% CI: 1.37-175.00, p=.0027) was a significant risk factor associated with "eye disorders," which included watery eyes.

Fourth, he cites to another study using the FAERS database published by Wang and others in 2022 ("Wang Study"). Dr. McGwin explains that in Wang Study, the authors compared positive signals of adverse drug events among paclitaxel and docetaxel to evaluate the accuracy of current drug package information. For docetaxel, "periorbital and eyelid disorders" had the strongest signal.

---

[107] Doc. 493-135.
[108] Doc. 487-12.
[109] *Id.* at 3, 5.
[110] Doc. 462-5 at 219.

### 1. *Whether the PRR analysis sufficiently identifies an association*

Sanofi does not argue that the PRR methodology is itself unreliable. Rather, Sanofi contends that the 2023 McGwin Study does not present data capable of establishing a reliable, statistically significant association under the Bradford Hill methodology. They point out that because Bradford Hill assumes the existence of an association, courts have excluded expert testimony "in the absence of any epidemiologic studies finding an association."[111] Sanofi avers that the 2023 McGwin Study is not an "epidemiologic study" because it is not a randomized trial, cohort study, case-control study, or meta-analysis.

The Court disagrees. As the FDA notes, the PRR method "relies on an 'independence assumption,' i.e., that there is no association between products and events mentioned in reports."[112] So, if "there is disproportionate reporting of an event for a particular product, then this independence assumption is questionable"—that is, "there may be an association between a particular adverse event and the product."[113] In this sense, a PRR calculation may provide evidence of an association, and nothing in the RMSE precludes Dr. McGwin from relying on a disproportionality analysis. Indeed, courts frequently allow general causation experts to identify an association via this methodology.[114]

---

[111] Doc. 521 (citing Frischhertz v. SmithKline Beecham Corp., No. 10-2125, 2012 WL 6697124, at *3 (E.D. La. Dec. 21, 2012)).

[112] Doc. 521-1 at 3–4.

[113] *Id.*

[114] *See, e.g.*, *In re Abilify*, 2021 WL 4951944, at *5 (holding that statistical methods employed by expert—including PRR—were reliable and allowing expert to rely on same in identifying an association for general causation purposes); *see also In re* Fosamax (Alendronate Sodium) Prods. Liab. Litig., Nos. 11-5304, 08–08, 2013 WL 1558690, at *8 (D.N.J. Apr. 10, 2013); *In re* Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab.

To be sure, a FAERS analyses measure reporting disproportionality, not population-level disease risk. Without incidence data (i.e., a defined denominator), a PRR cannot establish "relative risk" in the traditional epidemiologic sense. The 2023 McGwin Study, however, acknowledges this limitation, noting that "[u]nlike a cohort study, the lack of a true denominator (i.e. the number of persons prescribed or who use a product) precludes the calculation of incidence rates," but explains that the "calculation of reporting ratios . . . from pharmacovigilance data as valid estimates of relative risks has been described and their use is widely accepted."[115] Even so, the FDA describes an association expressed by a PRR as "statistical; thus, it cannot be interpreted as causal or *related to risk*."[116]

Courts have recognized these limitations. In *In re Abilify*, for example, the district court observed that "the safety signals identified through disproportionality analyses in this case do not, by themselves, demonstrate a causal association," but nonetheless permitted their use as supporting evidence.[117] In a subsequent decision, the court again found such analyses reliable to "investigate the possible existence of a statistical association between Abilify and reports of certain adverse events in the FAERS database."[118] The court noted that "[i]nvestigation and contextualization of a

---

Litig., No. 3:09–md–02100, MDL No. 2100, 2011 WL 6302573, at *17 (S.D. Ill. Dec. 16, 2011). Indeed, this Court previously allowed an expert to identify an association, for general causation purposes, via a PRR methodology. *In re* Taxotere (Docetaxel) Prods. Liab. Litig., No. 16-2740, 16-17144, 2019 WL 3997122, at *4–5 (E.D. La. Aug. 23, 2019).

[115] Doc. 487-2 at 6.

[116] Doc. 521-1 at 3 (emphasis added).

[117] *In re Abilify*, 299 F. Supp. 3d at 1346 (citation modified).

[118] *In re* Abilify (Aripiprazole) Prods. Liab. Litig., No. 3:16-md-2734, 2021 WL 4951944, at *6 (N.D. Fla. July 15, 2021).

statistical signal are critical to determining whether the signal represents a causal relationship between a drug and a reported adverse event."[119] That process "involves examining supporting information such as published case reports, biological and clinical plausibility, clinical trials data, temporal relationship, similarity to other drugs, and may also require [conducting] epidemiological studies in healthcare databases."[120]

That is how Dr. McGwin uses the database here. After identifying a potential association—relying primarily on the 2023 McGwin Study, but also citing additional studies in support—he applies the Bradford Hill criteria as to numerous studies. As such, Dr. McGwin does not treat the 2023 McGwin Study as definitive proof of causation. Notably, in many of Dr. McGwin's cited publications, there appears to be a consensus that docetaxel is, at the very least, associated with an increased risk of stenosis. Dr. McGwin's approach is not unlike a "weight of the evidence" approach that courts have held to be permissible.[121]

---

[119] *Id.*

[120] *Id.* (alterations in original) (citation modified) (first citing Harpaz et al., *Novel Data-Mining Methodologies for Adverse Drug Event Discovery and Analysis*, 91 CLINICAL PHARMACOLOGY & THERAPEUTICS 1010, 1013 (2012); then citing Harpaz et al., *Performance of Pharmacovigilance Signal Detection Algorithms for the FDA Adverse Event Reporting System*, 93 CLINICAL PHARMACOLOGY & THERAPEUTICS 539 (2013)); *see also* Doc. 521-1 at 12 (noting that "[h]ands-on case reviews," as well as analyses of other "public scientific literature," and "further epidemiologic assessments are necessary to characterize the clinical and public health significance of safety 'signals' generated by data mining analyses").

[121] *See* David L. Faigman et al., 3 MODERN SCIENTIFIC EVIDENCE § 23:15 (2025-2026 ed.) (noting that "[t]he weight-of-the-evidence approach is frequently discussed in terms of the Bradford Hill criteria" and that "[a]lthough Sir Bradford Hill imagined the criteria as a way to assess causation in epidemiologic research, many of the factors, e.g., specificity, temporality, dose-response, and plausibility, are clearly relevant to the assessment of other types of evidence and courts frequently invoke the Bradford Hill criteria as a way to assess

Sanofi further asserts that the 2023 McGwin Study is unreliable because FAERS is composed of unverified, uncontrolled, and anecdotal case reports that are not subject to medical corroboration. They also contend that when asked about the fact that half of all the docetaxel case reports in the 2023 McGwin Study were reported in a 24-month period, Dr. McGwin acknowledged that these were presumably related to this litigation. Although there are limitations with FAERS data, this does not warrant exclusion. Sanofi may explore these issues through cross-examination and the presentation of contrary evidence.[122]

### 2.    *Whether Dr. McGwin must show an association at weekly and every-three-week administration*

Next, Sanofi argues that Dr. McGwin's opinion is unreliable because he failed to show a statistically significant association at each relevant schedule of administration (that is, weekly and every-three-weeks). It asserts that for purposes of identifying a statistically significant association, "dose matters," and that dose is "a product of both the concentration of a chemical or physical agent and the duration or frequency of exposure."[123] Plaintiffs respond that Dr. McGwin sufficiently identified an association via his PRR analysis and that he need not do so for each relevant "dose."

The Court finds that neither the caselaw nor the RMSE require Dr. McGwin to identify an independent association at each administration of

---

an expert's weight-of-the evidence analysis"); *see also In re Abilify*, 299 F. Supp. 3d at 1311; *In re Abilify*, 2021 WL 4951944, at *6; *In re Fosamax*, 2013 WL 1558690, at *4.

[122] *See In re Abilify*, 2021 WL 4951944, at *5.

[123] Doc. 450-1 at 5 (citing Simon v. Grand Isle Shipyard, Inc., No. CV 11-1432, 2023 WL 2430048, at *5 (E.D. La. Mar. 9, 2023)).

docetaxel. In support of its argument, Sanofi cites to two district court cases outside of this jurisdiction, *In re Lipitor* and *In re Bextra*.[124] In those cases, the district courts assessed the experts' causation analyses separately for each dose at which the drugs at issue were administered. Other district courts, however, have rejected any such requirement.[125] This makes sense: a "dose-response" relationship is assessed through the Bradford Hill criteria, the second step of the analysis.

But even if *Bextra* and *Lipitor* were binding on this Court, both are distinguishable. In those cases, the drug at issue was prescribed at one of several commercially available doses.[126] By contrast, Plaintiffs in this case were administered docetaxel at various dosing schedules (such as once a week or every three weeks), as well as in different treatment settings (metastatic, adjuvant, and neoadjuvant) and for varying durations, all of which affect dose.[127] Further, while Sanofi contends that Dr. McGwin agrees that the

---

[124] Doc. 462-1 at 5–6 (citing *In re Bextra*, 524 F. Supp. 2d 1166); Doc. 526 at 3 n.2 (citing *In re Lipitor*, 174 F. Supp. 3d 911).

[125] *See In re*: Zicam, 797 F. Supp. 2d at 945.

[126] *See In re Bextra*, 524 F. Supp. 2d 1166; *In re Lipitor*, 174 F. Supp. 3d 911.

[127] In an editorial responding to a 2013 study, Sanofi's expert Dr. Esmaeli and her co-authors stated that while docetaxel administered every three weeks for a shorter duration are not "the subject of greatest concern," those who receive docetaxel weekly, or every three weeks for extended periods (such as in the metastatic setting), are among those patients who are "at the greatest risk of canalicular stenosis." Doc. 493-131 at 2. Dr. Esmaeli also opines in her Report that when considering the association between stenosis and weekly docetaxel, "the duration of treatment, frequency of intravenous administration of the drug, and cumulative dose are all factors to consider. Doc. 462-3 at 22. While she appears to acknowledge that there is an association between docetaxel administered in the weekly setting and stenosis, she also opines that there is insufficient evidence with respect to the association between docetaxel administered every three weeks in shorter durations (such as in the adjuvant setting). *Id.*

27

evidence differs with respect to dosing and that there is a "dose-response" relationship, it does not specifically identify any studies that directly undermine his conclusions, as was the case in *Bextra* and *Lipitor*. The Court will not, therefore, require Dr. McGwin to provide a separate analysis for weekly and every-three-week administration or evidence of an association at every conceivable dose. That kind of inquiry is best addressed through a dose-response analysis and/or specific causation.[128]

## B.   Whether a Showing of "Threshold" or "Toxic" Dose Is Required

Next, Sanofi contends that Dr. McGwin's opinion is unreliable because he failed to show a "toxic" or "threshold" dose at which Taxotere causes stenosis—which Sanofi contends is a requirement for a general causation expert's opinion to be admissible under Fifth Circuit caselaw. This argument is without merit. In the recent decision *Ruffin v. BP*, the Fifth Circuit explicitly rejected the defendant's argument that "to be admissible, an expert must 'identify the minimum amount of a particular chemical necessary to cause a plaintiff's alleged condition in the general population.'"[129] Framing the defendant's contention as a relevance objection, the court noted that *Daubert*

---

[128] Other courts have explained that "dose primarily is relevant to the question of specific causation—whether a particular exposure caused the plaintiff's injury. Courts have placed less emphasis on dose when addressing general causation." Davis v. McKesson Corp., Nos. CV-18-1157, CV-18-1159, CV-18-1778, 2019 WL 3532179, at *11 n.5 (D. Ariz. Aug. 2, 2019) (citing Clausen v. M/V New Carissa, 339 F.3d 1049, 1059 (9th Cir. 2003)). "This is especially true in cases like this that do not involve common background levels of exposure to a substance, or where there is no identified benign exposure level." *Id.* (first citing *In re*: Zicam, 797 F. Supp. 2d at 944–45; then citing Henricksen v. ConocoPhillips Co., 605 F. Supp. 2d 1142, (E.D. Wash. 2009)).

[129] *Ruffin*, 137 F.4th at 281.

and Federal Rule of Evidence 702 "control whether evidence is admissible, and they each provide that evidence is admissible if, among other things, it is 'relevant' to the applicable legal element," that is, general causation.[130] Under the governing law, this required only a showing that the substance was capable of causing the condition at issue in the general population.[131] The court further explained that a quantitative estimate was not required and that, "even when an expert does provide a quantitative-dosage estimate, we have allowed a numerical 'range' supported by other, non-dosage associations, such as the chemical's 'toxicological profile' and the 'temporal connection' between workplace exposure to a chemical and the incidence of a condition."[132]

The court also stressed that the Bradford Hill criteria "consider a dose-response relationship" as "but one factor among others,"[133] and cited authority contrasting general causation, in which dose is not a central issue, with specific causation, in which the primary issue is whether there has been exposure to a sufficient dose to be a likely cause of the condition.[134] It ultimately concluded that the "general-causation caselaw is inconsistent with

---

[130] *Id.* (quoting *Daubert*, 509 U.S. at 591).

[131] *Id.* (quoting *Knight*, 482 F.3d at 351). The Fifth Circuit acknowledged that this standard—articulated in *Knight v. Kirby*—derived from Texas state law; nevertheless, the court applied it in the maritime context. *See id.* at 280 n.1 (noting that "we have still previously required general and specific causation for toxic-tort claims arising under general maritime law," and that "even though the *Knight* rule derives from state law, we nevertheless applied it there to a claim that arose under the Jones Act (citing *Knight*, 482 F.3d at 350)).

[132] *Id.* at 283 (citing Curtis v. M&S Petroleum, Inc., 174 F.3d 661, 669–70, 670 n.8 (5th Cir. 1999)).

[133] *Id.* (citation modified).

[134] *See id.*

requiring a quantitative dosage for expert testimony to be relevant under Rule 702 or *Daubert*."[135]

As one district court has explained, *Ruffin* "teaches us not to confuse what is sufficient to prove causation—a precise quantitative dose—with what is *required*—some level of exposure that shows the substance is capable of causing the relevant harm."[136] This makes sense because "[d]ose is not synonymous with specific concentration amounts anyway—part of dose includes duration of exposure."[137] Other courts have followed suit and have declined to extend the "toxic dose" requirement "from environmental exposure litigation to drug products liability actions."[138] "That the toxic dose issue does not arise more frequently in the drug products liability context makes sense," because "[i]n environmental exposure litigation, plaintiffs may allege injury caused by a substance with which many people interact harmlessly at lesser degrees of exposure."[139] Thus, "to explain how a pervasive substance is harmful, one must show that at a particular level of exposure, the substance becomes toxic."[140] Absent such a requirement, there is a risk of plaintiffs filing meritless claims based on harmless exposures. "But that risk is less severe in drug product liability actions."[141]

---

[135] *Id.* at 283.

[136] *Perrotti*, 2025 WL 2554425, at *15 (citing *Ruffin*, 137 F.4th at 282).

[137] *Id.*

[138] *In re: Zicam*, 797 F. Supp. 2d at 945.

[139] *Id.*

[140] *Id.*

[141] *See id.* at 946.

As such, the Court finds that Dr. McGwin need not provide a "toxic" or "threshold dose" to be admissible. Rather, the pertinent question is whether he adequately considered the "dose-response" factor.[142]

## C.    Dose-Response Analysis

Sanofi argues that Dr. McGwin did not reliably apply the dose-response factor. The Court disagrees. In the epidemiological context, a dose-response relationship means that "[a] relationship in which a change in amount, intensity, or duration of exposure to an agent is associated with a change—either an increase or a decrease—in risk of disease."[143] In considering this factor (which Dr. McGwin refers to as "biological gradient"), Dr. McGwin opines that a number of studies have demonstrated that patients treated with docetaxel who develop stenosis have a higher cumulative dose than those who do not.

In assessing this criterion, Dr. McGwin cites a study published by Dr. Esmaeli and others in 2002 in Ophthalmology titled "Canalicular Stenosis Secondary to Weekly Versus Every-3-Weeks Docetaxel in Patients with Metastatic Breast Cancer" ("2002 Esmaeli Ophthalmology Study"), wherein the authors compared canalicular stenosis secondary to weekly versus every-three-weeks docetaxel in patients with metastatic breast cancer.[144] The authors reported on the pattern of docetaxel administration, as well as the "dose intensity" and "mean cumulative dose" that each patient received.[145]

---

[142] Notably, as to weekly administration, Dr. Esmaeli admits that there is no precise threshold dose.

[143] See RMSE, supra note 36, at 1013.

[144] Doc. 462-5 at 44.

[145] Id. at 44–46.

31

"The mean cumulative dose of docetaxel was higher in patients with canalicular stenosis than in patients without canalicular stenosis," with 712 mg/m² (±201) for stenosis versus 361 mg/m² (±172) without. The authors concluded that "canalicular stenosis and epiphora were more common in patients receiving docetaxel weekly."[146]

Dr. McGwin also cites additional studies that indicate that a higher cumulative dose of docetaxel may increase the incidence of stenosis. For example, in 2002, Dr. Esmaeli and others published a study in the Annals of Oncology titled "Canalicular stenosis secondary to weekly docetaxel: a potentially preventable side effect" ("2002 Esmaeli Annals of Oncology Study"). There, the authors tied severity to cumulative dose.[147] The authors concluded that "[t]he mean cumulative dose of docetaxel at the time of diagnosis of epiphora was higher in patients with severe canalicular stenosis than in patients with moderate canalicular stenosis," (399 mg/m² vs. 501 mg/m², P=0.09).

He also cites a 2006 study authored by Medy Taslic and others titled "Epiphora (Excessive Tearing) and Other Ocular Manifestations Related to Weekly Docetaxel," which was published in Medical Oncology ("2006 Tsalic Study"). The authors reported epiphora related to canalicular stenosis occurring in seven of twenty-one (33%) patients," with two patients developing "complete canalicular stenosis requiring surgery" who received docetaxel at 208 and 645 mg/m².[148]

---

[146] *Id.* at 46.
[147] Doc. 487-7 at 2.
[148] Doc. 462-5 at 162.

32

Sanofi also argues that Dr. McGwin failed to reliably apply the dose-response factor because he relies on the Noguchi Study, which does not focus on stenosis specifically. The Noguchi Study reported on patients taking docetaxel every three weeks who developed "eye disorders," defined as "an event in which the pharmacist confirmed the symptoms in a patient interview and the ophthalmologist diagnosed the disorder."[149] The authors reported that 7 out of 89 total patients (7.9%) had eye disorders and symptoms of "watering eyes."[150] Of these, 2.2% had a stye and eye discharge. The reported cases also included corneal and conjunctival disorder, visual acuity reduction, and blepharedema (1.1% each).  Four patients who presented with watering eyes, eye discharge, or corneal and conjunctival disorder showed improvement with the use of eye drops such as artificial tears. The authors concluded that docetaxel-related eye disorders might be influenced by the cumulative dose of docetaxel, as well as cumulative docetaxel dose and concomitant cyclophosphamide use.

The Noguchi Study, standing alone, would be insufficient. Exclusion is not warranted, however, because Noguchi supports Dr. McGwin's conclusions as to the 2002 Esmaeli Study; the authors specifically cite it as reporting that the cumulative dose of docetaxel was "significantly higher in patients with canalicular stenosis than in those without canalicular stenosis."[151]

Here, the Court finds that Dr. McGwin adequately addressed the dose-response criterion, and he need not identify a threshold dose to be

---

[149] Doc. 462-5 at 221.
[150] *Id.* at 219.
[151] *Id.* at 220.

admissible.[152] Any differences with respect to weekly v. every-three-week administration go to the weight of Dr. McGwin's opinion, not its reliability.

### D.    Strength

Next, Sanofi argues that Dr. McGwin failed to reliably apply the "strength" factor. "The relative risk is a commonly used measure of association that represents the strength of an association."[153] "Larger relative risks (or stronger associations using other statistical measures) are often believed to be more likely to be causal than smaller ones."[154] While "lower relative risks can reflect causality, the epidemiologist will scrutinize such associations more closely because there is a greater chance that they are the result of uncontrolled confounding or biases."[155] Dr. McGwin opines that the results of (1) the 2023 McGwin Study; (2) the Fortes Study; (3) the Wang Study; (4) the Sodhi Study; and (5) Sanofi's clinical trial data are consistent with a strong association between docetaxel exposure and stenosis of the nasolacrimal drainage system of the eye resulting in epiphora. Sanofi argues that some of the studies upon which Dr. McGwin relies do not specifically identify stenosis. Further, it points out that while Dr. McGwin acknowledged that not every report of tearing in a study is a report of stenosis of the tear ducts, he does not

---

[152] *See In re* Taxotere (Docetaxel) Prods. Liab. Litig., MDL No. 16-2740, 16-17144, 2019 WL 3997122, at *8 (E.D. La. Aug. 23, 2019) (finding expert (1) adequately considered "dose response factor" and (2) was not required to give a definitive dose, where she testified that "not every study is identical with when the observations are seen what dose," and that she thought that "the pertinent point is that there was a dose response").

[153] RMSE, *supra* note 36, at 977.

[154] *Id.*

[155] *Id.*

34

attempt to differentiate between reports of stenosis and those of tearing without underlying stenosis.

The Fifth Circuit does not "require an expert to back his or her opinion with published studies that unequivocally support his or her conclusions."[156] "Nonetheless, the expert's testimony must be reliable at each and every step or else it is inadmissible."[157] "District courts must carefully analyze the studies on which experts rely for their opinions before admitting their testimony."[158] Further, "while '[t]rained experts commonly extrapolate from existing data,' the Supreme Court has held that 'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'"[159] "In such a situation, 'a court may conclude that there is simply too great an analytical gap between the data and the opinion offered.'"[160] Additionally, studies that do not examine the precise disease at issue may not be relevant, that is, "fit" the facts of the case and thereby assist the trier of fact to understand the evidence.[161]

In support of its argument, Sanofi cites a decision from another section of this Court, *Burst v. Shell Oil*.[162] There, the plaintiff's expert asserted that exposure to low levels of benzene present in gasoline can cause acute myeloid leukemia ("AML") and that the decedent's exposure to gasoline containing

---

[156] *See Burst*, 650 F. App'x at 174.

[157] *Id.*

[158] *Id.*

[159] *Id.* at 173 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).

[160] *Id.* (quoting *Joiner*, 522 U.S. at 146).

[161] *Burst*, 2015 WL 3755953, at *3.

[162] *Id.*

benzene caused his disease.[163] The expert relied primarily on studies that focused on benzene, rather than gasoline.[164] The parties did not dispute that gasoline contains benzene or that benzene, at sufficiently high exposure levels, is capable of causing AML.[165] But "no scientific authority" had "classified gasoline as a human carcinogen."[166] The defendant argued, among other things, that the expert's reliance on benzene studies was improper.[167]

The court agreed,  emphasizing that the scientific literature addressing gasoline exposure did not mirror the literature concerning benzene exposure.[168] The defendant also presented evidence that benzene is present in gasoline only in small concentrations and that gasoline constituents can interfere with benzene's toxic effects through competitive inhibition.[169] The court ultimately determined that although the evaluation of the benzene literature was generally relevant to the expert's ultimate opinion,  it *alone* could not provide a reliable basis for that opinion.[170] The court also found numerous methodological flaws in the expert's analysis of the gasoline literature.

Applying *Burst* to the present facts, Dr. McGwin's reliance on studies involving taxanes generally, other comparator drugs, or broader ocular conditions does not automatically render his opinion unreliable. Rather, *Burst*

---

[163] *Id.*
[164] *See id.* at *4.
[165] *Id.* at *9.
[166] *Id.*
[167] *Id.* at *4.
[168] *Id.* at *9.
[169] *Id.* at *10.
[170] *Id.*

36

suggests that such studies may be considered relevant supporting evidence.[171] Here, Dr. McGwin adequately explains how these studies provide support for his opinions. Dr. McGwin first notes that Fortes and the 2023 McGwin study "report statistically significant higher risks of nasolacrimal duct adverse effect and lacrimal adverse events (specifically dacryostenosis and increased lacrimation), respectively, for those receiving docetaxel compared to paclitaxel."[172] He then cites the findings in Sodhi and Wang as additional support. He explains that "the literature inconsistently refers to stenosis, epiphora, and lacrimal duct obstruction," but concludes that "there is sufficient overlap to support the strength of association."[173]

Unlike in *Burst*, this conclusion is not necessarily contradicted by the literature. For example, though Sodhi reported on the association between "epiphora" and taxanes, "epiphora" at least included reported cases of "stenosis."[174] The Sodhi authors also recognized that the "proposed mechanism for taxane-induced epiphora is stenosis."[175] Thus, while Sodhi does not allow for the extraction of  the exact number of reported cases of stenosis, it is supportive of Dr. McGwin's opinion, particularly when combined with the 2023 McGwin Study's findings.

---

[171] *See id.* at *9–10.

[172] As to Fortes, of the 371 docetaxel patients, there were 11 reported cases of an "ophthalmic effect." Of these, there were 4 reported cases of "canalicular obstruction," 1 case of "punctal stenosis," 1 case of "binocular diplopia," 1 case of "cranial nerve six palsy," 2 cases of "meibomian gland dysfunction" (MGD"), 1 "chalazion," and 1 "blepharitis with MGD." Doc. 493-135.

[173] Doc. 487-12 at 3.

[174] *Id.*

[175] *Id.* at 5.

Further, Dr. McGwin identifies additional limitations in the studies. For example, as to Sodhi, Dr. McGwin notes that although the authors do not report taxane-specific associations, "Fortes and McGwin suggest that docetaxel is driving the association."[176] As to Fortes, although it was not possible to "calculate a quantitative measure of association," this was so because there were "zero events in the paclitaxel group," the "comparator" group.[177] As to Wang, it "reported a remarkably strong association between docetaxel and periorbital and eyelid disorders, though associations for specific conditions within this class of adverse effects are not reported."[178] As to Sanofi's clinical trial data, he acknowledges its limitations by noting that the adverse events reported in these trials, which are summarized in the docetaxel label, include many events such as "lacrimation disorder or related conditions."[179]

Here, there is not "simply too great an analytical gap between the underlying data and the opinion offered."[180] The Court recognizes that it "may exclude expert testimony based on epidemiological studies where the studies are insufficient, whether considered individually or collectively, to support the expert's causation opinion."[181] Nevertheless, the Court finds that Dr. McGwin's opinions are sufficiently supported by the literature. Certainty is not required.[182]

---

[176] Doc. 462-4 at 15.

[177] *Id.*

[178] *Id.*

[179] *Id.*

[180] *See Burst*, 650 F. App'x at 173.

[181] *Burst*, 2015 WL 3755953, at *6.

[182] *See Burst*, 650 F. App'x at 174.

38

### E.    Failure to Identify "Background Risk" of Stenosis

"A temporal, or chronological, relationship must exist for causation to exist."[183] "If an exposure causes disease, the exposure must occur before the disease develops."[184] In assessing temporality, Dr. McGwin opines that "[t]he majority of etiologic epidemiologic studies are randomized controlled trials or prospective studies, thus the issue of the temporality of the observed association is clear."[185] Sanofi contends that Dr. McGwin did not reliably apply the "temporality" criterion because he failed to consider the "background rate" of stenosis. As Plaintiffs point out, however, temporality refers to the temporal relationship between a drug and disease, not necessarily the background rate.

Plaintiffs further argue that Dr. McGwin adequately considered the background rate because in comparative studies, the background rate of disease applies to persons exposed and unexposed to docetaxel, so any observed increased risk is over and above the background rate of those symptoms and conditions. They contend that a reliable analysis need not take this into account other than with the choice of a suitable comparison group. In his deposition, Dr. McGwin explained:

> Q: You would agree that there is a certain segment of the population that has stenosis of the nasolacrimal drainage system before they are ever exposed to Taxotere; correct?
>
> A: I would agree with you that that is true.

---

[183] RMSE, *supra* note 36, at 975.
[184] *Id.*
[185] Doc. 462-4 at 16.

Q: And in forming your opinions in this case, what determination did you make as to what that background rate was for individuals before they are ever exposed to Taxotere?

A: In this case, I didn't need to make that determination. The individual studies that I included would have made that determination. If I were doing my own study, it would have been a different issue.[186]

Indeed, in his report, Dr. McGwin cites studies that compare patients exposed to docetaxel and paclitaxel, such as the 2022 Sodhi Study and 2023 McGwin Study. The data from both the exposed and unexposed groups would account for any alleged background rate. Dr. McGwin also cites studies that do not necessarily have a "comparison" group. In some of those studies, however, a baseline evaluation was performed on patients at the start of the study.[187] Thus, since one can assume that those studies did not include pre-existing cases of stenosis, Dr. McGwin would not need to consider "background risk."

Sanofi points out that in several studies cited by Plaintiffs in their Opposition, the authors only evaluated patients *after* they received docetaxel. Specifically, Sanofi cites to the 2002 Esmaeli Annals of Oncology Study, the 2002 Esmaeli Ophthalmology Study, and the 2006 Tsalic Study. Although in these studies patients were not excluded at baseline based on asymptomatic

---

[186] Doc. 462-2 at 6.

[187] For example, in 2006, Dr. Esmaeli and others published "Prospective Study of Incidence and Severity of Epiphora and Canalicular Stenosis in Patients With Metastatic Breast Cancer Receiving Docetaxel" in the Journal of Clinical Oncology ("2006 Esmaeli Study"), which reports the findings of a prospective study of patients receiving docetaxel weekly and every three weeks. Doc. 462-5 at 167. The authors noted that before treatment with docetaxel, patients were evaluated by the same ophthalmologist and underwent a comprehensive ophthalmologic examination. *Id.* at 168.

stenosis, each study enrolled patients who were symptom-free at entry and identified cases only when clinically apparent epiphora developed after docetaxel exposure, at which point stenosis was confirmed through objective ophthalmologic evaluation. Thus, at the very least, the relevant outcome (stenosis manifesting as epiphora) was not present at baseline.

Even so, Sanofi points out that courts have recognized that "[i]gnoring available evidence about background risks may be fatal to an expert's general causation opinion."[188] In support, it cites one publication that it contends addresses background risk of stenosis (the "2013 Chan Study"), which is a prospective study that aimed to assess tearing in early breast cancer patients receiving docetaxel every three weeks. The authors reported that, at baseline evaluation, asymptomatic "lacrimal duct obstruction" ("LDO") was present in 17–18% of patients.

At the outset, Sanofi argues that Dr. McGwin does not identify or describe this (or any) reported background rate in his report. But in arguing that Dr. McGwin impermissibly relies "heavily on studies that report on conditions other than stenosis of the nasolacrimal drainage system," Sanofi specifically cites, among other publications, the 2013 Chan Study as one that Dr. McGwin "concedes" does not specifically address stenosis.[189] That Sanofi faults Dr. McGwin for failing to rely on Chan's findings on background risk

---

[188] *In re* Deepwater Horizon Belo Cases, No. 3:19CV963, 2022 WL 17721595, at *13 (N.D. Fla. Dec. 15, 2022), *report & recommendations adopted by* No. 3:19CV963, 2023 WL 2711573 (N.D. Fla. Mar. 30, 2023), *aff'd*, 119 F.4th 937 (11th Cir. 2024).

[189] Doc. 462-1 at 12 n.18.

while objecting to his reliance on it because it reports on a different injury is puzzling.[190]

Regardless, Dr. McGwin does not ignore Chan's findings. Rather, he explains that although the authors concluded that docetaxel-related tearing was likely "not caused by lacrimal duct obstruction," the study's design undermines that conclusion for at least three reasons. First, according to the study's methodology, patients with asymptomatic LDO should have been excluded, but the results suggest otherwise.[191] Second, patients were evaluated using two diagnostic approaches (CT-DCG and ophthalmic examination), which "demonstrated poor agreement, thus raising the issue of misclassification."[192] Dr. McGwin further notes that his critiques are consistent with the opinions of Dr. Durairaj, who explains that "CT-DCG is not the standard of care."[193] Third, the authors themselves acknowledge that the 2013 Chan Study "was not designed to evaluate specific causes of tearing," meaning "their conclusion that docetaxel-related tearing is not caused by lacrimal duct obstruction cannot be supported by the study design."[194] These diagnostic limitations call into question not only the study's overall conclusions but also the reliability of the reported "background rate."

---

[190] Like other studies upon which Plaintiffs' experts do rely, the 2013 Chan Study identifies cases of "lacrimal duct obstruction." Elsewhere in this litigation, Defendants have taken the position, and Plaintiffs disagree, that the term "lacrimal duct obstruction" on the Taxotere label sufficiently encompasses "stenosis." The Court clarifies that it makes no determination on that issue, or any issue related to label adequacy, here.

[191] Doc. 462-4 at 14.

[192] *Id.* at 14.

[193] Doc. 455-2 at 27.

[194] Doc. 462-4 at 14. The authors in the 2013 Esmaeli Editorial echo these concerns.

Although Sanofi may disagree with Dr. McGwin's conclusions, "where an expert's testimony is within 'the range where experts may reasonably differ,' the jury, not the trial court, should 'decide among the conflicting views of different experts.'"[195] Here, because Dr. McGwin identifies and accounts for the "limited body of scientific literature currently available on background risk," the fact that he does not "offer a more expansive analysis of background risk . . . does not present a 'serious methodological deficiency' or 'substantial weakness'" in his general causation opinions.[196]

### F.    Remaining Bradford Hill Criteria

Finally, although Sanofi does not specifically address the remaining Bradford Hill criteria, the Court finds that Dr. McGwin adequately addresses them. For example, as to the fifth factor, where the biological mechanism of an injury is not fully established, the plausibility inquiry asks whether the proposed causal explanation is consistent with existing medical and scientific knowledge, recognizing that well-supported hypotheses may suffice even in the absence of definitive mechanistic proof.[197] In support of this factor, which Dr. McGwin refers to as "plausibility and coherence," Dr. McGwin relies on two studies published by Dr. Esmaeli and others examining how docetaxel may affect the eye's tear drainage system.

First, he cites a study published by Dr. Esmaeli and others in titled "Docetaxel secretion in tears: association with lacrimal drainage obstruction" in the Archives of Ophthalmology ("2002 Esmaeli Arch. Ophthal. Study"). The

---

[195] *See In re Abilify*, 2021 WL 4951944, at *3 (quoting *Kumho Tire*, 526 U.S. at 137).

[196] *See In re Abilify*, 299 F. Supp. 3d at 1308 (quoting Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1308 (11th Cir. 2014)).

[197] *See Milward*, 639 F.3d at 25; *see also* RMSE, *supra* note 36, at 605.

2002 Esmaeli Arch. Ophthal. Study was a prospective trial of six patients who received docetaxel on a weekly or every-3-week interval that measured the subjects' tears for the concentration of the drug. All six patients had docetaxel measured in their tears, and the two patients with the two highest doses of docetaxel had the highest concentration in their tears. The authors stated that "the detection of docetaxel in tears collected" from all six patients after "its injection confirms our hypothesis that the ocular surface irritation and fibrosis of the tear-drainage ducts seen following treatment with this drug may be partly due to direct contact between the drug and both the conjunctival surface and mucosal lining of the tear drainage apparatus."[198] Dr. McGwin explains that the 2002 Esmaeli Arch. Ophthal. Study "provided evidence that the secretion of docetaxel in tears may be a mechanism for canalicular inflammation."[199]

Then, in 2003, Dr. Esmaeli and others published a study titled "Docetaxel Induced Histological Changes in the Lacrimal Sac and Nasal Mucosa" in Ophthalmic Plastic and Reconstructive Surgery (2003 Esmaeli Ophthalmic Study"). Dr. McGwin explains that in the 2003 Esmaeli Ophthalmic Study, "biopsies of patients revealed histopathological changes in the lacrimal sac and the nasal mucosa caused by docetaxel."[200] The authors ultimately concluded that "that nasolacrimal duct obstruction following docetaxel treatment may be due to stromal fibrosis in the mucosal lining of the

---

[198] Doc. 446-6 at 3.
[199] Doc. 462-4 at 16.
[200] *Id.*

44

lacrimal drainage apparatus."[201] Thus, Dr. McGwin identifies a plausible mechanism for stenosis.

In sum, the Court finds that Dr. McGwin's general causation testimony is admissible. Sanofi's Motion to Exclude Dr. McGwin is therefore **DENIED.**

## II.   MOTION TO EXCLUDE DR. THUNDIYIL

Plaintiffs offer Dr. Thundyil as an expert in toxicology. Dr. Thundiyil performed a review of the literature with respect to the causal association between docetaxel and ocular pathology. Like Dr. McGwin, he applies the Bradford Hill factors. Although Sanofi does not challenge his qualifications, Dr. Thundiyil is a licensed medical doctor practicing in the state of Florida with Board Certifications in Emergency Medicine, Medical Toxicology, and Occupational and Environmental Medicine. He notes that he has more than 20 years of clinical experience with independent practice.

Sanofi asserts three arguments that Dr. Thundiyil's opinion is unreliable: (1) he does not identify a statistically significant association; (2) he did not reliably apply the dose-response criterion; and (3) he failed to reliably apply the remainder of the Bradford Hill criterion because his analysis is "rife with errors, cherry-picking, untested hypotheses, fit problems, and missing analyses."[202] The Court will consider each in turn.

### A.   Statistically Significant Association

Sanofi points out that Dr. Thundiyil did not specifically address the first prong of the analysis, that is, identify a statistically significant association

---

[201] *Id.*

[202] Doc. 446-1 at 17.

between docetaxel and stenosis. As explained above, ordinarily, where an expert invokes the two-prong epidemiologic methodology, the expert is required to first identify an association that is statistically significant. Here, however, the Court finds that Dr. McGwin has adequately identified an association between docetaxel and stenosis via studies that include statistically significant results. As such, Dr. Thundiyil need not do so. "From a scientific perspective and for legal causation purposes, there is no requirement that the same expert who identifies a statistical signal conduct the entire causation inquiry."[203] The Court recognizes that while Plaintiffs argue that they provided "complimentary" expert opinion testimony from Dr. Thundiyil and Dr. McGwin, Dr. Thundiyil provides a standalone general causation analysis. Nevertheless, Dr. Thundiyil cites several studies also relied upon by Dr. McGwin, including the 2023 McGwin Study. Accordingly, Dr. Thundiyil need not explicitly identify the existence of a statistically significant association to be admissible.

### B.   Dose-Response Analysis

Next, Sanofi contends that Dr. Thundiyil's dose-response analysis is inadmissible because he did not provide a threshold dose at which Taxotere causes stenosis. As explained above, however, neither the RMSE nor the caselaw require this. Accordingly, this argument must be denied.

Sanofi further argues that Dr. Thundiyil's dose-response analysis is not reliable because he failed to identify reliable evidence in support of his

---

[203] *In re Abilify*, 2021 WL 4951944, at *6; *see also In re Taxotere*, 2019 WL 3997122, at *3; *In re Abilify*, 299 F. Supp. 3d at 1312-30, 1361-68 (finding Dr. Madigan "amply qualified" to offer a biostatistical analysis of scientific evidence but unqualified to offer expert opinions on medical causation).

conclusions. Sanofi points out that Dr. Thundiyil only specifically cites two sources in support of his dose-response inquiry. First, he cites the 2002 Esmaeli Arch. Ophthal. Study. Second, he cites deposition testimony of Sanofi's Chief Medical Officer Dr. Barry Childs.

### 1.  *Reliance on 2002 Esmaeli Arch. Ophthal. Study*

Dr. Thundiyil concludes that the 2002 Arch. Ophthal. Study "provides not only proof of exposure through tears, but also a dose dependent relationship."[204] Sanofi argues that the 2002 Arch. Ophthal. Study did not actually determine that patients had stenosis but rather only measured the presence of docetaxel in tears. It further contends that Dr. Thundiyil overlooked conflicting data in the study—i.e., that it did not find consistently higher concentrations of docetaxel in both the plasma and tears of specific patient groups (weekly administration of smaller doses v. every-three-week administration of higher doses). Sanofi further argues that when pressed, Dr. Thundiyil acknowledged that he could not identify a dose-response correlation in the 2002 Esmaeli Arch. Ophthal. Study, pointing to the following testimony:

> Q: But the takeaway here is that the higher dose results in a higher presence in the tears; that's the takeaway from this study?
>
> A. Yes -- well, that's one the of takeaways. I mean, it is important to note, though, that, you know, even in patient 1, who had the lower dose, the 35 with the total of 58, her concentration in tears at that time was still not that much different than someone who had the higher dose. So there's not a -- necessarily a direct correlation. There's a trend for a dose response, but it – there's probably some other patient factor that we don't yet understand

---

[204] Doc. 446-3 at 9–10.

that might cause some people to secrete it more in tears than others.[205]

The Court finds that Dr. Thundiyil's reliance on the 2002 Esmaeli Arch. Ophthal. Study does not render his opinion unreliable. First, Dr. Thundiyil did not "acknowledge" that there was no dose-response relationship. Rather, he indicated that there was at least a trend. Second, although the authors did not examine patients for the presence of stenosis, the authors indicated that their findings of docetaxel in tears confirmed their hypothesis regarding the mechanism of injury for docetaxel-induced stenosis. Indeed, the authors stated that "[w]e have previously reported that stenosis of the canaliculi and blockage of the nasolacrimal ducts are common adverse effects of weekly administration of docetaxel."[206] They further explained that "in this study, we sought to test the hypothesis that docetaxel may be secreted in tears. The secretion of docetaxel in tears would suggest that closure of the lacrimal drainage apparatus may be due in part to its direct contact with the drug."[207] Thus, the 2002 Arch. Ophthal. Study is sufficiently related to stenosis. Third, when asked if there was "any way to explain [the plasma] discrepancy," Dr. Thundiyil stated that "[i]n something of this small sample size, I don't know why that is, but it illustrates a couple of things: That not -- the plasma concentration may not directly be related to the dose or the tear concentration. Meaning, that how much you have in your plasma may not in everybody be directly related to how much is secreted in the tears."[208]

---

[205] Doc. 446-4 at 44.
[206] Doc. 446-2.
[207] *Id.*
[208] Doc. 446-4 at 44.

Fourth, like Dr. McGwin, Dr. Thundiyil relies on additional studies that support the dose-response criterion. Although he does not directly cite them in the "dose-response" section of his report, Dr. Thundiyil relies on several studies that indicate that higher doses or cumulative exposures correlate with increased incidence or severity. For example, like Dr. McGwin, Dr. Thundiyil cites the 2002 Esmaeli Annals of Oncology Study and the 2002 Esmaeli Ophthalmology Study.[209]

### 2. *Reliance on deposition testimony*

Finally, Sanofi argues that Dr. Thundiyil impermissibly relied on deposition testimony of Dr. Barry Childs, Sanofi's Chief Medical Officer. In his report, Dr. Thundiyil cites to Dr. Childs deposition testimony that "it was known that docetaxel was secreted in tears."[210] Dr. Thundiyil also cites Dr. Childs's testimony describing an exhibit he prepared, which states that (1) "Taxotere secretion in tears may contribute to the canalicular stenosis"; (2) in patients with hyperlacrimation, this injury "occurs most often with weekly dosing"; and (3) "incidence appears to increase with cumulative dose."[211] Sanofi points out that Dr. Thundiyil admitted that he does not usually rely

---

[209] He also relies on a study published in 2006 by Dr. Esmaeli and others in the Journal of Clinical Oncology ("2006 Esmaeli Study"). There, the authors reported that of the twenty-eight patients taking weekly docetaxel, "[n]ine patients (32%) had worsening of canalicular stenosis despite tobramycin and dexamethasone (to grade 2 in eight patients and to grade 3 in one patient), so surgery was recommended." Doc. 462-5 at 168. Of the twenty-eight patients taking docetaxel every two or three weeks, "[t]wo patients (7.1%) had persistent epiphora and grade 1 canalicular stenosis and underwent bilateral DCR with temporary silicone tube placement." *Id.* at 169. Plaintiffs point out that patients requiring surgery for epiphora had a median cumulative docetaxel dose of 889.5 mg, whereas those who developed epiphora (but did not necessarily require surgery in this study) had median doses of 496.5 mg (weekly group) and 420 mg (every-three-week group).

[210] Doc. 446-3 at 9.

[211] *Id.* at 9–10.

upon company witness testimony in considering the Bradford Hill factors. It further avers that Dr. Thundiyil overlooked the dose limitations of the cited statements. Sanofi points out that Dr. Childs states that "[t]he three weeks on and one week off is consistent with conventional dosing and helps avoid some of the chronic toxicities like . . . hyperlacrimation . . . ."[212]

Here, Dr. Thundiyil does not treat Dr. Child's statements as conclusive proof of a dose-response relationship. Rather, cites them as additional, supportive evidence. Dr. Thundiyil also includes the statements regarding every-three-week administration in his report. Although Dr. Thundiyil does not separate out his analysis by weekly and every-three-week administration, again, this is not required to satisfy the dose-response factor. While Sanofi takes issue with Dr. Thundiyil's "failure to consider differences in dosing," as well as alleged discrepancies in the studies upon which he relies, here, those issues go to the weight of his testimony, and Sanofi may address them on cross-examination or by the presentation of contradictory evidence.

## C.   Plausibility

Sanofi also argues that Dr. Thundiyil failed to reliably apply the plausibility factor because he failed to cite reliable studies in support of his opinions. In his report, Dr. Thundiyil begins by explaining, as background, how docetaxel works at the cellular level. He explains that docetaxel works by inhibiting the cell division of cancer cells. When cells cannot replicate, this leads to cell death, and he notes that docetaxel may also influence proteins involved in apoptosis (programmed cell death). He then states that these same

---

[212] Doc. 446-4 at 10.

50

"cytotoxic" (cell-killing) properties that allow docetaxel to destroy cancer cells can also affect other cells in the body, particularly rapidly dividing cells, and can result in a range of adverse effects.

He then turns, under the plausibility factor, to the mechanisms of injury. He begins by describing the body's general response to tissue damage: injury leads to the release of cytokines and immune cells, causing inflammation, along with angiogenesis, extracellular matrix deposition, and the formation of new tissue. He explains that fibroblasts produce extracellular matrix to repair damage, but that excess matrix formation can result in stiffening and scarring, particularly in tissues with limited regenerative capacity.

After describing this injury-response process, he opines that "[a]lthough the exact mechanism of docetaxel induced canalicular stenosis is not known," there are several plausible mechanisms which likely play a factor in the development of this pathology."[213]  He then identifies two specific mechanisms related to docetaxel. First, he opines that one mechanism is edema, explaining that docetaxel increases vascular permeability and causes fluid leakage. Second, like Dr. McGwin, Dr. Thundiyil notes that in the 2003 Esmaeli Ophthalmic Study, biopsies revealed extensive fibrotic changes in the nasal mucosa and lacrimal sac. He also explains that lymphocytic infiltrates and chronic fibrosis of the stroma were found in the patients in this study. He ultimately concludes that "[i]t is plausible and very clear that exposure to docetaxel in the eye can cause inflammation and trauma to the eye. Due to the unique embryologic origin of the canaliculi, the damaged cells that line it

---

[213] Doc. 446-3 at 8.

51

undergo scarring as confirmed by biopsy. This scarring is the plausible mechanism for stenosis."[214]

Sanofi argues that Dr. Thundiyil's biological plausibility opinions are speculative because he concedes that the precise mechanism by which docetaxel purportedly causes tear-duct stenosis is unknown and admits there is no evidence linking apoptosis to lacrimal duct injury. Plaintiffs respond that Dr. Thundiyil's opinions are reliable and that he reviewed docetaxel's known cytotoxic effects, relevant anatomy, and study findings to propose plausible mechanisms like increased edema and scarring. They further argue that a precise mechanism is not required under *Daubert*.

As to his apoptosis theory, Dr. Thundiyil testified as follows:

Q. Okay. And is that meant to say that the cell killing properties of docetaxel, that allow it to destroy cancer cells, are the same properties that are leading to stenosis of the lacrimal duct system?

A: All I'm really trying to say here is there's a plausible mechanism for cell damage, because we know it kills cancer cells, we know the mechanism is to inhibit mitosis, which causes apoptosis. What my point is here is that, in addition to the desired effects that chemotherapeutic drugs give, which is the killing of cancer cells, there are also some of the undesired effects, and I list some of the symptoms here. And I am explaining why it's plausible that this can also cause damage to certain parts of the eye.

Q. Okay. And, precisely, how does apoptosis lead to damage to the lacrimal duct system?

A. In this case, I'm not aware of apoptosis and lacrimal duct damage, or at least it's not been specifically shown.[215]

---

[214] *Id.* at 9.
[215] Doc. 446-4 at 34.

As explained above, the RMSE and Hill recognize that plausibility depends on the "biological knowledge of the day," so courts cannot demand mechanistic certainty.[216] Courts also recognize that "biological plausibility" is but one criterion in the Bradford Hill analysis; thus, to the extent an expert is unable to articulate a biologically plausible mechanism *at all*, "that is an issue that goes to the weight of their opinion, and not the issue of admissibility."[217]

Here, the Court finds that the absence of a fully elucidated mechanism does not render Dr. Thundiyil's opinion inadmissible. While the lack of support for the connection between docetaxel, apoptosis, and tear duct damage may create fodder for cross-examination, it does not render it unreliable. Dr. Thundiyil mentions apoptosis as representative of one mechanism through which a cytotoxic agent such as docetaxel may injure cells.

Next, Sanofi contends that the 2003 Esmaeli Ophthalmic Study does not support Dr. Thundiyil's opinion because in the biopsies taken, the authors found notable scarring in the nasal mucosa and lacrimal sac, which are different body tissues from the "punctal, canalicular, and/or nasolacrimal duct" targeted by Dr. Thundiyil's opinions. In his deposition, Dr. Thundiyil did agree that the study was a three-case report, that only one patient had a lacrimal-sac specimen, that two patients had only nasal-mucosa specimens, and that none of the patients had biopsy tissue from the canaliculi or punctum. He also

---

[216] *See* Doc. 488 at 25 (citing 2011 RMSE, *supra* note 45, at 605); *see also* Austin Bradford Hill, *The Environment and Disease: Association or Causation*, 58 PROC. ROYAL SOC'Y MED. 295, 295 (1965)).

[217] *Wagoner*, 813 F. Supp. 2d at 804 (citing *In re* Viagra Prods. Liab. Litig., 658 F. Supp. 2d 936, 946 (D. Minn. 2009)).

agreed that the lacrimal sac is a different structure from the canaliculi and punctum. Even so, his reliance on the 2003 Esmaeli Ophthalmic Study does not render his opinions unreliable.

Indeed, the authors were examining patients who had canalicular narrowing and nasolacrimal duct obstruction, and they interpreted the fibrosis they observed in the lacrimal sac and nasal mucosa as evidence that docetaxel causes fibrotic changes in the lacrimal drainage apparatus more broadly. Indeed, they explicitly stated that the drug probably affects the "entire lacrimal drainage apparatus," while acknowledging the narrower scope of the tissue sampled.[218] Accordingly, the 2003 Esmaeli Ophthalmic Study provides support for Dr. Thundiyil's conclusions. In his report, Dr. Thundiyil uses it as support for his broader biological-plausibility chain: docetaxel can injure ocular tissues, injury can trigger inflammation and fibroblast-driven scarring, and scarring can obstruct the lacrimal drainage system.

As additional support, Dr. Thundiyil also cites a study published by Abdul Hassan and others in 1998 titled "Epiphora in patients receiving systemic 5-flourouracil therapy ("5-FU") ("1998 Hassan Study"). He contends that the 1998 Hassan Study "revealed a dose dependent relationship between 5-Fluorouracil and epiphora," that "[t]his study demonstrates a precedent in an analogous drug which have a similar effect to docetaxel."[219] Sanofi contends that there is a "fit" problem because the 1998 Hassan Study focused on a different drug. They point out that when pressed about the mechanisms of action resulting in scarring and inflammation for both drugs, Dr. Thundiyil

---

[218] *Id.* at 4.
[219] Doc. 446-3 at 8.

admitted that "their mechanisms [of action] are different," with one drug affecting mRNA and DNA replicability and the other damaging cells' microtubules.[220] Sanofi also argues that Dr. Thundiyil "ignored contrary evidence" and cherry-picked favorable data because he summarily rejected the 1998 Hassan article's conclusions that fibrosis might be related to excessive eye-rubbing.

The Court disagrees. In his deposition, Dr. Thundiyil explained why he cited the 1998 Hassan Study: "With the limited understanding that exists for the mechanism, the important thing that my opinion carries is the cause. The proposed mechanism, that's--as I mentioned, is analogous in other drugs, or other settings, is this common theme of scarring that causes stenosis."[221] As for the authors' conclusions regarding "punctal excoriation," or eye rubbing, Dr. Thundiyil testified that he did not believe that the study proved that conclusion.

To be sure, the 1998 Hassan Study does not establish that chemotherapy-induced fibrosis is the definitive mechanism of tearing. Nevertheless, like the 2003 Esmaeli Ophthalmic Study, it provides some support for an association between treatment, canalicular fibrosis, and tear-duct dysfunction, rendering Dr. Thundiyil's reliance on it a matter of weight rather than admissibility. Here again, Sanofi may explore these issues on cross-examination.

### D.    Failure to Identify Background Risk of Stenosis

---

[220] Doc. 446-1 at 18.
[221] Doc. 446-4 at 62.

Finally, as with Dr. McGwin, Sanofi argues that Dr. Thundiyil failed to consider the "background rate" for lacrimal duct stenosis. This too must be rejected. Again, Sanofi does not identify any evidence of a "background rate" that Dr. Thunidyil ignores. Rather, when pressed, Dr. Thundiyil testified as follows:

> Q: Okay. And the evaluation of your assignment in this case, did you make any effort to identify the background rate for lacrimal duct stenosis in the general population?
>
> A. I tried to do that. It's not--there is not--I couldn't find a good answer to that, because there's wide varieties, or wide intervals like this, and there are a variety of biases, which go into that--the biggest thing is either a referral bias, or lot of people -- many don't go seek care for minor causes of tearing. And then, in some cases, not all ophthalmologists do some of the gold standard procedures, which would be probing and irrigation, to identify it. *So there didn't seem to be a uniform method for evaluating an[sic] diagnosing it, so it was hard to get a background rate for this.*[222]

Thus, in this case, Dr. Thundiyil contends that while he attempted to do such an analysis, given the limited body of evidence, he could not do so. Sanofi nevertheless contends that Dr. Thundiyil "admitted there were international studies and comparator populations, but he did not consider them."[223] When asked about these studies, however, Dr. Thundiyil gave a reasoned explanation as to why each one was not sufficient to give the prevalence or incidence of stenosis in the general population, such as biases.[224] He ultimately testified that "I have not seen an accurate study that reflects what the baseline

---

[222] *Id.* at 52 (emphasis added).
[223] Doc. 508 at 10.
[224] Doc. 446-4 at 52–54.

prevalence, or incidence, of canalicular stenosis is."[225] As such, Dr. Thundiyil did not simply "disregard" these studies, as Sanofi contends. Rather, as was the case with Dr. McGwin, the record evidence indicates that Dr. Thundiyil "identified and accounted for the limited body of scientific literature currently available on background risk for" stenosis.[226] In so doing, he "satisfied Rule 702 and *Daubert*."[227]

In sum, after reviewing Dr. Thundiyil's report, deposition testimony, and the arguments presented by the parties, the Court concludes that Sanofi's objections go to the weight of Dr. Thundiyil's opinions, not their admissibility. Accordingly, Sanofi's Motion to Exclude Dr. Thundiyil is **DENIED.**

## III.   MOTION TO EXCLUDE DR. DURAIRAJ

Plaintiffs proffered Dr. Durairaj as a medical expert who specializes in treating the injury at issue. Dr. Durairaj is a board-certified ophthalmologist who is fellowship trained in oculoplastic and orbital surgery. He completed his fellowship at the Mayo Clinic, served as a professor at the University of Colorado and the University of Texas at Austin's Dell Medical School, and is currently the managing partner of an oculoplastic clinic. Dr. Durairaj opines that, based on his review of the medical literature and his experience with the patients he has treated, Taxotere/docetaxel can cause permanent stenosis to the nasolacrimal drainage system. Sanofi moves to exclude Dr. Durairaj's general causation opinions, as well as his opinions related to label adequacy

---

[225] *Id.* at 54.
[226] *In re Abilify*, 299 F. Supp. 3d at 1332.
[227] *See id.*

and warnings, arguing that he is not qualified and that he did not apply a reliable methodology. The Court will consider each argument in turn.

### A.    General Causation Opinions

Sanofi argues that Dr. Durairaj is not qualified to offer general causation opinions because he (1) is not epidemiologist, toxicologist, or pharmacologist; (2) has never published anything about Taxotere and stenosis; and (3) has never conducted a study to determine whether Taxotere is capable of causing stenosis nor otherwise assessed whether any drug is capable of causing a side effect. Sanofi further contends that Dr. Durairaj's methodology is not reliable because he did not invoke the epidemiological or toxicological methodologies described above, and that his opinions, which are based only on his review of the medical literature as well as his own personal experience, are not a reliable substitute. Plaintiffs counter that Dr. Durairaj is qualified based on his clinical experience. They point out that in 2002, Dr. Durairaj gave a presentation regarding canalicular stenosis as a complication of Taxotere to the Department of Oncology at the University of Colorado. According to Plaintiffs, this makes Dr. Durairaj "one of the earliest surgeons in the world familiar with this specific injury."[228] They further contend that Dr. Durairaj's opinions are reliable because they are based on his clinical experience and a general consensus within his field.

Although usually in the context of specific causation, the Fifth Circuit "has upheld the admission of expert testimony where it was based on the expert's specialized knowledge, training, experience, and first-hand

---

[228] Doc. 482 at 10.

observation while supported by solid evidence in the scientific community."[229]

Here, however, Dr. Durairaj admitted his limitations:

> Q: Absolutely. So as far as any sort of causation opinion regarding Taxotere and stenosis or dosing issues or infusion schedules involving Taxotere and stenosis, would you defer to the epidemiologist and toxicologist listed in this litigation?
>
> A: I'm not sure how to answer that question. I would just say that's outside of my area of expertise.
>
> Q: Okay. So any causation opinion would be outside your area of expertise?
>
> A: In saying "causation," I don't – I mean I think that's a difficult question to ask, and the reason why is – I'll give you an example, like if somebody got hit by a baseball and it caused an orbital fracture, part of my area of expertise is I would say getting hit by a baseball caused an orbital fracture. So yeah.
>
> Q: Well, maybe I can ask you this. Would you agree that you're not an expert in determining causation?
>
> A: I mean, I think it depends on the situation.

Dr. Durairaj also testified that he does not know whether an association differs from causation and acknowledged that he has never assessed whether any drug can cause a particular side effect. He testified that once he has diagnosed stenosis, he "assumes it is probably Taxotere," based upon a consensus within this field.[230]

This Court need not decide whether Dr. Durairaj is qualified, however, because he failed to apply a reliable methodology. Although epidemiological

---

[229] Pipitone v. Biomatrix, Inc., 288 F.3d 239, 247 (5th Cir. 2002) (citing Skidmore v. Precision Printing and Packaging, Inc., 188 F.3d 606, 617 (5th Cir. 1999)).

[230] Doc. 455-3 at 76.

evidence is not strictly required, he must still employ a reliable method of analyzing the available evidence. The literature relied upon by Dr. Durairaj admittedly describes epiphora associated with docetaxel and identifies canalicular stenosis as a proposed mechanism. But Dr. Durairaj does not analyze or synthesize that literature to establish general causation. He does not evaluate the underlying studies, assess their strengths or limitations, or explain how they support a causal conclusion. Instead, he adopts the conclusions of the literature without demonstrating that they are sufficient to establish causation. His opinion therefore amounts to an unsupported *ipse dixit*.

Accordingly, the Court finds that Dr. Durairaj's ultimate opinion on general causation is inadmissible. Dr. Durairaj, however, may offer other relevant supporting opinions. For example, he may testify about the nature and treatment of stenosis, as well as describe and/or critique the findings reported in the literature and his field. He may also testify as to the mechanism of injury. Based on his clinical experience, he opines that the "unique cellular structure of the drainage system is susceptible to damage" and that "scarring and/or fibrosis can progress until pathway[s] closes and predominantly affects the punctal and canalicular systems, and sometimes the nasolacrimal duct."[231] He supports this opinion by citing literature, which he contends indicates that "the mechanism of injury occurs through secretion of the drug in tears causing inflammation, scarring, and/or fibrosis in the nasolacrimal drainage

---

[231] *Id.*

system."[232] In sum, while he may testify about these issues, Dr. Durairaj may not offer an opinion on general causation.

## B.  Regulatory and Labeling Opinions

Sanofi moved to exclude Dr. Durairaj "from offering any opinions on the adequacy of Taxotere's label or how prescribing oncologists would interpret it." Specifically, it seeks to preclude the following opinions:

1. The use of the term "lacrimal duct obstruction" in the Taxotere label is "imprecis[e]," "unhelpful to treating physicians," and has "no place in a prescription drug label."

2. The Taxotere label should direct oncologists to refer patients with epiphora for a prompt ophthalmologic examination.

3. The Taxotere label should warn that stenosis is potentially permanent, and "many oncologists do not fully appreciate that Taxotere / Docetaxel-related epiphora is not a minor transitory inconvenience that will dissipate at the completion of chemotherapy[.]"

4. The "need for an improved warning in the [Taxotere] label was heightened by the publication" of the 2013 Chan Study.

5. Based on the foregoing, the Taxotere label and the 2013 Chan Study created confusion within the oncology community about the nature and severity of the injury.

Sanofi seeks to exclude these opinions on the basis that (1) Dr. Durairaj is not qualified; (2) he has no reliable basis for these opinions and/or that they are mere speculation; and (3) his opinions do not fit the facts of the bellwether cases. As a threshold matter, Sanofi points out that Dr. Durairaj conceded that

---

[232] Doc. 455-2 at 9.

he does not hold himself out to be an expert in labeling, appropriate labeling, or regulatory matters. Plaintiffs respond that Dr. Durairaj is not offering opinions on whether the label meets regulatory requirements but rather offers fact-based observations about the label's content and associated side effects he has personally treated.

An expert may be qualified to testify based on the expert's "knowledge, skill, experience, training, or education."[233] Generally, "qualification is viewed liberally and is determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."[234] An expert who is qualified may "draw a conclusion from a set of observations based on extensive and specialized experience."[235] If, however, "the witness is relying solely or primarily on experience," he or she "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."[236] The Court now considers each of Dr. Durairaj's opinions in turn.

### 1.   *Use of the term "lacrimal duct obstruction"*

Dr. Durairaj opines that the term "lacrimal duct obstruction" is "imprecise," "unhelpful," and has "no place in a prescription drug label."[237]

---

[233] FED. R. EVID. 702.

[234] *In re* Fosamax, 645 F. Supp. 2d 164, 190 (S.D. N.Y. 2009) (citing *In re* Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., Nos. 1:00-1898, M21-88, MDL No. 1358, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008)).

[235] *Id.* (citing *In re MTBE*, 2008 WL 1971538, at *6).

[236] Andrews v. Rosewood Hotels & Resorts, LLC, 575 F. Supp. 3d 728, 734 (N.D. Tex. 2021) (citing FED. R. EVID. 702 advisory committee's note to 2000 amendment).

[237] Doc. 455-2 at 6.

Courts in this jurisdiction have held that "doctors are fully qualified to opine on the medical facts and science regarding the risks and benefits" of drugs, and to "compare that knowledge with what was provided in the text of labeling and warnings for FDA approved drugs."[238] However, courts draw an important distinction between permissible medical testimony and impermissible regulatory opinions. While a physician may testify about medical risks and whether those risks are reflected in the label, he "must possess additional expertise" to opine on what information should or should not be included in a drug label.[239] In another MDL, this Court allowed an oncologist and expert treating physician to testify about Taxotere's label but precluded testimony "about whether the label complied with the FDA regulations," which fell outside of his expertise.[240]

Here, to the extent Dr. Durairaj explains the medical meaning of the term "lacrimal duct obstruction" and whether it accurately describes the condition at issue, such testimony is admissible. As a clinician, he may also testify how, from a medical perspective, the terminology would be understood by physicians. Dr. Durairaj's opinion, however, that this language has "no place in a prescription drug label" constitutes an impermissible opinion about what language should or should not be included in the label, which falls outside his expertise.

---

[238] Conn v. C.R. Bard, Inc., No. 4:14-CV-298, 2021 WL 2346036, at *3 (S.D. Tex. June 8, 2021) (citation modified).

[239] *Id.* (citation modified).

[240] *In re* Taxotere (Docetaxel) Prods. Liab. Litig., MDL No. 16-2740, 16-17039, 2021 WL 111778, at *3 (E.D. La. Jan. 12, 2021).

### 2. *Label should direct referral to an ophthalmologist and warn of permanence; oncologists do not appreciate severity*

Dr. Durairaj states in his report that prompt referral is necessary to prevent the progression of stenosis and that it is rare that patients who he diagnoses with epiphora secondary to docetaxel are referred by their oncologists. He opines that the fact that patients with this side effect have continued to consistently arrive in oculoplastic surgeons' offices with advanced cases of stenosis is evidence itself of the fact that many oncologists are not aware of this side effect. Finally, he contends that it is crucial that the Taxotere label include a clear warning to oncologists alerting them to the fact that this potentially permanent side effect can be prevented.

Dr. Durairaj may testify, based on his clinical experience, about the general need for prompt referral and the risk of permanent stenosis. He may also testify about patients who frequently present with advanced stenosis. However, his opinion that these observations demonstrate that "many oncologists are not aware" of the side effect is inadmissible. This conclusion constitutes an unsupported and speculative inference regarding the knowledge of other physicians and is not grounded in a reliable methodology.[241] Finally, again, he may not opine on what the label should have warned about, i.e., the risk of permanence or the need for prompt referral, as this falls outside of this expertise.

---

[241] *See In re Fosamax*, 645 F. Supp. 2d at 189 (holding inadmissible the expert's testimony about the manufacturer's "state of mind, knowledge, or intent").

### 3.   *The 2013 Chan Study heightened the need for an improved warning*

Dr. Durairaj opines that publication of the 2013 Chan Study heightened the need for an improved warning. This opinion constitutes a regulatory judgment regarding when a label should be modified. Again, such testimony requires expertise in drug labeling and regulatory standards, which Dr. Durairaj does not possess.[242] He also opines that the Taxotere label and the Chan Study created confusion within the oncology community. This opinion is an unsupported assertion about the collective understanding of oncologists and is not grounded in any reliable methodology. Courts routinely exclude such broad, speculative claims.[243] He may, however, testify regarding the medical findings of the 2013 Chan Study, their significance to clinicians, and offer critiques. He just may not testify that the 2013 Chan Study created a duty or "need" to change the label.

### 4.   *Sanofi's argument regarding treating physicians*

Finally, Sanofi argues that under this Court's prior rulings, testimony regarding how a warning would have affected a physician's decision must come from the treating physician, not a retained expert. In failure-to-warn cases, causation turns on whether a different warning would have altered the prescribing physician's decision.[244] That argument is correct as to case-specific causation. This Court has previously held that when determining whether a

---

[242] *See C.R. Bard.*, 2021 WL 2346036, at *3.

[243] *See In re Fosamax*, 645 F. Supp. 2d at 197–98 (finding that medical expert's testimony that "osteoporosis is 'controversial' or that it is not really a disease was "mere personal opinion going beyond his expertise and, as such, would not be helpful to the jury").

[244] *See* Willett v. Baxter Int'l, Inc., 929 F.2d 1094, 1098–99 (5th Cir. 1991).

different warning would have altered a prescribing decision, the appropriate witness is the treating physician, particularly where that physician is available to testify.[245]

Plaintiffs, however, represent that Dr. Durairaj does not intend to offer opinions regarding how any bellwether plaintiff's oncologist would have interpreted the label or altered treatment decisions. To the extent Dr. Durairaj limits his testimony to general medical principles—such as the nature of the risk, its severity, and the importance of timely treatment—such testimony is permissible. Dr. Durairaj may not, however, offer case-specific opinions regarding (1) what a prescribing oncologist would have done; (2) how any oncologist would have interpreted the label; or (3) whether a different warning would have changed treatment decisions. Those opinions are reserved for the treating physicians. Accordingly, Sanofi's Motion to Exclude Dr. Durairaj is **GRANTED IN PART** and **DENIED IN PART**, as outlined herein.

## IV. MOTION FOR SUMMARY JUDGMENT ON GENERAL CAUSATION

As explained above, Sanofi moves for summary judgment solely on the basis that Plaintiffs lack admissible expert testimony. Having found that Plaintiffs have presented admissible expert testimony on general causation, Sanofi's Motion for Summary Judgment must be **DENIED.**

---

[245] *In re* Taxotere (Docetaxel) Prods. Liab. Litig., MDL No. 16-2740, No. 16-17039, 2021 WL 321661, at *3 (E.D. La. Feb. 1, 2021).

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Sanofi's Motion to Exclude Opinions of Dr. McGwin (Doc. 462) is **DENIED.**

**IT IS FURTHER ORDERED** that Sanofi's Motion to Exclude General-Causation Opinions of Dr. Thundiyil (Doc. 446) is **DENIED.**

**IT IS FURTHER ORDERED** that Sanofi's Motion to Exclude Certain Testimony of Dr. Vikram Durairaj (Doc. 455) is **GRANTED IN PART** and **DENIED IN PART.** Dr. Durairaj may offer medical testimony regarding the risks, severity, and treatment of stenosis and may compare those risks to what is disclosed in the Taxotere label. He may not offer opinions on the ultimate issues of general causation, label adequacy, regulatory requirements, or how prescribing physicians would have interpreted or acted upon the label.

**IT IS FINALLY ORDERED** that Sanofi's Motion for Summary Judgment on General Causation (Doc. 450) is **DENIED.**

New Orleans, Louisiana this 2nd day of April, 2026.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

67