## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE: TAXOTERE (DOCETAXEL)** | ) | **MDL NO. 3023** |
| **EYE INJURY** | ) | |
| **PRODUCTS LIABILITY LITIGATION** | ) | |
| | ) | |
| **This document relates to:** | ) | **SECTION: "H" (5)** |
| All cases naming Sanofi as a Defendant | ) | |

## ORDER AND REASONS

Before the Court is Defendant Sanofi's Motion to Exclude Certain Testimony of Dr. David Ross (Doc. 456). For the reasons set forth herein, Sanofi's Motion is **DENIED**.

## BACKGROUND

Plaintiffs in this multidistrict litigation ("MDL") are suing several pharmaceutical companies that manufactured and/or distributed a chemotherapy drug, Taxotere or docetaxel, that Plaintiffs were administered for the treatment of cancer, primarily breast cancer. Among these companies are Defendants sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. (collectively, "Sanofi"). Sanofi manufactures Taxotere, the brand name for the drug docetaxel. Plaintiffs allege that Taxotere or docetaxel caused them to sustain injuries to their lacrimal systems, including punctal, canalicular,

1

and/or nasolacrimal duct stenosis, which resulted in excessive tearing, otherwise known as epiphora.[1]

On May 2, 2023, this Court issued Case Management Order No. 16 ("CMO 16").[2] Among other things, CMO 16 set deadlines for discovery and motion practice, and bifurcated general dispositive issues, including but not limited to preemption, adequacy of the label, and general causation. Pursuant to CMO 16, Plaintiffs provided the expert report of their regulatory expert, Dr. David Ross.

On February 28, 2025, Sanofi filed a Motion for Summary Judgment arguing that Plaintiffs' claims were preempted under the Federal Food, Drug, and Cosmetic Act ("FDCA") and its corresponding regulations because there existed no "newly acquired information"—as defined in the regulations—such that Sanofi could have changed its label pursuant to the changes-being-effected ("CBE") regulation.[3] On December 1, 2025, this Court denied Sanofi's Motion for Summary Judgment, finding that Plaintiffs' claims were not preempted because there existed "newly acquired information" as early as 2003.[4] Specifically, the Court found that two articles, which summarized the findings of studies done by Dr. Bita Esmaeli and others, constituted "newly acquired information." The first article, titled "Blockage of the Lacrimal Drainage Apparatus as a Side Effect of Docetaxel Therapy," was published in 2003 by Dr. Esmaeli and others in Cancer ("2003 Esmaeli Study"). The second,

---

[1] For reference, this Court provided extensive background on the injury at issue and the facts giving rise to this case in its prior Orders and Reasons addressing preemption. Doc. 583; Doc. 591.

[2] Doc. 115.

[3] Doc. 445.

[4] Doc. 583 at 30.

2

"Prospective Study of Incidence and Severity of Epiphora and Canalicular Stenosis in Patients with Metastatic Breast Cancer Receiving Docetaxel," was published by Dr. Esmaeli and others in the Journal of Clinical Oncology in 2006 ("2006 Esmaeli Study"). On February 27, 2026, this Court entered an Order and Reasons granting Sanofi's Motion to Certify this Court's December 1, 2025 Order and Reasons for Interlocutory Appeal.[5]

On February 28, 2025, Sanofi filed the instant Motion to Exclude Certain Testimony of Dr. Ross.[6] Plaintiffs Oppose.[7]

## **LEGAL STANDARD**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The current version of Rule 702 reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[8] and *Kumho Tire Co. v.*

---

[5] *Id.* This Court granted similar Motions for Summary Judgment filed by Defendants Accord Healthcare, Inc. ("Accord"); Sandoz Inc. ("Sandoz"); Hospira Worldwide, LLC f/k/a Hospira Worldwide, Inc., Hospira, Inc. (collectively, "Hospira"), and Pfizer, Inc. ("Pfizer"), and dismissed Plaintiffs' claims against Defendants with prejudice. Doc. 591, Doc. 606, Doc. 609.

[6] Doc. 456.

[7] Doc. 484.

[8] 509 U.S. 579 (1993).

*Carmichael.*[9] The threshold inquiry is whether the expert possesses the requisite qualifications to render an opinion on a particular subject matter.[10] Having defined the permissible scope of the expert's testimony, a court next inquires whether the opinions are reliable and relevant.[11] "Under Federal Rule of Evidence 702 and *Daubert*," expert testimony is reliable if "the reasoning or methodology underlying the expert's testimony is scientifically valid."[12] In assessing reliability, the Court may consider several nonexclusive factors, such as "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community."[13] "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."[14]

In turn, in determining the admissibility of expert testimony, the Court must also "determine whether the expert's reasoning or methodology 'fits' the facts of the case, and whether it will thereby assist the trier of fact to

---

[9] 526 U.S. 137 (1999).

[10] Wagoner v. Exxon Mobil Corp., 813 F. Supp. 2d 771, 799 (E.D. La. 2011); *see also* Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.").

[11] *See* United States v. Valencia, 600 F.3d 389, 424 (5th Cir. 2010).

[12] Ruffin v. BP Expl. & Prod., Inc., 137 F.4th 276, 280 (5th Cir. 2025) (citation modified).

[13] Burleson v. Tex. Dept. of Crim. Just., 393 F.3d 577, 584 (5th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94).

[14] Nestle v. BP Expl. & Prod., Inc., 627 F. Supp. 3d 577, 583 (E.D. La. Sept. 12, 2022) (alterations in original) (quoting Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 355 (5th Cir. 2007)).

understand evidence. In other words, it must determine whether it is relevant."[15]

In undertaking this tripartite analysis, courts must give proper deference to the traditional adversary system and the role of the jury within that system.[16] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[17] As the "gatekeeper" of expert testimony, the trial court enjoys broad discretion in determining admissibility.[18]

## LAW AND ANALYSIS

Dr. Ross is a board-certified physician who worked at the United States Food and Drug Administration ("FDA") from 1996 to 2006, with responsibilities for regulating approved, marketed drug products as well as reviewing New Drug Applications (NDAs) and supplemental NDAs (sNDAs). Plaintiffs proffer Dr. Ross as an expert on the regulation of prescription drugs by the FDA. Sanofi seeks to exclude three aspects of Dr. Ross's ultimate opinion that Sanofi failed to comply with its regulatory obligations by failing to update the Taxotere label.[19] First, it seeks to preclude Dr. Ross from opining on whether any information or data, including the 2003 Esmaeli Study, is "newly acquired information" under federal law. Second, it seeks to exclude Dr. Ross's

---

[15] *Id.* at 583.

[16] *See Daubert*, 509 U.S. at 596.

[17] *Id.*

[18] Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 881 (5th Cir. 2013).

[19] Dr. Ross also offers opinions as to other § 505(b)(2) Defendants in this case, who have since been dismissed.

opinions related to the Taxotere label. Third, it seeks to preclude Dr. Ross's opinions that Sanofi violated several provisions of the Code of Federal Regulations by failing to update the Taxotere labeling. Sanofi does not challenge Dr. Ross's qualifications, but rather, argues that exclusion is warranted because Dr. Ross did not reliably apply his stated methodology. It further avers that Dr. Ross's opinions are not based on sufficient facts or data, or alternatively, constitute impermissible legal conclusions. This Court will consider each argument in turn.

## I.   "Newly Acquired Information"

In his Report, Dr. Ross first outlines the FDA's complex regulatory scheme, including the requirements for a label change under the CBE regulation, which "allows manufacturers to file a supplemental application with the FDA and simultaneously implement a labeling change before obtaining FDA approval."[20] The CBE regulation is available "to add or strengthen a . . . warning" where there is "newly acquired information" providing "evidence of a causal association between the drug and a risk of harm."[21] The regulation defines "newly acquired information" as "data analyses, or other information not previously submitted to the Agency," including, but not limited to, "data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events or analyses reveal risks of a different type or

---

[20] Hickey v. Hospira, 102 F.4th 748, 751 (5th Cir. 2024) (citing 21 C.F.R. § 314.70(c)(6)).

[21] *Id.* (citation modified) (quoting Merck Sharp & Dohme Corp. v. Albrecht, 587 U.S. 299, 304–05 (2019)).

greater severity or frequency *than previously included in submissions to FDA*."[22]

Sanofi challenges Dr. Ross's opinion that "Sanofi should have submitted a CBE-0 label change as early as 2003" based on the 2003 Esmaeli Study.[23] Sanofi argues that in doing so, Dr. Ross is improperly opining on whether that study constitutes "newly acquired information." Sanofi contends that Dr. Ross "did not consider what information was previously submitted by Sanofi to FDA before 2003"—information that, according to Sanofi, is necessary to determine whether later information is "newly acquired."[24] In support, Sanofi points to Dr. Ross's testimony that he was "not completely clear on the universe of information that was submitted."[25] Sanofi therefore argues that Dr. Ross failed to apply the regulatory definition and did not rely on sufficient facts or data. Finally, Sanofi argues that whether information qualifies as "newly acquired information" is a legal question.

As explained in its prior Order and Reasons denying Sanofi's Motion for Summary Judgment, this Court determined that the 2003 Esmaeli Study constituted "newly acquired information."[26] This Court further explained that whether information is "newly acquired" is ultimately a legal question for the Court, not the jury, to determine, though that question may require resolution of subsidiary factual disputes. The Court therefore declined to consider expert testimony purporting to resolve that ultimate issue, finding such testimony

---

[22] *Id.* (emphasis added) (quoting 21 C.F.R. § 314.3(b)).

[23] Doc. 484-1 at 61.

[24] *See* Doc. 456-1 at 7. Sanofi reasserts this argument in its Motion for Summary Judgment on Label Adequacy.

[25] Doc. 456-1 at 6.

[26] Doc. 583.

7

unhelpful. Accordingly, because the Court found that there existed "newly acquired information," and therefore has already resolved that issue, Sanofi's argument on this point must be denied as moot. Dr. Ross, however, may discuss the existence of "newly acquired information" to the extent it relates to his other opinions.

## II.    Label-Related Opinions

For the same reasons, Sanofi also seeks to exclude two related regulatory opinions offered by Dr. Ross concerning the content of the Taxotere label. First, Dr. Ross opines that the CBE label change "to the Adverse Reactions section" should have included additional language describing "excessive tearing attributable to potentially permanent stenosis of the nasolacrimal drainage system requiring surgical intervention."[27] Second, he opines that a warning should have been added to the "Warnings and Precautions" section to include similar language, and also advise that patients undergo prompt ophthalmological evaluation to prevent progression to permanent stenosis.[28]

Sanofi argues that these opinions are unreliable because they rest on Dr. Ross's view that Sanofi could have implemented a CBE change in 2003—an action that, under federal law, requires the existence of "newly acquired information." According to Sanofi, because Dr. Ross did not adequately analyze what information Sanofi had previously submitted to the FDA, his opinions are not based on sufficient facts or data.

This argument conflates two distinct concepts: (1) whether "newly acquired information" existed such that the CBE regulation was available, and

---

[27] Doc. 456-2 at 62.

[28] *Id.*

8

(2) whether the Taxotere label was substantively adequate in light of the available risk information. The former is a legal and regulatory threshold question that turns on a comparison between post-approval information and the information previously submitted to the FDA. The latter, by contrast, concerns the adequacy of the warnings themselves and does not require the same regulatory comparison.

Accordingly, Dr. Ross is not required to independently determine whether "newly acquired information" existed. That issue has been resolved. His task, instead, was to assess whether the label adequately conveyed the relevant risks, considering the information available at the time. In doing so, Dr. Ross relied on his experience working at the FDA, as well as, among other things: (1) Sanofi's initial NDA approval package; (2) draft and final labels for Taxotere; (3) scientific literature cited by Plaintiffs' expert Dr. McGwin; and (4) clinical information described in Plaintiffs' expert Dr. Durairaj's report. [29]

In any event, the record reflects that Dr. Ross did in fact consider Sanofi's prior submissions to the FDA. Although certain submissions—dated June 1, 2001; January 9, 2002; February 1, 2002; and May 28, 2002—are not cited in the body of his report, a review of Dr. Ross's reliance materials and deposition testimony demonstrates that he considered them. For example, he identifies materials from several of these submissions as exhibits to the Sima Desai (Patel) deposition and cites a draft version of Sanofi's May 28, 2002 letter to the FDA. In his deposition, Dr. Ross also specifically referenced Sanofi's Eighth

---

[29] *See, e.g.*, *In re* Taxotere Docetaxel Prods. Liab. Litig., Nos. 16-2740, 16-17039, 2021 WL 2982991 at *3 (E.D. La. July 14, 2021) (Milazzo, J.) ("Rule 703 of the Federal Rules of Evidence allows an expert to reasonably rely on the work of another expert, and the Court finds that Dr. Ross's reliance on Dr. Madigan's analysis appears reasonable.").

and Ninth Periodic Safety Update Reports ("PSURs"), which were submitted on February 1, 2002 and which summarized adverse event reports involving lacrimal disorders, including cases requiring surgical intervention and cases that persisted after cessation of therapy.

Accordingly, the Court finds that Dr. Ross's opinions regarding label adequacy are based on sufficient facts and data and are the product of a reliable methodology. Sanofi's request to exclude these opinions is therefore denied.

## III.   Regulatory And/or Statutory Compliance

Next, asserting similar arguments, Sanofi seeks to preclude Dr. Ross's opinion that, as to Taxotere's labeling, "Sanofi failed to meet its regulatory obligations with regard to epiphora (excessive tearing) from stenosis in the nasolacrimal drainage system in patients receiving Taxotere . . . ."[30] Dr. Ross opines that although the CBE-0 regulation requires "newly acquired information," the general labeling regulations independently require that "the labeling must be updated when new information becomes available that causes the labeling to become inaccurate, false, or misleading."[31] He further explains that an NDA holder "can analyze all safety information it knows of," and that the results of such analyses may themselves constitute "newly acquired information" if they reveal risks of a different type or greater severity or frequency.[32] Based on this regulatory framework, Dr. Ross opines that Sanofi failed to meet its labeling obligations in several respects. Specifically, he concludes that:

---

[30] Doc. 456-2 at 60.

[31] *Id.* (citing 21 C.F.R. § 201.56(a)(1)).

[32] *Id.*

1. Sanofi failed to comply with the statutory requirement that the Taxotere labeling not be false or misleading. 21 U.S.C. § 352(a)(1).

2. Sanofi failed to comply with the regulatory requirement that the Taxotere labeling contain "a summary of the essential scientific information needed for the safe and effective use of the drug." 21 C.F.R. § 201.56(a)(1).

3. Sanofi failed to comply with the regulatory requirement that the Taxotere labeling "must be informative and accurate and neither promotional in tone nor false or misleading in any particular." 21 C.F.R. § 201.56(a)(2).

4. Sanofi failed to comply with the regulatory requirement that the Taxotere labeling "must be updated when new information becomes available that causes the labeling to become inaccurate, false, or misleading." 21 C.F.R. § 201.56(a)(2).[33]

Dr. Ross further opines that Sanofi's alleged noncompliance stems from its failure to submit a CBE supplement to update the Adverse Reactions and Warnings and Precautions sections of the label. In essence, Dr. Ross concludes that once sufficient information existed to support a causal association, Sanofi could have—and therefore should have—used the CBE process to update the label, and its failure to do so rendered the labeling noncompliant with federal requirements.

Sanofi argues that these opinions constitute impermissible legal conclusions and should therefore be excluded. Sanofi further contends that such opinions would carry undue weight and risk confusing the jury. Federal

---

[33] *Id.* at 60-61.

Rule of Evidence 704 provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." As the Fifth Circuit has explained, however, Rule 704 "does not open the door to all opinions."[34] Rather, testimony that merely tells the jury what result to reach is not permitted; nor does the Rule allow a witness to offer legal conclusions.[35] Consistent with this principle, courts in this Circuit have excluded expert testimony that a drug's labeling was "adulterated, misbranded, or false and misleading under the FDA regulations," reasoning that such statements embrace "legal terms of art" and cross the line into an impermissible legal opinion.[36]

Even so, district courts presiding over pharmaceutical MDLs have permitted expert testimony regarding FDA regulatory requirements and a defendant-manufacturer's conduct in relation to those requirements.[37] Indeed, "[n]umerous courts have found that the testimony of regulatory experts on the reasonableness of a pharmaceutical company's conduct in light of the complex

---

[34] Owen v. Kerr-McGee Corp., 698 F.2d 236, 240 (5th Cir. 1983); *see also* Kelley v. Smitty's Supply, Inc., No. 17-4711, 2019 WL 296819, at *1 (E.D. La. Jan. 23, 2019); Snap-Drape, Inc. v. C.I.R., 98 F.3d 194, 198 (5th Cir. 1996)).

[35] *See* Tsao v. Ferring Pharms., Inc., No. 4:16-cv-01724, 2018 WL 3649714, at *14 (S.D. Tex. Apr. 19, 2018) ("The Federal Rules of Evidence do not permit an expert to render conclusions of law, because such testimony cannot properly assist the jury in understanding the evidence or determining a fact in issue. Rather, expert testimony couched as legal conclusion merely tells the jury which result to reach" (citation modified)).

[36] *See* Robinson v. Ethicon, Inc., 588 F. Supp. 3d 726, 736 (S.D. Tex. 2022). In *Robinson*, the court held that a regulatory expert could not "make the final legal conclusions in her testimony," including that the drug was "adulterated" or "misbranded," but allowed the expert to "use the terms 'adulterated' and 'misbranded' to demonstrate to the jury what the regulations require." *Id. See also Tsao*, 2018 WL 3649714, at *14 ("Finally, Dr. Plunkett's opinions that the Bravelle was 'misbranded' or 'adulterated' are inadmissible legal conclusions.").

[37] *See In re* Mirena IUD Prods. Liab. Litig., 169 F. Supp. 3d 396, 467 (S.D. N.Y. 2016) (collecting cases).

nature of the FDA framework is helpful to a jury."[38] "Although experts cannot supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence, and while generally an expert's testimony on issues of law is inadmissible, courts admit expert testimony regarding companies' compliance with FDA regulations."[39] As one court explained,

> [t]he cases in this MDL are not governed by federal regulations but by state law theories of negligence and strict liability. Expert testimony on regulatory compliance will assist the jury in determining whether [the defendant] acted as a reasonably prudent pharmaceutical manufacturer. The Court will instruct the jury that it must take the law from the Court and not from any witness.[40]

Courts following this reasoning have further explained that in addition to proper jury instruction, cross-examination and the presentation of contrary evidence sufficiently mitigate any risk that the jury places undue weight on such testimony.[41] The Court finds this reasoning persuasive. As such, here, Dr. Ross may testify about the FDA regulatory framework, "what the regulations

---

[38] *Robinson*, 588 F. Supp. 3d at 736 (citing *In re* Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig., MDL No. 2445, Civ. A. No. 16-5073, 2020 WL 6887885 (E.D. Penn. Nov. 24, 2020)); *see also In re Mirena*, 169 F. Supp. 3d at 467 (citing *In re* Fosamax Prods. Liab. Litig., 924 F. Supp. 2d 477, 493 (S.D.N.Y. 2013)).

[39] *In re Mirena*, 169 F. Supp. 3d at 467 (citation modified).

[40] *In re* Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 191 n.16 (S.D.N.Y. 2009).

[41] *See id.* at 191; *see also In re* Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig., No. 09–MD–2100, 2011 WL 6302287, at *25 (S.D. Ill. Dec. 16, 2011) (finding that "[t]o the extent [the expert] does offer legal conclusions, the Court finds that [the expert's] testimony is permissible because of the complex nature of the process and procedures . . . [The expert's] testimony will assist the trier of fact in understanding the federal regulations, and the jury will be instructed that that the Court, not [the expert] nor any other witness, will instruct the jury on the law in this case").

require," and Sanofi's "conduct with regard to the regulations,"[42] including Sanofi's "compliance therewith."[43]

**<u>CONCLUSION</u>**

For the foregoing reasons,

**IT IS ORDERED** that Sanofi's Motion to Exclude Certain Testimony of Dr. Ross (Doc. 456) is **DENIED**.

New Orleans, Louisiana this 24th day of April, 2026.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[42] *See Robinson*, 588 F. Supp. 3d at 736 (citing *In re Suboxone*, 2020 WL 6887885).

[43] *See In re Fosamax*, 645 F. Supp. 2d at 191. To the extent Sanofi argues that Dr. Ross's opinions on this issue are not supported by sufficient facts or data, the Court rejects that argument for the reasons stated above. *See supra* Section II.