## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE: TAXOTERE (DOCETAXEL)** | ) | **MDL NO. 3023** |
| **EYE INJURY** | ) | |
| **PRODUCTS LIABILITY LITIGATION** | ) | |
| | ) | |
| **This document relates to:** | ) | **SECTION: "H" (5)** |
| All cases naming Sanofi as a Defendant | ) | |

## <u>ORDER AND REASONS</u>

Before the Court is Plaintiffs' Motion to Exclude Adam Brufsky, M.D., Ph.D. (Doc. 440). For the reasons set forth herein, the Motion is **GRANTED IN PART** and **DENIED IN PART.**

## <u>BACKGROUND</u>

Plaintiffs in this multidistrict litigation ("MDL") are suing several pharmaceutical companies that manufactured and/or distributed a chemotherapy drug, Taxotere or docetaxel, that Plaintiffs were administered for the treatment of cancer, primarily breast cancer. Among these companies are Defendants sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. (collectively, "Sanofi"). Sanofi manufactures Taxotere, the brand name for the drug docetaxel. Plaintiffs allege that the drug caused them to sustain injuries to their lacrimal systems, including punctal, canalicular, and/or nasolacrimal

1

duct stenosis, which resulted in excessive tearing, otherwise known as epiphora.[1]

On May 2, 2023, this Court issued Case Management Order No. 16 ("CMO 16").[2] Among other things, CMO 16 set deadlines for discovery and motion practice, and bifurcated general dispositive issues, including but not limited to preemption, adequacy of the label, and general causation. Pursuant to CMO 16, Sanofi provided the expert report of Adam Brufsky, M.D., Ph.D. ("Dr. Brufsky"). On February 28, 2025, Plaintiffs filed the instant Motion to Exclude Dr. Brufsky.[3] Sanofi opposes.[4]

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[1] For reference, this Court provided extensive background on the injury at issue and facts giving rise to this case in its prior Order and Reasons addressing preemption. Doc. 583; Doc. 591.

[2] Doc. 115.

[3] Doc. 440.

[4] Doc. 489.

2

The current version of Rule 702 reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[5] and *Kumho Tire Co. v. Carmichael*.[6] The threshold inquiry is whether the expert possesses the requisite qualifications to render an opinion on a particular subject matter.[7] Having defined the permissible scope of the expert's testimony, a court next inquires whether the opinions are reliable and relevant.[8] "Under Federal Rule of Evidence 702 and *Daubert*, expert testimony is admissible if the reasoning or methodology underlying the expert's testimony is scientifically valid and can be properly applied to the facts in issue."[9]

First, in assessing reliability, the Court may consider several nonexclusive factors, such as "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community."[10] "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."[11]

---

[5] 509 U.S. 579 (1993).

[6] 526 U.S. 137 (1999).

[7] Wagoner v. Exxon Mobil Corp., 813 F. Supp. 2d 771, 799 (E.D. La. 2011); *see also* Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.").

[8] *See* United States v. Valencia, 600 F.3d 389, 424 (5th Cir. 2010).

[9] Ruffin v. BP Expl. & Prod., Inc., 137 F.4th 276, 280 (5th Cir. 2025) (citation modified).

[10] Burleson v. Tex. Dep't of Crim. Just., 393 F.3d 577, 584 (5th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94).

[11] Nestle v. BP Expl. & Prod., Inc., 627 F. Supp. 3d 577, 583 (E.D. La. 2022).

"Second, the Court must determine whether the expert's reasoning or methodology 'fits' the facts of the case, and whether it will thereby assist the trier of fact to understand evidence. In other words, it must determine whether it is relevant."[12]

In undertaking this tripartite analysis, courts must give proper deference to the traditional adversary system and the role of the jury within that system.[13] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[14] As the "gatekeeper" of expert testimony, the trial court enjoys broad discretion in determining admissibility.[15]

## LAW AND ANALYSIS

Sanofi's expert oncologist, Dr. Brufsky, is a Professor at the University of Pittsburgh School of Medicine in the Division of Hematology-Oncology, Department of Medicine. For the past twenty-five years, he was Co-Director of the Comprehensive Breast Cancer Center of the UPMC Hillman Cancer Center at Magee-Women's Hospital in Pittsburgh, Pennsylvania, and Medical Director of the Women's Cancer Center at Magee-Women's Hospital. He has published over 300 peer-reviewed papers, presented abstracts at major medical meetings, and has been invited to speak on topics related to breast cancer and its management. He was involved in the development of docetaxel regimens in

---

[12] *Id.* at 583 (citing *Daubert*, 509 U.S. at 591).
[13] *See Daubert*, 509 U.S. at 596.
[14] *Id.*
[15] Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 881 (5th Cir. 2013).

current common use in breast oncology and has used these regimens in his clinical practice.

Plaintiffs seek to exclude Dr. Brufsky's opinions regarding (1) the warnings oncologists allegedly provide their patients and (2) what oncologists or other physicians knew or should have known about risks associated with Taxotere. Plaintiffs argue that Dr. Brufsky lacks sufficient foundation for, and/or is unqualified to offer, these opinions. The Court addresses each opinion in turn.

## I.    Opinions Regarding Warnings Oncologists Allegedly Provided Their Patients

First, Plaintiffs seek to exclude Dr. Brufsky's opinions regarding the warnings oncologists allegedly gave their patients. Specifically, Dr. Brufsky opines that "it is not common practice for oncologists to warn patients receiving Taxotere every three weeks of excessive tearing or lacrimal duct obstruction in the initial patient teaching because it is an uncommon potential risk with this dosing schedule."[16] He further opines that "many oncologists include this warning in written materials provided to patients undergoing Taxotere chemotherapy," and that "[i]n the early decades after the development of Taxotere, weekly Taxotere use was more common, the frequency of excessive tearing from . . . patients receiving weekly Taxotere was recognized, and patients were warned of this potential complication."[17]

Plaintiffs seek to exclude these opinions, arguing that they are unreliable and speculative—and therefore not helpful to a jury. They further

---

[16] Doc. 440-2 at 14–15.
[17] *Id.* at 15.

assert that Plaintiffs' prescribing physicians will be deposed in the respective bellwether cases and will be asked about their prescribing practices and what warnings they specifically gave Plaintiffs.[18]

An expert may be qualified to testify based on the expert's "knowledge, skill, experience, training, or education."[19] Generally, "qualification is viewed liberally and is determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."[20] An expert who is qualified may "draw a conclusion from a set of observations based on extensive and specialized experience."[21] If, however, "the witness is relying solely or primarily on experience," he or she "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."[22]

Following this reasoning, courts have recognized that "a doctor's experience alone renders him a reliable witness to testify about a reasonable

---

[18] In another MDL, this Court previously explained that "[t]o determine causation, the jury will need to decide whether 'a proper warning would have changed the decision of the treating physician.'" *In re* Taxotere (Docetaxel) Prods. Liab. Litig., MDL No. 16-2740, 16-17039, 2021 WL 321661, at *3 (E.D. La. Feb. 1, 2021) (Milazzo, J.) (quoting Willett v. Baxter Int'l, Inc., 929 F.2d 1094, 1098–99 (5th Cir. 1991)). "This Court, therefore, has ruled that testimony from a treating physician, not a third-party physician, is appropriate to assist the jury." *Id.*

[19] FED. R. EVID. 702.

[20] *In re* Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 190 (S.D.N.Y. 2009) (citing *In re* Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., No. 1:00-1898, MDL No. 1358, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008)).

[21] *Id.* (citing *In re MTBE*, 2008 WL 1971538, at *6).

[22] Andrews v. Rosewood Hotels & Resorts, LLC, 575 F. Supp. 3d 728, 734 (N.D. Tex. 2021) (alterations in original) (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendments).

standard of care or what a reasonable physician would do."[23] Most courts, however, "have prohibited experts from testifying about what all doctors generally consider in making prescription decisions or about what doctors generally think, unless the testimony is based on something more reliable than simply the expert's own experience as a doctor."[24]

Here, the Court finds that Dr. Brufsky may testify about his experience informing patients through the decision-making process. He may also testify to what his colleagues or others with whom he has personal experience have done.[25] Further, he may testify as to what a reasonable oncologist would have done. He may not, however, testify that (1) all "patients were warned of this complication" or that (2) "many oncologists include this warning in written materials," as such testimony is impermissibly speculative.[26]

## II.    Opinions Regarding What Oncologists or Other Physicians Knew

Second, Plaintiffs seek to exclude Dr. Brufsky's opinions related to what oncologists (or other physicians) knew or should have known about the risks associated with Taxotere. Specifically, Plaintiffs seek to exclude Dr. Brufsky's opinion that "[f]rom the early 2000s onward, oncologists knew or should have known from the Taxotere label," the "published literature, and international

---

[23] *In re* Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig., No. 13-MD-2445, 16-5073, 2020 WL 6887885, at *26 (E.D. Pa. Nov. 24, 2020) (collecting cases).

[24] *See In re Suboxone*, 2020 WL 6887885, at *27 (citation modified).

[25] *See id.* (citing *In re* Loestrin 24 Fe Antitrust Litig., 433 F. Supp. 3d 274, 302–03 (D.R.I. 2019)).

[26] *See In re Taxotere*, 2021 WL 321661, at *5 (noting that "Dr. Bosserman provides no analysis that would support her opinions about the knowledge that Sanofi or the writers of the informed consent document had").

conference presentations that [lacrimal duct obstruction][27] and tearing were potentially irreversible complications of Taxotere therapy."[28] Dr. Brufsky further opines that he "was personally aware of this uncommon but possibly significant complication in the early 2000s."[29] Finally, he opines that "[i]t is well known that conjunctivitis and lacrimation do not end upon the completion of any one chemotherapy infusion."[30]

Plaintiffs argue that while Dr. Brufsky is qualified to offer opinions as to side effects that are well known to him personally, he has no basis to proffer testimony regarding what oncologists know about other side effects, or to guess at what literature and conferences other oncologists throughout the country have seen and attended to ascertain when each of them allegedly became aware of a particular side effect.

Courts have held that a doctor may testify as to his or her own knowledge, as well as that of colleagues or other physicians with whom he or she has personal experience.[31] In *Bartlett v. Mutual Pharmaceutical Co.*, the District Court for the District of New Hampshire precluded similar testimony from the defendant-manufacturer's medical expert ("Dr. Stern").[32] In *Bartlett*, the plaintiff sued the manufacturer of Sulindac, a generic, nonsteroidal anti-inflammatory drug ("NSAID"), alleging that the drug caused severe side

---

[27] Though it has undergone numerous changes, from 2003 on, the Taxotere label has warned about the risk of "excessive tearing, which may be attributable to lacrimal duct obstruction . . . ." *See* Doc. 440-2 at 24–25.

[28] *Id.* at 23.

[29] *Id.*

[30] *Id.* at 24.

[31] *See In re Suboxone*, 2020 WL 6887885, at *27 (citing *In re Loestrin*, 433 F. Supp. 3d at 302–03).

[32] 742 F. Supp. 2d 182 (D.N.H. 2010).

effects, including Stevens-Johnson syndrome and toxic epidermal necrolysis ("SJS/TEN").[33] The plaintiff sought to preclude Dr. Stern "from testifying about what doctors generally know about SJS/TEN and their link to NSAIDs," arguing that such testimony was speculative.[34] The court agreed, reasoning that Dr. Stern had not identified a more reliable basis (other than his own experience as a doctor) for his testimony.[35] The court, however, allowed Dr. Stern to "testify about what a reasonable doctor *should* know about the link between NSAIDs and SJS/TEN and how a reasonable doctor would interpret Sulindac's safety warning," reasoning that such testimony was "properly based on his experience as a professor of dermatology at Harvard Medical School, the chief of dermatology at a major Boston hospital, and the author of frequently cited articles on SJS/TEN and its link to NSAIDs."[36]

Here too, the Court finds that Dr. Brufsky may offer testimony about what he personally knew regarding the risks associated with Taxotere and may discuss this knowledge in relation to the relevant published literature and conferences. He may also testify about what (1) that literature reveals, including, for example, whether it indicates that conjunctivitis and lacrimation do not end upon the completion of any one chemotherapy infusion and (2) what a reasonable oncologist should know about such risks. Dr. Brufsky may not, however, offer speculative opinions about what all oncologists generally knew about the risks associated with Taxotere.

---

[33] *Id.*

[34] *Id.* at 195.

[35] *Id.* at 195–96.

[36] *Id.* at 196.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Plaintiffs' Motion to Exclude Adam Brufsky, M.D., Ph.D. (Doc. 440) is **GRANTED IN PART** and **DENIED IN PART**, as detailed in this opinion.

New Orleans, Louisiana this 29th day of April, 2026.

_____

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

10