## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: TAXOTERE (DOCETAXEL) | ) | MDL NO. 3023 |
| EYE INJURY | ) | |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | |
| This document relates to: | ) | SECTION: "H" (5) |
| All cases naming Sanofi as a Defendant | ) | |

## ORDER AND REASONS

Before the Court is Plaintiffs' Motion to Exclude Joohee Sul, M.D. (Doc. 460). For the reasons set forth herein, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

Plaintiffs in this multidistrict litigation ("MDL") are suing several pharmaceutical companies that manufactured and/or distributed a chemotherapy drug, Taxotere or docetaxel, that Plaintiffs were administered for the treatment of cancer, primarily breast cancer. Among these companies are Defendants sanofi-aventis U.S. LLC and Sanofi U.S. Services Inc. (collectively, "Sanofi"). Sanofi manufactures Taxotere, the brand name for the drug docetaxel. Plaintiffs allege that the drug caused them to sustain injuries to their lacrimal systems, including punctal, canalicular, and/or nasolacrimal

1

duct stenosis, which resulted in excessive tearing, otherwise known as epiphora.[1]

On May 2, 2023, this Court issued Case Management Order No. 16 ("CMO 16").[2] Among other things, CMO 16 set deadlines for discovery and motion practice and bifurcated general dispositive issues, including but not limited to preemption, adequacy of the label, and general causation. Pursuant to CMO 16, Sanofi provided the expert report of their proposed regulatory expert, Joohee Sul, M.D. ("Dr. Sul"). On February 28, 2025, Plaintiffs filed the instant Motion to Exclude Dr. Sul.[3] Sanofi opposes.[4]

## **LEGAL STANDARD**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[1] For reference, this Court provided extensive background on the injury at issue and facts giving rise to this case in its prior Order and Reasons addressing preemption. Doc. 583; Doc. 591.

[2] Doc. 115.

[3] Doc. 460.

[4] Doc. 491.

The current version of Rule 702 reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[5] and *Kumho Tire Co. v. Carmichael*.[6] The threshold inquiry is whether the expert possesses the requisite qualifications to render opinion on a particular subject matter.[7] Having defined the permissible scope of the expert's testimony, a court next inquires whether the opinions are reliable and relevant.[8] "Under Federal Rule of Evidence 702 and *Daubert*," expert testimony is reliable if "the reasoning or methodology underlying the [expert's] testimony is scientifically valid."[9]

First, in assessing reliability, the Court may consider several nonexclusive factors, such as "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community."[10] "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."[11]

"Second, the Court must determine whether the expert's reasoning or methodology 'fits' the facts of case, and whether it will thereby assist trier of

---

[5] 509 U.S. 579 (1993).

[6] 526 U.S. 137 (1999).

[7] Wagoner v. Exxon Mobil Corp., 813 F. Supp. 2d 771, 799 (E.D. La. 2011); *see also* Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999).

[8] *See* United States v. Valencia, 600 F.3d 389, 424 (5th Cir. 2010).

[9] Ruffin v. BP Expl. & Prod., Inc., 137 F.4th 276, 280 (5th Cir. 2025) (alterations in original).

[10] Burleson v. Tex. Dep't of Crim. Just., 393 F.3d 577, 584 (5th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94).

[11] Nestle v. BP Expl. & Prod., Inc., 627 F. Supp. 3d 577, 583 (E.D. La. Sept. 12, 2022).

3

fact to understand evidence. In other words, it must determine whether it is relevant."[12]

In undertaking this tripartite analysis, courts must give proper deference to the traditional adversary system and the role of the jury within that system.[13] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[14] As the "gatekeeper" of expert testimony, the trial court enjoys broad discretion in determining admissibility.[15]

## LAW AND ANALYSIS

Sanofi's proposed regulatory expert, Dr. Sul, is a board-certified neurologist with fellowship training in neuro-oncology. She has practiced clinical medicine, conducted academic research, and is a former employee of the United States Food and Drug Administration ("FDA"). Her experience at the FDA includes providing scientific, clinical, and regulatory oversight for investigational and approved drugs within the Center for Drug Evaluation and Research ("CDER"), the Center for Biologics Evaluation and Research ("CBER"), and the Center for Devices and Radiological Health ("CDRH").

Citing specific paragraphs of Dr. Sul's report, Plaintiffs seek to exclude three categories of Dr. Sul's opinions, First, according to Plaintiffs, Dr. Sul offers unreliable and speculative opinions about the FDA's oversight with

---

[12] *Id.* at 583.
[13] *See Daubert*, 509 U.S. at 596.
[14] *Id.*
[15] Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 881 (5th Cir. 2013).

respect to labeling changes done pursuant to the changes-being-effected ("CBE") regulation.[16] Second, Plaintiffs argue that Dr. Sul is not qualified to offer medical opinions on oculoplastic and/or ophthalmological issues. Third, Plaintiffs raise various objections as to Dr. Sul's label adequacy opinion, specifically seeking to exclude her opinions related to (1) her review of a centralized database for medical terminology and (2) foreign regulatory bodies. The Court addresses the admissibility of each opinion in turn.

## I.     FDA Oversight

Plaintiffs first seek to exclude Dr. Sul's opinions regarding the FDA's alleged "mindset" and "preferences" in overseeing labeling changes.[17] In her report, Dr. Sul describes the CBE regulatory framework, which allows for a drug manufacturer, in certain circumstances, to unilaterally change its drug's label prior to FDA approval.[18] Dr. Sul opines that the FDA "prefers to maintain input and regulatory authority over labeling," and that "the most conservative approach," which affords the FDA "the most oversight," should be applied to labeling changes. In support, Dr. Sul cites a 2004 FDA guidance document ("FDA Guidance").[19] From this, she concludes that a unilateral CBE change (i.e., a "CBE-0" change) should be "reserved for safety issues of the most urgent nature."[20] She further asserts that, although a CBE-0 can be enacted without FDA approval, in practice, the FDA will respond promptly with feedback for

---

[16] *See* 21 C.F.R. § 314.70(c).

[17] Doc. 460-2 at 33–34.

[18] *See* 21 C.F.R. § 314.70(c).

[19] Doc. 460-2 at 33 (citing U.S. DEP'T OF HEALTH & HUM. SERV., FOOD & DRUG ADMIN., CTR. FOR DRUG EVALUATION & RSCH. (CDER), GUIDANCE FOR INDUSTRY: CHANGES TO AN APPROVED NDA OR ANDA (April 2004) ("FDA Guidance")).

[20] *Id.*

urgent safety updates and that, in many cases, the FDA may have already discussed a CBE-0 with the sponsor prior to submission.[21] Finally, Dr. Sul explains how the FDA reviews a proposed label update and lists examples of CBE label changes submitted for other drugs.

Courts routinely permit regulatory experts to testify regarding the FDA's regulatory requirements and procedures, as such testimony may assist the jury in understanding a complex regulatory scheme.[22] Accordingly, the Court finds that Dr. Sul is qualified to testify that, based on her personal experience, "in practice," the FDA often engages with sponsors during the CBE process. She may also explain how the FDA reviews labeling changes and give examples of CBE changes.

Dr. Sul's further opinions, however, must be excluded. First, Dr. Sul may not offer her opinion about what the FDA "prefers." Courts consistently preclude regulatory experts from opining "on the intent, motives or states of mind of corporations, regulatory agencies and others," as such opinions "have no basis in any relevant body of knowledge or expertise."[23]

Second, Dr. Sul's broader conclusion that FDA Guidance "specifies that the most conservative approach where FDA is afforded the most oversight

---

[21] *Id.*

[22] *See* Robinson v. Ethicon, 588 F. Supp. 3d 726, 736 (S.D. Tex. 2022) (collecting cases); *see also In re* Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 191 (S.D.N.Y. 2009) (allowing regulatory expert to testify about "FDA regulatory requirements and procedures" and to offer an opinion as to the defendant-manufacturer's compliance therewith, reasoning that "[a] lay jury cannot be expected to understand the complex regulatory framework that informs the standard of care in the pharmaceutical industry").

[23] *In re* Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *see also In re Fosamax*, 645 F. Supp. 2d at 192 (granting defendant-manufacturer's motion to the extent it "seeks to preclude Dr. Parisian from testifying as to the knowledge, motivations, intent, state of mind, or purposes of Merck, its employees, the FDA, or FDA officials").

should be applied to labeling change"—and therefore CBE-0 changes "should be reserved for safety issues of the most urgent nature"—are not supported by the FDA Guidance upon which she relies.[24] Indeed, Dr. Sul cites the section of the FDA Guidance which addresses "general requirements" for all "post-approval changes," which provides only that the FDA must be notified of most changes.[25] Moreover, her opinion is arguably contradicted by the CBE regulation itself—or, at the very least, may confuse or mislead a jury. As Dr. Sul herself explains, while a CBE-0 change allows a sponsor to submit changes to the FDA and concurrently update the label without awaiting FDA review, other changes require further review before a change can be published.[26] Accordingly, Dr. Sul cannot offer her testimony on this issue. Dr. Sul, however, may discuss the FDA Guidance as supportive of her other opinions, provided such testimony is otherwise admissible.[27]

## II.   Oculoplastic and/or Ophthalmological Issues

Plaintiffs also seek to exclude Dr. Sul's opinions discussing the "lacrimal system" and the injury at issue.[28] Plaintiffs argue that her experience as a

---

[24] Doc. 460-2 at 33.

[25] Sanofi counters that the FDA guidance directs drug manufacturers to utilize the most restrictive category for "multiple related changes." *See* Doc. 491 at 4. Dr. Sul's broader opinion about FDA oversight, however, does not appear to be limited to such a change. Indeed, Dr. Sul separately opines on "multiple related changes" in her report. *See* Doc. 460-2 at 32. Further, Plaintiffs contend that regardless, multiple changes are not the issue here. Plaintiffs, however, have not moved to exclude these opinions in Dr. Sul's report.

[26] For example, Dr. Sul explains that a sponsor submitting a "CBE-30" change may not publish an updated change until thirty days after submission of that change.  If the FDA has no objection to the updates, the sponsor can publish the changes. If FDA has comments or edits, the sponsor and FDA will negotiate these in the usual fashion. Doc. 460-2 at 31.

[27] Dr. Sul also offers similar opinions comparing the CBE-0 and CBE-30 processes, which Plaintiffs have not moved to exclude. *See* Doc. 460-2 at 30.

[28] *Id.* at 37–39.

neurologist does not qualify her to render opinions on oculoplastic matters. Sanofi counters that Dr. Sul is qualified, based on her medical training and work at the FDA, to opine on these issues, and that her opinion is supported by her review of medical literature.

In her report, Dr. Sul provides a brief overview of "lacrimation and the lacrimal system more broadly" in order to "put into context the description of this condition in the Taxotere label."[29] In that overview, she explains the "lacrimal duct system," provides an illustration of the relevant anatomy, and describes how the narrowing of what she calls the "lacrimal ducts" can lead to "various symptoms such as excessing tearing."[30] Plaintiffs take issue with this opinion, as well as Dr. Sul's statement that "lacrimal duct obstruction"—which is contained on the Taxotere label—is "a condition where one or more ducts become narrowed, preventing tears from draining to the nasal cavity and leading to excessive tearing."[31] Plaintiffs argue that this definition "is found in no medical textbook" and that Dr. Sul does not cite anything to support her assertion.[32] They further argue that her definition is "contrary to definitions offered by Sanofi itself," pointing to deposition testimony from Sanofi's former employees.[33] Sanofi responds that Plaintiffs' own expert, Dr. Ross (a prior FDA employee who is board-certified in internal medicine) similarly discusses the injury at issue in his report.

---

[29] *Id.* at 38–39.
[30] *Id.* at 39.
[31] *Id.*
[32] Doc. 522 at 5.
[33] *Id.*

8

"A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject."[34] Even so, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."[35] Here, the Court concludes that Dr. Sul, as a licensed physician, is qualified to offer her limited background testimony, including the basic structure and function of the lacrimal system. Such testimony requires no subspeciality training. [36] Dr. Sul may also explain her understanding of the injury at issue, the definition of which the parties have contested throughout this litigation. That Plaintiffs disagree with Dr. Sul's definition of the injury goes to the weight of her testimony, not its admissibility.[37] Notably, Dr. Sul indicates that as a Medical Officer at the FDA, she was required to review, among other things, safety information related to investigational and approved drugs as well as proposed and existing labeling. The Court therefore denies Plaintiffs' request to exclude Dr. Sul's opinions related to the nasolacrimal system.

## III.  Opinions Related to the Label

Next, Plaintiffs seek to partially exclude Dr. Sul's opinions related to the adequacy of the Taxotere label.  Dr. Sul states in her report that based on her

---

[34] Huss v. Gayden, 571 F.3d 442, 452 (5th Cir. 2009).

[35] *Id.* (citing *Daubert*, 509 U.S. at 596).

[36] *See id.*

[37] *See In re* Avandia Mktg., Sales Pracs., & Prods. Liab. Litig., MDL No. 1871, 2007-MD-1871, 2011 WL 13576, at *5 (E.D. Penn. Jan. 4, 2011) (declining to exclude the plaintiffs' experts where the defendant-manufacturer argued that they defined 'adverse event' too broadly").

review of the materials, background in oncology, and work at the FDA, her opinion is that "lacrimal duct obstruction," as described in the Taxotere label, "adequately describes the potential adverse reaction at issue in this lawsuit."[38] Dr. Sul lists four separate bodies of evidence supporting her conclusions: (1) foreign regulatory actions and foreign labels, including regulatory actions by the European Agency for the Evaluation of Medicinal Products ("EMA")[39] and Taxotere's European label; (2) medical literature discussing this condition; (3) her review of the Medical Dictionary for Regulatory Activities ("MedDRA"); and (4) FDA-approved labels of other drugs.

Plaintiffs seek to exclude Dr. Sul's opinions related to MedDRA terminology, foreign regulatory bodies, and foreign labels. Plaintiffs also argue that Dr. Sul's opinions constitute impermissible legal conclusions.

### A. MedDRA Terminology

Dr. Sul explains that MedDRA is a standardized, internationally used medical terminology system designed to ensure consistent coding and classification of adverse events in clinical trials, postmarketing reports, and regulatory submissions. It organizes related medical concepts into a hierarchical structure, allowing different clinical descriptions of similar conditions to be grouped under broader categories for regulatory purposes. Dr. Sul further explains that while not specifically mandated, the FDA typically uses MedDRA to characterize adverse event terms and that MedDRA

---

[38] Doc. 460-2 at 57–58.

[39] In Dr. Sul's report, "EMA" refers to the European Agency for the Evaluation of Medicinal Products, which changed its name to the European Medicines Agency in 2004. Doc. 460-1 at 10 n.5.

endeavors to capture multiple terms describing the same adverse reaction so that these events can be captured, coded, and described consistently.

Dr. Sul explains that she reviewed the various MedDRA terms under the "Lacrimal Disorders Standardised MedDRA Query ("SMQ")."[40] SMQs allow for "retrieval of MedDRA-coded data," and "are validated, pre-determined sets of MedDRA terms grouped together."[41] She further states that she focused on the MedDRA term "Dacryostenosis acquired," and that terms related to this term included "lacrimal duct obstruction" and "stenosis."[42] Building on this, Dr. Sul concludes that because "lacrimal duct obstruction" is a defined MedDRA term, and since the Taxotere label uses this term, the Taxotere label adequately captures the adverse event. She states that, as it relates to the Taxotere label, "what is important in my opinion is that 'lacrimal duct obstruction' is a defined MedDRA term."[43]

Plaintiffs argue that Dr. Sul is not qualified to offer these opinions because she lacks ophthalmologic specialization and that her reasoning is unreliable. Here, the Court finds that Dr. Sul is qualified to testify regarding MedDRA generally, including its role as a standardized medical terminology dictionary used by FDA and other regulatory agencies in pharmacovigilance and drug labeling. Dr. Sul may also testify that "lacrimal duct obstruction" is a recognized MedDRA term and that the FDA commonly uses MedDRA. Dr. Sul's experience as a former FDA Medical Officer involved reviewing adverse-event terminology and drug labeling, thereby qualifying her to explain

---

[40] Doc. 460-2 at 64.
[41] *Id.*
[42] *Id.*
[43] *Id.* at 65.

how FDA utilizes MedDRA terminology in practice. Although Plaintiffs argue that Dr. Sul's "circular reasoning" renders her conclusion unreliable, Plaintiffs' objection goes to the weight of her testimony, not its admissibility.

Even so, Plaintiffs further assert that Dr. Sul lacks the specialized ophthalmological expertise to reliably assess the *clinical* suitability of MedDRA terms for this specific injury, which Plaintiffs contend is the basis of her label adequacy opinion. Courts have allowed regulatory experts to opine on the adequacy of a drug's label from "a regulatory perspective," so long as they do not opine on the label from a "clinical perspective," that is, "stray from [their] expertise in the regulatory arena into the area of how other physicians might interpret the label."[44]

Here, as this Court found with respect to Dr. Ross, Dr. Sul may testify as to the adequacy of the label from a "regulatory perspective," including offer testimony about the FDA regulatory framework, "what the regulations require," and Sanofi's "conduct with regard to the regulations,"[45] including Sanofi's "compliance therewith."[46] To the extent such regulatory opinions constitute legal conclusions, this Court has found such testimony permissible.[47] Dr. Sul may not, however, opine about the label from a "clinical perspective," as she is not qualified to do so (and regardless, Sanofi's other experts will address this issue).

---

[44] *In re* Mirena IUD Prods. Liab. Litig., 169 F. Supp. 3d 396, 464, 465 (S.D.N.Y. 2016).

[45] *See Robinson*, 588 F. Supp. 3d at 736 (citing *In re* Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig., MDL NO. 2445, Civ. A. No. 16-5073, 2020 WL 6887885 (E.D. Penn. Nov. 24, 2020)).

[46] *See In re Fosamax*, 645 F. Supp. 2d at 191.

[47] *See* Doc. 628 at 13–14.

## B.     Foreign Regulatory Bodies

Finally, Plaintiffs seek to exclude Dr. Sul's opinions related to foreign regulatory bodies. Dr. Sul opines that "lacrimal duct obstruction," as described in the Taxotere label approved by the FDA, "adequately describes the potential adverse reaction at issue in this lawsuit" because "'lacrimal duct obstruction' was the specific medical term initially selected by" the EMA following its receipt of materials from Sanofi.[48] She also discusses the Taxotere labels reviewed and approved by the relevant regulatory authorities in Canada and Australia. Plaintiffs argue that her opinions are irrelevant and risk confusing the jury.

"Courts have found that evidence of foreign regulatory actions in products liability litigation is properly excluded as irrelevant and/or confusing."[49] In *In re Mirena*, the court precluded the plaintiffs' regulatory expert from testifying on foreign regulatory issues, except to the extent that she intended "refer to the fact of a particular foreign regulatory action as evidence of information available to" the manufacturer defendants "on the basis of which a regulatory obligation in the U.S. was triggered."[50] The court found that (1) the expert was not an expert in the laws of foreign jurisdictions, so she was not qualified to opine on foreign regulatory issues; (2) there was no reason to believe that the foreign regulatory framework was similar to the FDA's system; and (3) the expert's "report and proposed testimony in this area is a recitation of reports and regulatory actions, with little or no analysis,

---

[48] Doc. 460-2 at 57–58.

[49] *In re Mirena*, 169 F. Supp. 3d at 488 n.87 (collecting cases).

[50] *Id.* at 477–78.

which is not proper expert testimony because it is not helpful to the trier of fact."[51] The court noted, however, that the plaintiffs could provide direct evidence of interactions with foreign bodies as evidence of the manufacturer's knowledge, provided it was otherwise admissible.[52]

Here too, the Court concludes that Dr. Sul's opinions related to foreign regulatory bodies should be excluded, as Dr. Sul is not qualified to opine on these issues. As other courts have found, "experts are not 'appropriate vehicles' for introduction of evidence related to foreign regulatory actions because [the] subject of that testimony is a lay matter."[53] Further, her opinions on these issues are likely of limited relevance and pose a substantial risk of confusion.[54] As such, Dr. Sul may not discuss the contents of foreign labels or actions taken by foreign regulatory bodies.  Sanofi responds that Dr. Sul's discussion of Sanofi's interactions with the EMA is relevant background information, pointing out that Dr. Sul explains that the EMA's identification of "nine cases of canalicular fibrosis from a non-Sanofi sponsored clinical trial involving trastuzumab" was the catalyst for conducting "a cumulative review of canalicular fibrosis and lacrimation disorder" associated with the use of Taxotere. Plaintiffs, however, do not seek to exclude these statements in her report. Regardless, the Court finds that Dr. Sul may discuss this fact, as it is relevant to Sanofi's interactions with the FDA. Finally, to the extent the

---

[51] *Id.* at 477.

[52] *See id.* at 478, 488.

[53] *Id.* (quoting *In re Rezulin*, 309 F. Supp. 2d at 553).

[54] *In re* Xarelto (Rivaroxaban) Prods. Liab. Litig., MDL No. 2592, Case No. 2:14-md-02592, Doc. No. 7194, at 5 (E.D. La. Aug. 1, 2017) (Fallon, J.). In *In re Xarelto*, the Court noted that such evidence was likely excludable as "irrelevant, confusing, and misleading," but reserved ruling on the issue pending trial context. *Id.*

14

parties seek to provide direct evidence of what information Sanofi provided to the EMA as relevant to any other issues, such as its knowledge of the risk at the time, they may do so, provided such evidence is otherwise admissible.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Plaintiffs' Motion to Exclude Dr. Sul (Doc. 460) is **GRANTED IN PART** and **DENIED IN PART,** as follows:

1. Plaintiffs' request to exclude Dr. Sul's opinions regarding the FDA's mindset and/or preferences (Doc. 460-2, ¶¶ 94–96) is **GRANTED IN PART** and **DENIED IN PART**. Dr. Sul may offer the opinions in paragraphs 95–96 of her report, which address FDA practices and procedures. Further, Dr. Sul may offer her testimony that "although a CBE-0 can be enacted without FDA approval, in practice, FDA will respond promptly with feedback for urgent safety updates and in many cases may have already discussed a CBE-0 with the sponsor prior to submission," which is located at paragraph 94. The remainder of Dr. Sul's opinions in paragraph 94 will be excluded.

2. Plaintiffs' request to exclude Dr. Sul's opinions regarding the "lacrimal system" (Doc. 460-2, ¶¶ 107–111) is **DENIED.**

3. Dr. Sul's label adequacy opinions (Doc. 460-2, ¶¶ 72 and 177-7) is **GRANTED IN PART** and **DENIED IN PART**. Dr. Sul may offer testimony about the label from a "regulatory perspective." She may not, however, offer testimony about the adequacy of the label from a "clinical perspective."

15

4. Plaintiffs' request to exclude Dr. Sul's opinions related to foreign regulatory actions (Doc. 460-2, ¶¶ 162–167) is **GRANTED.**

New Orleans, Louisiana this 22nd day of May, 2026.

 

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

16